**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | |
|---|---|
| SOUTH CAROLINA STATE CONFERENCE OF THE NAACP; IBRAM X. KENDI; AYANNA MAYES; MARY WOOD; T.R., a minor by and through their father and next friend, TODD RUTH-ERFORD; and J.S., a minor by and through their mother and next friend, AMANDA BRADLEY, | |
| Plaintiffs, | Civil Action No. 3:25-cv-487-SAL |
| v. | |
| ELLEN WEAVER in her official capacity as South Carolina Superintendent of Education; LEXINGTON COUNTY SCHOOL DISTRICT THREE; and SCHOOL DISTRICT FIVE OF LEXINGTON & RICHLAND COUNTIES, | |
| Defendants. | |

### DEFENDANTS WEAVER'S AND LEXINGTON COUNTY SCHOOL DISTRICT THREE'S RENEWED MOTION TO DISMISS PLAINTIFFS' COMPLAINT

Oral argument requested

NELSON MULLINS RILEY & SCARBOROUGH LLP

Miles E. Coleman
Fed. ID No. 11594
miles.coleman@nelsonmullins.com
William A. Neinast
Fed. ID No. 13172
will.neinast@nelsonmullins,com
2 West Washington Street, Suite 400
Greenville, SC 29601
(864) 373-2300

*Attorneys for Ellen Weaver, in her official capacity as South Carolina Superintendent of Education, and Lexington County School District Three*

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. III

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................... 3

    I.     The General Assembly enacted Budget Proviso 1.79 in the 2024–25 state budget. ...................................................................................................... 3

    II.    District Three removed one of Kendi's books from its libraries due to factual errors and omissions, but kept two of his other books about race and racism. .................................................................................................... 5

    III.   The South Carolina Department of Education elected not to renew a pilot of two Advanced Placement classes, one of which was an African American Studies course. ............................................................................................ 7

    IV.   Two employees of District Five experienced uncertainty and anxiety about the Budget Proviso, but they concede they suffered no penalty, sanction, or repercussion. ............................................................................................... 9

    V.    The NAACP seems not to have been harmed at all, either directly or vicariously through its members. ..................................................................... 10

STANDARD OF REVIEW .................................................................................................... 11

ARGUMENT ..................................................................................................................... 12

    I.     The case should be dismissed because Plaintiffs lack standing. ............................ 12

         A.   The Supreme Court and Fourth Circuit require a plaintiff to allege concrete, traceable, redressable injuries, not just speculation or future aspirations. ..................................................................................... 12

         B.   The Student Plaintiffs' allegations fail to plead an injury because one of them has only a generic, indefinite desire to take AP African American History someday, the others already have access to the equivalent local honors course, and, in any event, their 'injury' is not traceable to Weaver or redressable by the Court. ...................................... 15

         C.   Kendi was not excluded from District Three's libraries, much less on the basis of his viewpoints, and therefore has not established a constitutional injury. ................................................................................. 18

         D.   Wood and Mayes have not suffered any injury sufficient to confer standing, much less one that is traceable to Defendants. .......................... 20

         E.   The NAACP lacks standing. .................................................................. 23

    II.    The case should be dismissed because the Complaint fails to state any viable claims. .................................................................................................... 24

A.    Count One fails because public school students have no constitutional right to select the curricula they wish, and, in any event, Defendant Weaver's decision was reasonably related to legitimate pedagogical concerns. ..............................................................24

    1.    Defendant Weaver's decision not to renew the AP African American Studies course cannot violate the First Amendment because the selection and curation of public-school curricula is government speech that is not subject to the Free Speech Clause. .....25

    2.    Public school students have no constitutional right to dictate public school curricula. ..............................................................26

    3.    Defendant Weaver's decision not to renew the AP African American Studies course was permissible because it was reasonably related to pedagogical concerns. ......................................27

        a.    Under *Hazelwood*, public officials have broad discretion to regulate public school curricula. ...........................................28

        b.    The Fourth Circuit, applying *Hazelwood*, has consistently held that a public school's governing body may dictate the school's curricula without violating the Free Speech Clause. ...............................................................29

B.    Count Two fails because District Three's decision to remove *Stamped* from its school libraries does not violate Plaintiff Kendi's First Amendment rights. .......................................................31

    1.    The selection, curation, and management of public school library materials is government speech that is not subject to the Free Speech Clause.......................................................................31

    2.    Kendi has not alleged (and cannot allege) facts capable of supporting a claim that District Three removed *Stamped* for viewpoint discriminatory reasons rather than because of the book's factual errors and omissions. .................................................33

C.    Count Three fails because reframing a failed First Amendment claim as a Due Process claim cannot create a viable cause of action where none exists.................................................................37

D.    Counts Four and Five fail because reframing a failed First Amendment claim as an Equal Protection claim cannot create a viable cause of action where none exists. .................................................38

III.    Plaintiffs' claims are effectively preempted by recent federal mandates that duplicate the Proviso's requirements, and Plaintiffs' alleged injuries cannot, therefore, be redressed by the relief they seek in this suit. .....................................40

CONCLUSION..................................................................................................41

<u>T</u>ABLE OF <u>A</u>UTHORITIES

**Page(s)**

**Cases**

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
    557 F.3d 1177 (11th Cir. 2009) .................................................................14, 15, 16, 34, 35, 36

*Ammari v. City of Los Angeles*,
    988 F. Supp. 2d 1139 (C.D. Cal. 2013) ...................................................................................37

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................................................................11

*Blau v. Fort Thomas Pub. Sch. Dist.*,
    401 F.3d 381 ............................................................................................................................27

*Board of Education, Island Trees Union Free School District No. 26 v. Pico*,
    457 U.S. 853 (1982).....................................................................................................33, 34, 35

*Boring v. Buncombe County Bd. of Educ.*
    136 F.3d 364 (4th Cir. 1998) ...............................................................................28, 29, 30, 38

*Bradley v. Pittsburgh Bd. of Educ.*,
    910 F.2d 1172 (3d Cir.1990)....................................................................................................38

*Brinsdon v. McAllen Indep. Sch. Dist.*,
    863 F.3d 338 (5th Cir. 2017) .............................................................................................26, 38

*Bryant v. Gates*,
    532 F.3d 888 (D.C. Cir. 2008) (Kavanaugh, J., concurring) ...................................................32

*C.H. v. Rankin Cnty. Sch. Dist.*,
    415 Fed. App'x 541 (5th Cir. 2011) ...................................................................................26, 38

*C.K.-W. by and through T.K. v. Wentzville R-IV School District*,
    619 F. Supp. 3d 906 (E.D. Mo. 2022).....................................................................................35

*Cal. Parents for Equalization of Educational Materials v. Torlakson*,
    973 F.3d 1010 (9th Cir. 2020) .................................................................................................27

*Chiras v. Miller*,
    432 F.3d 606 (5th Cir. 2005) .............................................................................................31, 32

*Corales v. Bennett*,
    567 F.3d 554 (9th Cir. 2009) ...................................................................................................37

*Doe v. Obama*,
   631 F.3d 157 (4th Cir. 2011) .........................................................................................12, 14

*Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. Pshp.*,
   213 F.3d 175 (4th Cir. 2000) .................................................................................................11

*Edwards v. City of Goldsboro*,
   178 F.3d 231 (4th Cir.1999) ..................................................................................................39

*Galibois v. Fisher*,
   No. 04–cv–444–JD, 2007 WL 1246452 (D.N.H. Apr. 27, 2007)...........................................37

*Hazelwood Sch. Dist. v. Kuhlmeier*,
   484 U.S. 260 (1988)................................................................................................27, 28, 29

*Hufford v. McEnaney*,
   249 F.3d 1142 (9th Cir. 2001) ...............................................................................................37

*Illinois Dunesland Preservation Soc'y v. Illinois Dept. of Natural Resources*,
   584 F.3d 719 (7th Cir. 2009) .................................................................................................33

*Katyle v. Penn Nat. Gaming, Inc.*,
   637 F.3d 462 (4th Cir. 2011) .................................................................................................11

*Kirkland v. Northside Indep. Sch. Dist.*,
   890 F.2d 794 (5th Cir.1989) ..................................................................................................38

*Lee v. York Cnty. Sch. Div.*,
   418 F. Supp. 2d 816 (E.D. Va. 2006) ...................................................................................38

*Logan v. Lockett*,
   No. 07–1759, 2009 WL 799749 (W.D.Pa. Mar. 25, 2009) ...................................................37

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992).......................................................................................... *passim*

*Mayer v. Monroe County Community School Corp.*,
   474 F.3d 477 (7th Cir.2007)           25

*Mazevski v. Horseheads Central School District*,
   950 F. Supp. 69 (W.D.N.Y. 1997)....................................................................................26, 38

*McCann v. Mangialardi*,
   337 F.3d 782 (7th Cir. 2003) .................................................................................................37

*Morrison v. Bd. of Ed. of Boyd Cnty.*,
   521 F.3d 602 (6th Cir. 2008) .................................................................................................39

*Muir v. Ala. Educ. Television Comm'n*,
   688 F.2d 1033 (Former 5th Cir. 1982) (en banc) ...................................................34

*Nampa Classical Academy v. Goesling*,
   447 Fed. App'x 776 (9th Cir. 2011) .........................................................................26

*Orin v. Barclay*,
   272 F.3d 1207 (9th Cir. 2001) ..................................................................................39

*Page v. Lexington Cnty. Sch. Dist.*,
   No. 3:06-249-CMC, 2007 WL 2123784 (D.S.C. July 20, 2007)...........................31

*People for the Ethical Treatment of Animals v. Gittens*,
   414 F.3d 23 (D.C. Cir. 2005) ..............................................................................32, 33

*Phillips v. LCI Int'l, Inc.*,
   190 F.3d 609 (4th Cir. 1999) .......................................................................................3

*Pickens County Branch of the NAACP, et al v. Sch. Dist. of Pickens Cnty*,
   Civil Action No. 8:23-cv-01736-JDA (July 20, 2023) ..........................................5, 6

*Pinkley, Inc. v. City of Fredrick*,
   191 F.3d 394 (4th Cir. 1999) ......................................................................................11

*Pleasant Grove City v. Summum*,
   555 U.S. 460 (2009).....................................................................................................25

*Presidents Council, District 25 v. Community School Board No. 25*,
   457 F.2d 289 (2nd Cir.), cert. denied, 409 U.S. 998 (1972) ...................................36

*Richmond, Fredericksburg & Potomac R.R. v. United States*,
   945 F.2d 765 (4th Cir. 1991) ......................................................................................11

*Seamons v. Snow*,
   84 F.3d 1226 (10th Cir. 1996) ..............................................................................26, 38

*Searcey v. Harris*,
   888 F.2d 1314 (11th Cir. 1989) ..................................................................................29

*Sutliffe v. Epping School District*,
   584 F.3d 314 (1st Cir. 2009).......................................................................................33

*United States v. Am. Libr. Ass'n, Inc.*,
   539 U.S. 194 (2003)...............................................................................32, 33, 34, 37

*Warth v. Seldin*,
   422 U.S. 490 (1975)......................................................................................................11

*Webster v. New Lenox Sch. Dist. No. 122*,
917 F.2d 1004 (7th Cir. 1990) .......................................................................38

*White Tail Park, Inc. v. Stroube*,
413 F.3d 451 (4th Cir. 2005) ..........................................................................3

**Rules**

Fed. R. Civ. P. 12(b)(1)..........................................................................1, 3, 11, 40

Fed. R. Civ. P. 12(b)(6)..........................................................................1, 11, 38, 41

Fed. R. Civ. P. 12(h)(3)........................................................................................3

Local R. Civ. P. 7.04 D.........................................................................................1

**Statutes**

S.C. Code Regs. 43-170, *available at* https://ed.sc.gov/state-board/state-board-of-
education/library-regulation/library-files/sbe-regulation-43-170/ ............................6

**Other Authorities**

*Black's Law Dictionary* 154 (8th ed. 2004) ................................................................35

*Black's Law Dictionary* 1322 (8th ed. 2004) ..............................................................35

District Three, Policy IJL Library Materials Selection and Adoption, *available at*
https://boardpolicyonline.com/?b=lex3&s=263430 (last visited March 18,
2025) ............................................................................................................6

H. 5100, 2023–2024 Gen. Assemb., 125th Sess., Part 1B § 1.79 (S.C. 2024) ...............4

Memorandum from C. Matthew Ferguson, Deputy Superintendent, S.C.
Department of Education, *Clarification on AP Course Offerings* (June 4,
2024) ........................................................................................................7, 8, 17

Ibram Kendi website, *Barracoon*, https://www.ibramxkendi.com/barracoon..............7

Ibram Kendi website, *How To Be An Antiracist*,
https://www.ibramxkendi.com/how-to-be-an-antiracist (last visited March 18,
2025) .......................................................................................................7, 19

Ibram Kendi website, *Stamped*, https://www.ibramxkendi.com/stampedbook (last
visited March 18, 2025) ....................................................................................5

Ileana Najarro, *Can South Carolina Schools Teach AP African American Studies?
It's Complicated*, Educ. Week (June 6, 2024) ..........................................................8, 9

Joe Pearlman, *Latest Kendi disclosures highlight Charlotte-Meck Schools' extravagance*, CAROLINA JOURNAL (Oct. 10, 2023) ....................................................6

Mark G. Yudof, *Personal Speech and Government Expression*, 38 CASE W. RES. L. REV. 671, 683 (1987)............................................................................................26, 31

*Random House Unabridged Dictionary* 1630 (2d ed.1993) .........................................35

Ronald D. Rotunda & John E. Nowak, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE § 18.39 (5th ed. 2013).............................................39

South Carolina State Board of Education, Final Opinion No. 2024-0004 (Nov. 26, 2024), https://ed.sc.gov/state-board/state-board-of-education/library-regulation/books-under-review-forms/a-court-of-frost-starlight-final-order/.........................10

Stephanie Saul, *An Ambitious Antiracism Center Scales Back Amid Allegations of Poor Management*, NEW YORK TIMES (Sept. 23, 2023), https://www.nytimes.com/2023/09/23/us/ibram-x-kendi-antiracism-boston-university.html ...........................................................................................................6

Valerie Nava, *State Nixed AP African American Studies Course. Charleston County May Offer Honors Version*, Post & Courier (Aug. 15, 2024) ........................................8

Ellen Weaver, in her official capacity as South Carolina Superintendent of Education (the "Superintendent"), and Lexington County School District Three ("District Three") move under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) to dismiss the Plaintiffs' suit because the Plaintiffs lack standing and they have failed to state causes of action on which relief can be granted.[1]

## INTRODUCTION

This lawsuit arises from a budget proviso enacted by the General Assembly as part of the 2024–2025 State Budget. The proviso prohibits the use of state funds to teach certain divisive concepts in public schools, including that one race or sex is inherently better than another or that an individual, by virtue of his race or sex, is inherently racist, sexist, or oppressive. Plaintiffs—a coalition of two high school students, a teacher, a librarian, an author, and the NAACP—filed this suit asserting five causes of action alleging constitutional violations arising from the proviso and its alleged effects on them. Defendants Weaver and District Three moved to dismiss the suit. In response, Plaintiffs amended their Complaint to try to paper over the defects the Defendants had identified. But nothing in the Amended Complaint changes the inevitable conclusion. Plaintiffs' suit must be dismissed for at least three reasons.

*First*, the Plaintiffs lack standing. Start with the students. They claim that because of the proviso, they've lost the future opportunity to take a particular Advanced Placement class. But they've still not pled any facts that can establish a constitutional injury. One of them admits he had only an inchoate desire to enroll someday. But indefinite future aspirations do not a constitutional injury make. The others already have what they seek. Their district offers an honors class that covers the same content and allows them to sit for the AP exam. They aren't injured, so they lack standing.

The next Plaintiff, author Ibram Kendi, fares no better. He claims he was injured by being

---

[1] Pursuant to Local Civil Rule 7.04 D.S.C., a full explanation of the motion is provided herein, and, accordingly, a separate supporting memorandum would serve no useful purpose.

"excluded" from District Three's libraries, allegedly because of his views about race and racism. But that's just not true. Although District Three removed one of his books in 2022 due to its factual distortions, errors, and omissions, the District has at all relevant times—before, during, and after that removal (and still today!)—housed at least two other books by Kendi (and scores of books by other authors) about race and racism. Kendi and his viewpoint haven't been excluded. No exclusion means no injury, and no injury means no standing.

The school employee Plaintiffs likewise failed to allege any injury. They allege only that they felt surveilled and feared adverse employment action, but they tacitly admit they never experienced any adverse action, penalty, or sanction. Again, no injury means no standing. Nor can the NAACP establish standing. The Amended Complaint adds a few paragraphs in an effort to show an injury, but it still falls short. The NAACP members' "concern" about educational policy isn't a cognizable injury; the alleged uncertainty of its teacher members about what they can teach isn't either; and the two student members who allegedly wanted to take the AP course still have access to an honors class that covers the same content and allows them to take the AP exam.

*Second*, even if the Plaintiffs had standing, their suit should be dismissed because they failed to state viable claims for relief. For one, the selection, curation, and management of public-school curricula and library materials are government speech not protected by the Free Speech Clause. But even leaving that aside, the claims still fall short. The Fourth Circuit and courts across the country have recognized that public officials have broad discretion over school curricula. And neither the Supreme Court nor the Fourth Circuit has ever adopted the test that Plaintiffs propose for the curation of public school libraries. This Court shouldn't adopt it either. Nor can Plaintiffs' attempt to reframe their First Amendment claims as Due Process and Equal Protection Clauses create a viable claim where none existed before. Other courts have rejected similar attempts, ruling that students, school employees, and organizations don't have a due process or equal protection

right in school curricula, course selections, or AP availability. This Court should reject those claims, too. Plaintiffs haven't stated claims on which relief can be granted.

*Third*, even if Plaintiffs had viable claims, they couldn't be redressed in this suit. The proviso has been essentially duplicated by recent federal mandates, and even if the Court enjoined the proviso, it would not change Plaintiffs' circumstances or redress their alleged injuries.[2]

<u>**FACTUAL BACKGROUND**</u>[3]

Plaintiffs—the South Carolina State Conference of the NAACP, author Ibram X. Kendi, educators Mary Wood and Ayanna Mayes, and minors T.R. and J.S.—filed this suit challenging Section 1.79 of the 2024–2025 South Carolina Appropriations Bill (the "Proviso"), and similar provisos enacted since 2021. (Am. Compl. ¶ 1, ECF No. 34.) The 96-page Amended Complaint recounts nearly 300 years of racial injustice and inequality in South Carolina, which—while tragic and shameful—predates or is legally irrelevant to Plaintiffs' claims. The following summary contains only the facts necessary and sufficient to dismiss the Amended Complaint.

**I.     The General Assembly enacted Budget Proviso 1.79 in the 2024–25 state budget.**

The crux of Plaintiffs' case is the Budget Proviso enacted by the General Assembly as part of the 2024–2025 State Budget. All five of Plaintiffs' causes of action are premised expressly on

---

[2] Another reason may in the future support dismissal, namely that it will be moot by the time the Court considers it. That's because each of the claims and alleged harms stem from and depend on the continued vitality of Proviso 1.79. The Proviso, however, like every South Carolina budget proviso, is effective only for the fiscal year following its enactment. It will expire, as a matter of law, on June 30, 2025, and the suit will be moot. *See* Rule 12(h)(3), Fed. R. Civ. P.

[3] These facts are drawn from the allegations of the Amended Complaint and the documents and incorporated by reference therein. *See Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (noting a court may consider documents that are "integral to and explicitly relied on in the complaint" without converting a motion to dismiss into one for summary judgment). In addition, to the extent this Motion arises under Rule 12(b)(1) for lack of standing, the facts include those drawn from the parties' declarations and other exhibits. *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005) (noting that when ruling on a motion to dismiss for lack of standing, the court may consider evidence outside the pleadings without converting the motion to one for summary judgment).

the alleged unconstitutionality of the Proviso, and each of Plaintiffs' substantive Requests for Relief relates explicitly to the Proviso. (*See id.* ¶¶ 243–45 [Count One], 164, 247–51 [Count Two], 254–65 [Count Three], 270–80 [Count Four], 283–85 [Count Five], and pp. 93–95 [Requests for Relief A–I].) The Proviso prohibits the expenditure of state funds for instruction on concepts identified by the General Assembly as partisan or ideologically divisive, including teaching that:

(1) one race or sex is inherently superior to another race or sex;

(2) an individual, by virtue of his race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously;

(3) an individual should be discriminated against or receive adverse treatment solely or partly because of his race or sex;

(4) an individual's moral standing or worth is necessarily determined by his race or sex;

(5) an individual, by virtue of his race or sex, bears responsibility for actions committed in the past by other members of the same race or sex;

(6) an individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his race or sex;

(7) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by members of a particular race to oppress members of another race; and

(8) fault, blame, or bias should be assigned to a race or sex, or to members of a race or sex because of their race or sex.

H. 5100, 2023–2024 Gen. Assemb., 125th Sess., Part 1B § 1.79 (S.C. 2024) (text unaltered) (formatted for ease of readability).[4] The Proviso expressly allows professional development training addressing unconscious bias in the context of literary or historical instruction regarding historical discrimination. *Id.* The Amended Complaint alleges that an identical proviso had been enacted in the state budget for each of the preceding three years. (Am. Compl. ¶ 1.)

The Amended Complaint refers to allegedly invidious comments made by three members of the General Assembly. (*Id.* ¶¶ 76, 142, 210, 215.) From this, Plaintiffs extrapolate the

---

[4] https://www.scstatehouse.gov/sess125_2023-2024/appropriations2024/tap1b.htm#s1 (accessed March 17, 2025).

remarkable proposition that the entire General Assembly, the Defendants, and the law itself are motivated by racism or are racist in effect. (*See id*. ¶¶ 122, 140, 151–53, 168–70, 212, 266–80).[5]

Defendant Ellen Weaver, Superintendent of Education for the State of South Carolina, is responsible for implementing state education laws and policies enacted by the legislature, including the Proviso. (*See* Am. Compl. ¶ 24.) Defendants District Three and District Five are local educational subdivisions subject to compliance with legislative mandates, including the Proviso. (*See id.* ¶¶ 24–25.) Neither Weaver, District Three, nor District Five was involved in passing the Proviso.

## II.   District Three removed one of Kendi's books from its libraries due to the book's factual errors and omissions but kept two of his other books about race and racism.

In 2020, District Three acquired two copies of *Stamped: Racism, Antiracism, and You* ("*Stamped*") by Ibram Kendi and Jason Reynolds. (*See* Declaration of Ashley Atkinson ("Atkinson Decl.") ¶ 3, **Exhibit A**.) The book is intended for young adults and "reveals the history of racist ideas in America." *See* https://www.ibramxkendi.com/stampedbook (last visited April 22, 2025); (*see also* Am. Compl. ¶ 16). The authors emphasize that *Stamped* is not a normal history book. *See* Ibram X. Kendi & Jason Reynolds, *Stamped* at 1 (2020). Rather, they say, it is a book that talks about history to expose racist ideas in America. *Stamped* at 1; (*see also* Am. Compl. ¶ 16).

In October 2022, District Three convened a committee including a teacher, administrator, media specialist, and community member to review the educational suitability of *Stamped*. (Am. Compl. ¶¶ 164–65.) At the conclusion of its review, the committee recommended the removal of *Stamped* from the District's middle school library and its high school library. (*Id*. ¶ 164.) In Plaintiffs' view, the District "banned" *Stamped* "due to concerns that it violated the Budget Proviso" and because the District disagreed with the viewpoints expressed in the book—not

---

[5] Similarly, Plaintiffs allege that discriminatory intent can be imputed to Weaver, District Three, District Five, and the Legislature based on three centuries of South Carolina history plus comments from the Governor, former Governor, and former State Superintendent. (*See* Am. Compl. ¶ 273.)

because of any legitimate pedagogical reason. (*Id.* ¶¶ 164, 173.) The Amended Complaint's allegations, however, are not supported by—and, in fact, are contrary to—the documents they rely on. Most notably, the review committee's report (*see* Am. Compl. ¶ 164) *does* provide legitimate pedagogical, non-viewpoint-discriminatory reasons for the committee's recommendation, namely the fact that *Stamped* contained "inaccuracies," "conjecture," and a "lack of objectivity." *See* Committee Report (Nov. 30, 2022), attached hereto as **Exhibit B**.[6 & 7]

Furthermore, District Three's libraries still contain other books by Plaintiff Kendi that discuss similar subjects as *Stamped* and that convey Kendi's perspective and purpose of addressing contemporary and historic racism and racial injustice in America. Specifically, since 2020 (and still today), District Three's libraries house Kendi's book *How to Be an Antiracist*, that—in Kendi's words—"reshapes the conversation about racial justice in America" and combines "ethics, history, law, and science" to "rethink" and "reexamine[] the policies and larger social structures"

---

[6] This conclusion was not unique to District Three. *See*, *e.g.*, Expert Declaration of Professor David Bernstein, ECF No. 21-1, *Pickens County Branch of the NAACP, et al v. Sch. Dist. of Pickens Cnty*, Civil Action No. 8:23-cv-01736-JDA (July 20, 2023) (recounting the numerous factual errors, omissions, and misrepresentations in *Stamped*); Joe Pearlman, *Latest Kendi disclosures highlight Charlotte-Meck Schools' extravagance*, CAROLINA JOURNAL (Oct. 10, 2023), https://www.carolinajournal.com/opinion/latest-kendi-disclosures-highlight-charlotte-meck-schools-extravagance/ ("The academic rigor of Kendi's work has received no small amount of criticism."); Stephanie Saul, *An Ambitious Antiracism Center Scales Back Amid Allegations of Poor Management*, NEW YORK TIMES (Sept. 23, 2023), https://www.nytimes.com/2023/09/23/us/ibram-x-kendi-antiracism-boston-university.html (noting that Boston University's Center for Antiracist Research, led by Ibram Kendi, had abruptly laid off more than half of its employees amidst complaints from employees and scholars of color who alleged mismanagement by Kendi, and noting that Kendi's "work has been criticized by some scholars who question its academic rigor").

[7] Incidentally, District Three—like nearly every district in the State—recently adopted a new policy for the review of materials including library books. *See* District Three, Policy IJL Library Materials Selection and Adoption, *available at* https://boardpolicyonline.com/?b=lex3&s=263430 (last visited March 18, 2025). This policy, which was adopted in November 2024, aligns with a new statewide regulation promulgated by the State Board of Education governing the selection, curation, and removal of instructional materials. *See* S.C. Code Regs. 43-170, *available at* https://ed.sc.gov/state-board/state-board-of-education/library-regulation/library-files/sbe-regulation-43-170/. Plaintiffs have not sought review under this new standard, nor has the State Board of Education yet had occasion to consider *Stamped* under the new statewide regulation.

in America today. *See* https://www.ibramxkendi.com/how-to-be-an-antiracist (last visited April 22, 2025); (*see also* Atkinson Decl. ¶ 4.) District Three's library collection also includes Kendi's book *Barracoon: Adapted for Young Readers—The Story of the Last Black Cargo*. (*See* Atkinson Decl. ¶ 4); (*see also* https://www.ibramxkendi.com/barracoon.)

III.   **The South Carolina Department of Education elected not to renew a pilot of two Advanced Placement classes, one of which was an African American Studies course.**

In 2022, one South Carolina high school tested out a new Advanced Placement ("AP") course in African American Studies ("AP AAS") that was being piloted by the College Board, a private nonprofit that develops and administers the SAT and AP courses. (Am. Compl. ¶ 218.) In the second year of its pilot status (the 2023–24 school year), the program expanded to 12 of South Carolina's 249 public high schools. (*Id.*)

On June 4, 2024, the South Carolina Department of Education released a memorandum notifying school districts that two new AP classes would not be added to the regular roster for the 2024–25 school year: AP Precalculus and AP AAS. (*See id.* ¶ 227 n.191 (citing Memorandum from C. Matthew Ferguson, Deputy Superintendent, S.C. Department of Education (June 4, 2024) ("Ferguson memorandum").[8]) The Complaint alleges that this memorandum disrupted the plans of "countless" unidentified students who had allegedly "planned to enroll" in the class in the future. (*Id.*) Plaintiff T.R., for example, alleges that he had hoped to take the class someday. (Am. Compl. ¶ 19; Declaration of T.R. (ECF No. 30-10) ¶ 13). Plaintiff J.S. alleged her mom had inquired with a guidance counselor about registering, but she could not take the AP class after it was not renewed. (Am. Compl. ¶ 18); Declaration of J.S. (ECF No. 30-11) ¶¶ 17–18).

In Plaintiff's view, the Department's decision to postpone the assignment of a permanent course code to AP AAS was motivated by invidious, partisan, or discriminatory motivations and, therefore, was unconstitutional. But the facts reveal a very different explanation. Ferguson's

---

[8] https://www.ed.sc.gov/newsroom/school-district-memoranda-archive/clarification-on-ap-course-offerings/clarification-on-ap-course-offerings-memo/)

memorandum provided two explanations for the Department's decision: (1) to ensure compliance with state law and (2) to await the conclusion of the then-pending, regularly scheduled review and update of statewide social studies standards before approving any new social studies classes. (*See* Ferguson memorandum.) The memo reiterated the Department's "unwavering commitment to teaching the factual historical experience of African Americans to our students," and highlighted some of the ways the Department was affirmatively doing so. *Id.* Ferguson also noted that districts could continue to "offer AP African American Studies as a locally-approved honors course should they choose to do so, in addition to continuing to offer other approved African American courses as districts have already done for a number of years." (*Id.*); (*see also* Am. Compl. ¶ 228.)

That is precisely what has happened in districts throughout the state. In fact, the opportunity is even better than what Ferguson suggested. Two of the sources cited in the Amended Complaint (*see id.* ¶¶ 219 nn.183–84) expressly state that districts in South Carolina, including Richland County School District Two—the district in which plaintiff T.R. is a student—will continue offering the AP AAS course content in a local honors class format. *See* Valerie Nava, *State Nixed AP African American Studies Course. Charleston County May Offer Honors Version*, Post & Courier (Aug. 15, 2024) ("Richland Two school board members in Columbia have already approved an honors version of the halted course.");[9] Ileana Najarro, *Can South Carolina Schools Teach AP African American Studies? It's Complicated*, Educ. Week (June 6, 2024);[10] (*contra* Am. Compl. ¶ 238.)  In addition, South Carolina students taking an AAS honors class can still sit for the AP exam and receive college credit. *See* Nava, *State Nixed AP* (noting that students enrolled in the local honors classes "will also have the opportunity to take the AP exam," and that "New York-based College Board, the nonprofit developing curricula and administering AP tests, has

---

[9] https://www.postandcourier.com/education-lab/charleston-schools-african-american-studies-ap-honors/article_97f72c66-5a42-11ef-9082-db96cd28371d.html.

[10] https://www.edweek.org/teaching-learning/can-south-carolina-schools-teach-ap-african-american-studies-its-complicated/2024/06.

authorized South Carolina schools that offer an honors version of African American studies as an AP course" and "will allow students to take the AP test for potential college credit"); Najarro, *Can South Carolina Schools Teach AP African American Studies?* (same).

The Amended Complaint includes no factual allegations indicating that District Three had any involvement in decisions related to the AP AAS course or that it has any discretion regarding statewide curriculum decisions. Plaintiffs J.S. and T.R. are minor students attending Richland County schools outside District Three. (*Id.* ¶¶ 18–19.) Even though the AP AAS class is currently available to J.S. (a student in Richland Two) and could be available to T.R. at the discretion of his school district (Richland One), they allege they've been harmed by the South Carolina Department of Education's pause on the AP AAS statewide course code. (*Id.*)

## IV. Two employees of District Five experienced uncertainty and anxiety about the Budget Proviso, but they concede they suffered no penalty, sanction, or repercussion.

Plaintiff Mary Wood, an Advanced Placement English teacher at Chapin High School (a school in District Five), alleges that school administrators required her to modify an assignment regarding systemic racism in response to concerns about the Budget Proviso. (Am. Compl. ¶ 17.) She further alleges that she received a reprimand from administrators, heard threats of adverse employment action, and experienced alleged "reputational damage" when the District allegedly "contemplated" adverse employment action, although she acknowledges no disciplinary action has occurred. (*Id.* ¶ 112.) She alleges she was forced to modify her lesson plans and choice of supplemental materials. (*Id.* ¶¶ 113–14, 176–80.) According to Wood, these curricular modifications and her uncertainty amounted to a threat to her "personal safety," though she alleges no facts—only a bare assertion—to support that alleged injury. (*Id.* ¶ 118.)

Similarly, Plaintiff Ayanna Mayes, a librarian also employed by District Five, claims she was directed to remove or restrict student access to certain library books, and she alleges increased "surveillance" of her activities, resulting in the cancellation of "library initiatives." (*Id.* ¶¶ 20, 103.) Mayes has not identified anyone responsible for this, and she does not allege that any formal

9

disciplinary action occurred. Instead, she alleges she is unable to understand some of the words in the Budget Proviso, that she had to alter a flier she had made promoting "banned books," and that she removed some books from the school library—many of which contain graphic sexual scenes that have nothing to do with the Budget Proviso.[11] (*Id*. ¶¶ 97–102.) On these bases, Wood and Mayes allege violations of their Due Process and Equal Protection rights. (*Id*. ¶¶ 252–85.)

## V.     The NAACP seems not to have been harmed at all—either directly or vicariously through its members.

Finally, Plaintiff South Carolina State Conference of the NAACP (the "NAACP") alleges broader theoretical harms from enacting the Budget Proviso statewide, asserting generalized impact related to race education and equity discussions. (*Id*. ¶ 18–19.) However, the Amended Complaint does not explicitly allege any direct actions or harms attributable to Defendant Weaver or District Three (or District Five for that matter) that affected or injured the NAACP. Instead, it lumps the NAACP in with the students, author, and school employees to assert claims under the First Amendment and the Due Process and Equal Protection Clauses. (*See id*. ¶¶ 21–23 and Counts One, Three, Four, and Five [asserted by various combinations of the "Equal Protection Plaintiffs" or the "Employee Plaintiffs" or the "Student Plaintiffs"].) The Amended Complaint barely even tries (and, ultimately, fails) to establish organizational standing for the NAACP.  In 96 pages, the most it can muster is vague assertions that the NAACP has members who are (1) teachers who "do not know what is permissible to teach under the Budget Proviso" and (2) students who "are not unable to receive the information in AP AAS." (Am. Compl. ¶¶ 119, 239.). The Amended Complaint alleges that two of its student members had plans to take the class. (*Id*. ¶ 232.) But both of them, like

---

[11] The books in the *Court of Rose and Thorns* series (*see* Am. Compl. ¶ 108) are fantasy novels unrelated to the topics addressed in the Budget Proviso but some of which have been challenged and removed from public school libraries by the State Board of Education due to their sexually explicit contents. *See*, *e.g*., State Bd. of Ed., Final Order and Opinion No. 2024-0004 (Nov. 26, 2024), https://ed.sc.gov/state-board/state-board-of-education/library-regulation/books-under-review-forms/a-court-of-frost-starlight-final-order/ and Committee Recommendation and excerpts https://ed.sc.gov/state-board/state-board-of-education/instructional-materials-review-committee/report-and-recommendations/4-a-court-of-frost-and-starlight-rrpdf/.

Plaintiff J.S., are students in Richland Two, which, as noted above, offers an honors AAS class that covers the same subject and allows students to get dual credit and take the AP exam.

### STANDARD OF REVIEW

**Standing.** "Federal courts are courts of limited subject matter jurisdiction, and as such there is no presumption that the court has jurisdiction." *Pinkley, Inc. v. City of Fredrick*, 191 F.3d 394, 399 (4th Cir. 1999). Whether a plaintiff has standing to warrant the invocation of federal court jurisdiction presents a threshold question in every federal case. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The burden of proving subject matter jurisdiction in response to a Rule 12(b)(1) motion to dismiss is on the plaintiff, the party asserting jurisdiction. *Richmond, Fredericksburg & Potomac R.R. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). When the Rule 12(b)(1) motion challenges the facts underlying a Complaint's jurisdictional assertions, "the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Id.*

**Failure to state a claim.** A motion to dismiss under Rule 12(b)(6) tests the complaint's legal sufficiency. *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. Pshp.,* 213 F.3d 175, 180 (4th Cir. 2000). The court must take the facts in the light most favorable to the plaintiff, but need not accept the legal conclusions drawn from the facts. *Id.* at 175. The court need not accept "unwarranted inferences, unreasonable conclusions, or arguments" as true. *Id.* at 175. A complaint must provide more than labels and conclusions to survive a 12(b)(6) motion. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face." *Id.* Courts may consider documents integral to the complaint or referenced in it, even if not physically attached to the complaint. *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011).

<u>ARGUMENT</u>

**I.     The case should be dismissed because Plaintiffs lack standing.**

Article III of the Constitution limits the federal courts to adjudicating actual "cases" and "controversies." *See Doe v. Obama*, 631 F.3d 157, 160 (4th Cir. 2011). "[S]tanding is an essential and unchanging part" of that case-or-controversy requirement. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" of standing has three elements, each of which must be established. *Id*. First, the plaintiff must have suffered an "injury in fact," an invasion of a legally protected interest which is concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Id*. Second, there must be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Id*. Third, it must be "likely," not merely "speculative" that the injury will be "redressed by a favorable decision." *Id*. at 561. Plaintiffs' allegations fail to satisfy these elements.[12]

**A.     The Supreme Court and Fourth Circuit require a plaintiff to allege concrete, traceable, redressable injuries, not just speculation or future aspirations.**

In the Supreme Court's seminal standing case, *Lujan*, environmental organizations challenged the joint regulation of the Fish and Wildlife Service, which required that federal agencies consult the Secretary of the Interior about certain threats to endangered species and habitats. 504 U.S. at 558–59. The environmental organizations sued, seeking a declaratory judgment and an injunction. *See id.* The Secretary moved to dismiss for lack of standing. *Id*. at 559. The district court dismissed, but the court of appeals reversed. *Id*.

---

[12] Plaintiffs' standing is evaluated based on the allegations of the Complaint (or, here, the Amended Complaint), not extraneous or subsequent declarations. S*ee Harty v. Burlington Coat Factory of South Carolina, LLC*, No. 3:11–1138–MBS, 2012 WL 264688 at *4 (D.S.C., Jan. 30, 2012). Even if the Court were to consider the Plaintiffs' declarations submitted in support of their Motion for Preliminary Injunction, those declarations still wouldn't suffice to establish standing, as explained in Weaver's and District Three's Response in Opposition to that Motion (ECF No. 46).

In discussing the injury-in-fact requirement, the Supreme Court stated that the plaintiffs needed to submit evidence or affidavits establishing a sufficiently concrete, particularized, actual, or imminent injury. *Id*. at 562–63. The environmental organizations had submitted affidavits of two members, Joyce Kelly and Amy Skilbred, in an attempt to establish that the Services' regulation would cause them to suffer the requisite injury. *Id.* at 563. Ms. Kelly swore in her affidavit, which was filed in 1988, that she had previously "traveled to Egypt in 1986 and 'observed the traditional habitat of the endangered [N]ile crocodile there and intends to do so again.'" *Id.* She also swore that if she returned to Egypt in the future, she would "'suffer harm in fact as the result of the American role in overseeing the rehabilitation of the Aswan High Dam on the Nile and in developing Egypt's Master Water Plan.'" *Id*. (quoting Ms. Kelly's affidavit).

Ms. Skilbred swore in her 1988 affidavit that previously "she traveled to Sri Lanka in 1981 and 'observed the habitat' of 'endangered species such as the Asian elephant and the leopard' at what is now the site of the Mahaweli project funded by the Agency for International Development." *Id*. (quoting Ms. Skilbred's affidavit). That project, she predicted, "'will seriously reduce endangered, threatened, and endemic species habitat.'" *Id*. (alterations omitted). Her desire to use and enjoy these endangered species would be harmed, Ms. Skilbred said, "because she 'intends to return to Sri Lanka in the future and hopes to be more fortunate in spotting at least the endangered elephant and leopard.'" *Id*. When asked at her deposition "when she had any plans to return to Sri Lanka,'" Ms. Skilbred answered, "'I intend to go back to Sri Lanka,'" but "'I don't know when. . . . I don't know. Not next year, I will say. In the future.'" *Id.* at 563–64.

Those two affidavits, the Supreme Court found, "plainly contain no facts . . . showing how damage to the species will produce 'imminent' injury to Mses. Kelly and Skilbred":

> [T]he affiants' profession of an "inten[t]" to return to the places they had visited before . . . is simply not enough. Such "some day" intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the "actual or imminent" injury that our cases require.

13

*Id.* The Court continued:

> Although "imminence" is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending. It has been stretched beyond the breaking point when, as here, the plaintiff alleges only an injury at some indefinite future time[.]

*Id.* at 564 n.2 (citation omitted).

In *Doe v. Obama*, the Fourth Circuit interpreted, applied, and expounded on the Supreme Court's "some day intentions" language. 631 F.3d at 163. In that case, the plaintiffs asserted that parents who "are actively considering adopting" human embryos had standing to challenge an Executive Order 13505 that removed restrictions on research involving human embryonic stem cells. *Id.* at 159, 162. These parents claimed that "implementation of Executive Order 13505 will 'reduce the number of *in vitro* human embryos available for adoption' such that they will be unable to adopt." *Id.* at 162 (quoting Br. of Appellants at 53). The court concluded that this allegation was insufficient for the court to "infer that such injury would be 'actual or imminent.'" *Id.* (quoting *Lujan*, 504 U.S. at 564). The court explained, "*Lujan*'s requirement that plaintiffs have some concrete plan constrains us" because "[t]he plaintiff parents here did not allege that they have already tried and failed to adopt embryos, nor do they allege any concrete plans for future adoption, so the possibility that they will never suffer the alleged injury looms too large." *Id.* at 163.

The Eleventh Circuit has similarly interpreted the Supreme Court's "some day intentions" language in a case analogous to this one. *See ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1196−98 (11th Cir. 2009). In that case, the ACLU of Florida sued a school board for removing *Vamos a Cuba* and other books in a series called "A Visit to" from the school's libraries as a violation of their members' First Amendment rights to freedom of speech and access to information and their Fourteenth Amendment rights to due process. *Id.* at 1188. Mark Balzli, a member of that chapter of the ACLU, swore in his declaration that: (1) his son was a student at North Beach Elementary School; (2) he wanted his son to have access to *Vamos a Cuba* and the

14

other books in the "A Visit to" series; (3) he saw *Vamos a Cuba* in the North Beach Elementary library; and (4) he had planned to check the book out of the library with his son "in the future," but they "will be unable to do so when school resumes on August 14, 2006" because of the school board's order removing the series. *Id*. (internal citations omitted). The court concluded that Mr. Balzli's declaration established an injury in fact as to *Vamos a Cuba* but not as to the other books in the "A Visit to" series. *Id*. at 1195, 1197–98.

The court's analysis turned on whether Mr. Balzli's declaration evidenced that the anticipated injury would occur within some fixed period of time in the future. *See id.* at 1194. The court observed that Mr. Balzli's declaration, dated July 5, 2006, stated that he anticipated checking out *Vamos a Cuba* "when school resumes on August 14, 2006," and that this showed a specific intention pegged to a sufficiently fixed period of time. *Id.* On the other hand, the court found that the plaintiffs' declarations did not carry their burden of showing that they face a threat of imminent injury from the removal of any of the *other* "A Visit to" books from the school district's libraries. *Id*. at 1197. The plaintiffs' declarations did not state that there was a concrete plan to check out any of the other "A Visit to" books when school resumed. *Id*. at 1196. Instead, the court concluded that the plaintiffs' "declarations merely establish a free-floating desire to access the other books in the 'A Visit to' series, a desire untethered to any intended action during any reasonably specific period of time." *Id.* The court held that this free-floating desire was like the declarations in *Lujan*, where the Supreme Court found imminence to be lacking. *Id*.

**B.    The Student Plaintiffs' allegations fail to plead an injury because one of them has only a generic, indefinite desire to take AP African American History someday, the others already have access to the equivalent local honors course, and, in any event, their "injury" is not traceable to Weaver or redressable by the Court.**

Plaintiffs T.R. and J.S. and NAACP student members J.C. and A.G. are high school students who claim that the Budget Proviso has harmed them by causing the pilot program for the AP AAS class to be removed from the State's course code catalog. (Am. Compl. ¶ 13, 232.) Their

claim is directed against Weaver for enforcing the proviso that allegedly led to the course's removal and allegedly violated their First Amendment right to receive information and ideas and their Fourteenth Amendment right to equal protection and due process. (*Id.* ¶¶ 240–45, 252–65, 266–80, and 281–85.) They lack standing to bring the claims.[13]

To establish an injury-in-fact, T.R. and J.S. (and the two NAACP student members) must demonstrate a concrete and particularized invasion of a legally protected interest that is actual or imminent. *Lujan,* 504 U.S. at 560. The students have not faced, nor could they face, any penalty, sanction, punishment, or other adverse action or the threat of any of those things under the Proviso. Their claims of educational harm from the removal of the pilot program AP AAS course code are speculative and lack the requisite concreteness and particularity. For example, the Complaint alleges that T.R., a sophomore enrolled at A.C. Flora High School in Richland County School District One, has an inchoate desire someday to take AP AAS, but he took no concrete steps to do so and had no imminent, definite plans to take the class. (*See* Am. Compl. ¶ 19.) Similarly, the NAACP student members J.C. and A.G. merely "attend schools that [had] planned to offer the AP AAS course" but now they "will no longer be able to take the course." (*Id.* ¶ 238.) Even the *Amended* Complaint doesn't offer any degree of factual allegations of concrete, particular plans to take the class in the imminent future. Vague, hypothetical "plans" to take a pilot program course "some day" in the future cannot give rise to injury-in-fact, and without more, T.R.'s (and J.C.'s and A.G.'s) allegations here amount to no more than Ms. Skilbred's plans to go to Sri Lanka "[i]n the future." *Lujan,* 504 U.S at 563–64. As a matter of law, therefore, they lack standing.

The other student Plaintiff is J.S., a junior at Spring Valley High School. (*See* Declaration of J.S. ("J.S. Decl.") ¶¶ 1-2, ECF No. 3-11.) In the Amended Complaint, she alleges that her mom

---

[13] Incidentally, Representative Todd Rutherford—the father of a minor plaintiff and, in that representative capacity, a nominal plaintiff in this suit—would himself lack standing if he were a real party in interest. That's because he voted in favor of the proviso. *See* 2024-25 Appropriations Bill, Roll Call Vote history, https://www.scstatehouse.gov/votehistory.php?KEY=25541.

emailed her guidance counselor to see if J.S. could enroll in the AP AAS course for the 2024–2025 school year, but J.S. later learned through her guidance counselor that the class would no longer be offered. (Am. Compl. ¶ 18). Even assuming that was a sufficiently concrete plan of action to establish standing (which isn't conceded), J.S. still lacks standing because her district offers an honors AAS class that would cover the same material and would allow her to sit for the AP exam. *See* pp. 8–9, *supra*.  The same is true for the NAACP's two student members, J.C. and A.G., who (even if they had made concrete plans to take the class) are also students in Richland Two high schools and could take the honors class.

Further, the student Plaintiffs lack standing because their alleged injuries aren't traceable to Weaver. South Carolina school districts retain the ability to offer AAS as an Honors course, even if the AP designation has been removed. The AP AAS course was initially offered in South Carolina merely as a temporary "pilot program" rather than a standard AP course (Am. Compl. ¶ 184), and there wasn't any guarantee that it would immediately and automatically be converted to a standard AP course at the conclusion of the initial pilot period. Neither the Budget Proviso nor any other action or omission of Weaver prohibits districts from providing instruction on African American Studies, and the Ferguson Memo (*see* note 8 and accompanying text, *supra*) affirmatively encouraged districts to do so. Therefore, the students' alleged harm of being unable to learn about African American Studies is not attributable to the Budget Proviso itself or to Weaver. And J.S.'s (and J.C.'s and A.G.'s) District is, in fact, doing so! (*See* notes 9–10 and accompanying text, *supra*.) And T.R.'s district could do the same if it wishes. If his district chooses not to, the solution isn't to sue Weaver. Therefore, the student Plaintiffs' alleged injury is not traceable to any named Defendant, and they lack standing to bring their claims. *See Lujan,* 504 U.S. at 560.

The Student Plaintiffs have another traceability problem, too.  To the extent T.R.'s alleged injury—the inability to take the AAS class even as an Honors class—is due to his district choosing

not to offer that class, his district's decision is not attributable to Weaver. The decision to offer AAS as an Honors course lies within the discretion of the individual school districts. (*See* Am. Compl. ¶ 93.) The decision of their district to offer or refrain from offering AAS as an Honors course would consequently not be attributable to Weaver. Plaintiffs have not demonstrated that their district has refused or is unable to offer the course as an Honors option. Without pleading that their district has definitively excluded African American Studies from its available curricula, the students' claims remain speculative and hypothetical.

Additionally, the student Plaintiffs have not shown that their alleged injuries are redressable by a favorable decision in this case. Even if the Court were to declare the Proviso unconstitutional and reinstate the AP designation, it is speculative to assume that the students would be able to enroll in the course. The districts retain discretion over their course offerings, and there is no guarantee that a district *would* offer the AP AAS course just because it could, nor is there any guarantee that either student would be able to secure a spot in the class. Consequently, the students' claims fail to meet the requirements for standing under Article III of the Constitution.

### C.   Kendi was not "excluded" from District Three's libraries, much less on the basis of his viewpoints, and therefore has not established a constitutional injury.

Plaintiff Ibram X. Kendi, an author, alleges that District Three removed *Stamped* from its libraries due to the Budget Proviso and because the District's disagreed with his viewpoints expressed in the book. (Am. Compl. ¶¶ 164, 249–50.) Kendi asserts that this removal caused personal and professional harm and negatively impacted his ability to disseminate his messages in schools. (*Id*. ¶¶ 16, 249.) Kendi lacks standing to bring this lawsuit because he has not demonstrated an injury in fact, causation, or redressability as required by Article III.

At the outset, Kendi lacks standing for a fundamental factual reason: he hasn't been excluded from District Three's libraries. As noted in the Factual Background above, District Three's libraries still house Kendi's book *How to Be an Antiracist* and *Barracoon: Adapted for*

18

*Young Reader—The Story of the Last Black Cargo*. *See* **Exhibit A** (Atkinson Decl. ¶ 4). Kendi describes the former book as one that "reshapes the conversation about racial justice in America" and helps the reader to "rethink" and "reexamine" the "policies and larger social structures" in America today. https://www.ibramxkendi.com/how-to-be-an-antiracist (visited April 22, 2025). Kendi's books and perspectives on race, racism, antiracism, and the black experience in America have not been "excluded" from District Three's libraries. He lacks standing to claim otherwise.

But even if we focus solely on *Stamped*, he still lacks standing.  To establish an injury-in-fact, Kendi must demonstrate a concrete and particularized invasion of a legally protected interest that is actual or imminent. *Lujan,* 504 U.S. at 560. Kendi's nebulous claim of "personal and professional harm" due to the removal of *Stamped* from school libraries is speculative and lacks the requisite concreteness and particularity. (*See* Am. Compl. ¶ 16.) There is no factual allegation that, even if true, could show that one rural school district's removal of *Stamped* has tangibly affected his personal or professional life in a way that meets the legal standard for injury. For instance, there is no evidence that the removal has led to a significant loss of income, damaged his reputation in a measurable way, or otherwise impacted him or his career in any direct and substantial way. Plaintiff Kendi's general statement of "personal and professional harm" fails to establish any concrete financial injury, because Lexington Three had already purchased the copies of *Stamped* which the review committee then voted to remove.

Likewise, Kendi's assertion that the removal of *Stamped* negatively impacts his ability to disseminate his personal messages in schools is insufficient to establish an injury-in-fact. That's because at least two of Kendi's other books, including *How to Be an Antiracist*, remain available in the libraries of District Three. *See* **Exhibit A** (*See* Atkinson Decl. ¶ 4). The continued availability of Kendi's other works undermines his claim of harm as it demonstrates that his ability to disseminate his message regarding race, racism, and anti-racism has not been curtailed.

19

Even if Kendi could establish an injury-in-fact, he must also demonstrate a causal connection between the injury and the conduct of which he complains. *Lujan,* 504 U.S. at 560. The injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Id.* Here, there's no traceability between the Budget Proviso and Kendi's alleged harm. The proviso, which prohibits the expenditure of state funds by schools for instruction on certain concepts, does not directly regulate Kendi's actions or prevent him from "disseminating his messages." And the proviso doesn't have any enforcement mechanism or penalties that can be brought to bear directly against Kendi.

### D.   Wood and Mayes have not suffered any injury sufficient to confer standing, much less one that is traceable to Defendants.

Plaintiffs Mary Wood and Ayanna Mayes, both educators, claim that the Budget Proviso has caused them professional harm and violated their constitutional rights. Plaintiff Mayes alleges that she was ordered to remove or limit access to certain books from the Chapin High School library, that she experienced increased surveillance and scrutiny of her work, and that unspecified individuals have "requested [the] cancellation of several library initiatives." (Am. Compl. ¶¶ 20, 98, 257.) Plaintiff Wood alleges she was required to modify a lesson plan on argumentative essay writing about systemic racism to include additional perspectives, and she received a letter of reprimand from administrators when she had initially failed to do so. (*Id*. ¶¶ 17, 114.) Both educator Plaintiffs have brought void-for-vagueness claims against Weaver. Additionally, Plaintiff Mayes has brought Equal Protection claims against Weaver. Both Plaintiffs lack standing because they have not demonstrated injury-in-fact, causation, or redressability as required by Article III.

To establish an injury-in-fact, Plaintiffs Wood and Mayes must demonstrate a concrete and particularized invasion of a legally protected interest that is actual or imminent. *Lujan*, 504 U.S. at 560. It is not apparent from Plaintiffs' Amended Complaint that either educator Plaintiff has suffered any concrete injury attributable to the actions of any named Defendant. Plaintiffs allege

that because of actions allegedly taken pursuant to the Proviso by unnamed District Five administrators, Plaintiff Mayes has been subject to "increased surveillance and scrutiny of her work." (Am. Compl. ¶ 98.) She does not describe who has taken these supposed surveillance measures, when they allegedly began or ended, or how they have impacted her employment in any way. Plaintiffs have not pleaded that Plaintiff Mayes has been subject to any actual professional discipline, suspension, or termination in any way. Indeed, the Proviso itself contains no terms by which an educator such as Plaintiff Mayes could be so penalized. Put simply, "increased surveillance and scrutiny" of one's work is not a legally cognizable or redressable injury. Such nebulous, unspecific, claims of "increased surveillance and scrutiny" do not amount to a concrete, particularized injury, and accordingly do not satisfy the injury in fact standing requirements under *Lujan*.

Plaintiff Wood fares no better. She claims she has "faced *threats* of adverse employment action from School District Five Defendant administrators." (Am. Compl. ¶ 112 (emphasis added).) However, she does not plead that she has *actually suffered* any adverse employment action (much less at the hands of Weaver or District Three, neither of whom employ her). Nor does Wood specify the nature of these "threats," identify the alleged threatening parties, or clarify how these "threats" amount to a concrete legal injury. Like Plaintiff Mayes, she remains employed. (Am. Compl. ¶ 112.) The alleged "threats" of adverse employment action are vague and unspecified, failing to demonstrate a concrete injury. Wood has not pleaded that she suffered any actual discipline, suspension, termination, or any other concrete injury.

Even if Plaintiffs Wood or Mayes could establish an injury-in-fact, they must also demonstrate a causal connection between the injury and the conduct of which they complain. *Lujan*, 504 U.S. at 560. The injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. *Id.*

21

Mayes' alleged injury is not fairly traceable to Defendants' actions, and certainly not to Weaver's or District Three's actions. The Budget Proviso does not directly regulate her actions or prevent her from managing the library. And the Proviso does not contain any enforcement or penalty mechanism that can be brought to bear directly against these two Plaintiffs or any other school district employee. The decision to remove or limit access to library initiatives or books was made by school administrators from District Five, not Weaver or District Three.

Wood's alleged injury is likewise not traceable to Weaver or District Three. Plaintiffs do not plead that either of them placed the letter of reprimand in her file, made the alleged "threats" of adverse employment action, or instructed her to modify her lesson plans. This lack of traceability is fatal to all of Wood's and Mayes' claims against Weaver and District Three, regardless of how those claims are denominated (*e.g.*, Due Process, Equal Protection, etc.).

Moreover, Proviso 1.79, both facially and as-applied, does not empower Weaver to take any punitive action against individual teachers for alleged violations. The Proviso's enforcement mechanism—the hypothetical diminution of State funds—is directed at the school districts, not the teachers. Any adverse employment actions or increased scrutiny (if any) experienced by the teachers is the result of decisions made by their respective school administrators, not by Weaver. The causal connection between the Proviso and the alleged injuries is too attenuated to establish standing against Weaver (much less District Three, which has no nexus to Wood or Mayes at all).

Finally, Wood and Mayes must demonstrate that it is likely, not merely speculative, that the injury will be redressed by a favorable decision. *Lujan*, 504 U.S. at 561. They seek to have the Budget Proviso declared unconstitutional and enjoined, but this relief is not likely to redress their alleged injuries. Even if the Court were to grant the relief sought, it is speculative to assume that school administrators would allow Wood to teach her original lesson plan without modification. The district retains discretion over its curriculum, and there is no guarantee that Wood's lesson

22

plan would be reinstated. Similarly, it is speculative to assume that the removal or limitation of access to certain books would be reversed if the Court grants the relief sought. The district retains discretion over its library materials, and there is no guarantee that the books would be reinstated.

### E. The NAACP lacks standing.

Plaintiff NAACP-South Carolina ("NAACP") claims that the Budget Proviso has caused harm to its members and the organization itself by restricting educational content related to racial and gender inequalities. It alleges that this enforcement of the Proviso violates its First Amendment right to receive information and ideas, and its Fourteenth Amendment rights to equal protection and due process. However, the NAACP lacks standing to bring this lawsuit because it has not demonstrated an injury in fact, causation, or redressability as required by Article III.

To establish an injury-in-fact, the NAACP must demonstrate a concrete and particularized invasion of a legally protected interest that is actual or imminent. *Lujan*, 504 U.S. at 560. Here, the NAACP alleges that the Budget Proviso restricts educational content related to racial and gender inequalities, thereby harming its members and the organization itself. (Am. Compl. ¶ 15). However, the NAACP has not alleged that any specific member has suffered a concrete and particularized injury as a result of the Budget Proviso. Its claims of harm due to the Budget Proviso—harms that its pleading describes as "concern[s]" (*id*.)—are merely "conjectural" and "hypothetical," and these speculative claims lack the requisite concreteness and particularity. *See Lujan,* 504 U.S. at 560. As a matter of law, vague statements of "concern" about hypothetical harm are not constitutionally sufficient to establish standing. *Lujan,* 504 U.S. at 560.

The NAACP lacks organizational standing, too, because the complaint fails to allege with adequate specificity that the group has members who had concrete, imminent plans to take the AP AAS course or to check *Stamped* out in District Three. (*See* discussion of the Student Plaintiffs' lack of standing, *supra*.) For an organization to establish standing, it must show that its members

would have standing to sue in their own right, which requires showing that the members have suffered or will imminently suffer a concrete and particularized injury. The Amended Complaint's references to the impact on students are generalized and lack the necessary detail to establish standing. Paragraph 239, for example, only vaguely states that two of the NAACP's student members attend schools that had previously offered the AP AAS course or had planned to offer it are "no longer [] able to" receive the information in the course. Plaintiffs do not plead specific facts showing that any member of the NAACP was registered for or had concrete, imminent plans to take the AP AAS course. Instead, they make vague assertions about the inability to take the class if they wanted to, which does not meet the threshold for demonstrating an imminent injury. Without concrete allegations that specific members of the NAACP were directly injured by the challenged actions, the organization cannot demonstrate that it has standing.

Even if the NAACP could establish an injury, it must also demonstrate a causal connection between the injury and the conduct of which it complains. *Lujan,* 504 U.S. at 560. The injury must be traceable to the challenged action of the defendants, and not the result of the independent action of some third party not before the court. *Id.* The NAACP cannot do so. Its alleged injury is not fairly traceable to the actions of Defendants. The decision to implement the Budget Proviso was made by the South Carolina General Assembly, not any named Defendant.

## II. The case should be dismissed because the Complaint fails to state any viable claims.

### A. Count One fails because public school students have no constitutional right to select the curricula they wish and because Defendant Weaver's decision was reasonably related to legitimate pedagogical concerns.

In Count One of the Amended Complaint, the Student Plaintiffs claim Defendant Weaver violated their First Amendment right to "receive information and ideas" by "prohibiting educators from teaching specific concepts about race and racism in public schools." (Am. Compl. ¶¶ 242–45.) Specifically, the Student Plaintiffs attempt to argue that Defendant Weaver's decision not to

offer the AP AAS course prevents them from receiving certain information in their preferred format, namely the AP AAS course.[14]  This argument fails for the reasons that follow.

       1.   *Defendant Weaver's decision not to renew the AP African American Studies course cannot violate the First Amendment because the selection and curation of public school curricula is government speech that isn't subject to the Free Speech Clause.*

A public school's selection and management of curricula is not the type of speech to which the First Amendment applies. Start with the general, undisputed proposition: the First Amendment does not regulate government speech. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.") (citations omitted). When, as here, government officials determine how public funds and spaces will be used to present ideas and messages, those decisions constitute government speech. *See id.* at 467–72 (holding that a city's decision of what privately-created material it would select and display on public grounds "constitute[s] government speech" and was a government-controlled message" that involved the government "speak[ing] for itself").

This principle also applies in the K12 public school context. The choice of curricula presented in public schools is government speech that is exempt from First Amendment scrutiny:

> Because Idaho charter schools are governmental entities, the curriculum presented in such a school is not the speech of teachers, parents, or students, but that of the Idaho government. The government's own speech is exempt from scrutiny under the First Amendment's speech clause. *See Pleasant Grove City v. Summum*, 555 U.S. 460 (2009). . . . A public school's curriculum, no less than its bulletin boards, is "an example of the government opening up its own mouth," [] because the message is communicated by employees working at institutions that are state-funded, state-authorized, and extensively state-regulated. *See Mayer v. Monroe County Community School Corp.*, 474 F.3d 477, 479–80 (7th Cir. 2007). Because the government's own speech is not

---

[14] Count One is not a model of clarity. Context, however, allows us to deduce what Count One must mean. This claim is asserted solely by the Student Plaintiffs—the two pseudonymous students, T.R. and J.S., and the NAACP (*see* Am. Compl. ¶ 23)—against Defendant Weaver alone. The only possible nexus between those Plaintiffs and that Defendant is the decision to pause the continuation of the AP AAS course. (*See also* Am. Compl. ¶ 245 (referring, at the conclusion of Count One, to the AP AAS course).)

subject to the First Amendment, plaintiffs have no First Amendment right to
compel that speech.

*Nampa Classical Academy v. Goesling*, 447 Fed. App'x 776, 778 (9th Cir. 2011); *see also* Mark

G. Yudof, *Personal Speech and Government Expression*, 38 CASE W. RES. L. REV. 671, 683 (1987)

("If the expression is governmental and not personal, students generally may not interfere with the

school's articulation of its own education messages. They do not have a constitutional right to add

or delete a course from the curriculum, alter the teacher's lesson plan, or scrutinize the school

district's choice of textbooks."). So too here. A public school's selection and management of its

curriculum is government speech that is not subject to the Free Speech Claus. Count One fails.

        2.   *Public school students have no constitutional right to dictate school curricula.*

Separate from the fact that the selection of public school curricula is government speech

that falls outside the purview of the First Amendment, Count One fails for another independent

reason:  Public school students have no constitutional right to be taught whatever, and however,

they wish. *See Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 350 (5th Cir. 2017) ("Students,

moreover, generally do not have a right to reject curricular choices as these decisions are left to

the sound discretion of instructors."); *C.H. v. Rankin Cnty. Sch. Dist.*, 415 Fed. App'x 541 (5th

Cir. 2011) (noting that a student "has no constitutional right to choose his own curriculum").

Courts have applied this principle to the exact sort of claim that the Student Plaintiffs assert

here and have held that students have no right to take Advanced Placement classes as opposed to

more pedestrian coursework. *Seamons v. Snow*, 84 F.3d 1226, 1234–1235 (10th Cir. 1996)

(holding a student did not have "a constitutional right to particular incidents of education" such as

"to take advanced placement classes");  *Mazevski v. Horseheads Central School District*, 950 F.

Supp. 69, 72 (W.D.N.Y. 1997) ("[P]laintiffs have cited no case which stands for the proposition

that a student has a protected property interest in participating in a particular class . . . . Many

courts have rejected arguments similar to those advanced by plaintiffs here. . . . there is no constitutional right to any one specific curricular or extracurricular activity.").

Likewise, to the extent the Student Plaintiffs are nominally represented by their parents in this litigation, the parents also lack a constitutional right to dictate a public school's curriculum. *See Cal. Parents for Equalization of Educational Materials v. Torlakson*, 973 F.3d 1010, 1020 (9th Cir. 2020) ("[W]ith respect to education, parents have the right to choose the educational forum, but not what takes place inside the school. . . . [T]he substantive due process right 'does not extend beyond the threshold of the school door.' [] Parents therefore do not have a due process right to interfere with the curriculum, discipline, hours of instruction, or the nature of any other curricular or extracurricular activities.") (citation omitted); *Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 395) (6th Cir. 2005) (holding parents have no right to decide the school curriculum).

Because neither the students, their parents, or the NAACP as their putative representative organization have a constitutional right to determine the makeup of public school curricula or to dictate exactly what and how they wish to be taught, Count One fails as a matter of law.

3. *Defendant Weaver's decision not to renew the AP African American Studies course was permissible because it was reasonably related to pedagogical concerns.*

Even if a public school's selection and management of curricula were the type of speech to which the Free Speech Clause applies and even if students had a right to dictate the precise topics and format of the curricula (neither of which is true), Plaintiffs still fail to state a viable claim related to the removal of the optional AP AAS course. That's because the students' ostensible right must yield to the legitimate pedagogical concerns of education officials. The Supreme Court has recognized that school officials have broad authority to exercise control—even content-based control—over curricula if their actions are "reasonably related to legitimate pedagogical concerns." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988).  The Fourth

Circuit has likewise afforded broad discretion to public officials when selecting and removing materials from curricula, even when those decisions are based on the content or viewpoint of the materials. *Boring v. Buncombe County Bd. of Educ.* 136 F.3d 364, 370–71 (4th Cir. 1998) (the "makeup of the curriculum of [a school] is by definition a legitimate pedagogical concern" entrusted to the discretion of "school authorities"). Accordingly, and as explained more fully below, under *Boring*, *Hazelwood*, and other cases, Plaintiffs have failed to state a claim on which relief may be granted.

        a.     *Under* Hazelwood*, public officials have broad discretion to regulate public school curricula.*

In *Hazelwood*, the principal at a Missouri high school refused to allow a journalism class to publish two stories in the student newspaper about pregnant students and the impact of divorce. 480 U.S. at 263–64. The principal was concerned the stories' contents were not age-appropriate for the audience. *Id.* at 263. The Supreme Court sided with the school administration, holding that these facts did not involve the suppression of students' First Amendment rights, but, rather, involved a school's control of expressive activities that are "part of the school curriculum." *Id.* at 270–71. Because the newspaper at issue was part of the curriculum, the school officials could exercise significant control over it. *Id.* at 271. The Court concluded that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273.

If that reasoning was true in *Hazelwood*, which involved school authority over *student*-written articles in a *student*-published newspaper to be accessed, received, and read by other students, it is doubly true here, where the dispute involves a pure curricular decision of whether to employ an AP class or an honors class to teach elective content. Under the rule of *Hazelwood*, the Superintendent of Education and other public education officials have wide latitude over the

selection, management, and removal of curriculum, instructional materials, course designations, state standards, and class offerings. Accordingly, the question of whether and when a topic should be taught through regular classes vs. honors classes vs. AP classes, and the question of how best to align those offerings with state social studies standards are legitimate pedagogical concerns vested in the discretion of the Superintendent and other public education officials. The exercise of that discretion does not violate the First Amendment.

> b.  *The Fourth Circuit, applying* Hazelwood*, has likewise held that public education officials may dictate a school's curricula without violating the Free Speech Clause.*

The Fourth Circuit has also considered this issue and sided with the authority of public education officials to dictate schools' curricula. *See Boring*, 136 F.3d at 369–70. *Boring* involved a high school teacher who chose a dramatic production for her advanced acting students to perform at a state competition, and, in preparation, the students performed a scene from the play for an English class at their high school. *Id*. at 366.  After a parent complained that the subject matter of the play was inappropriate for the students, the principal placed limitations on the play's contents for the competition and later requested the teacher's transfer from the school. *Id*. at 366–67.  The teacher filed suit, alleging in part that the school violated her freedom of speech. *Id*. at 367.

Citing *Hazelwood*, the Fourth Circuit took an expansive view of "curriculum," finding that curriculum includes school-sponsored publications, theatrical productions, and other expressive activities in addition to school curriculum "in a traditional classroom setting." *Id*. at 368 (citing *Hazelwood*, 484 U.S. at 271).  The court also found that under the test outlined in *Hazelwood*, the school had a "legitimate pedagogical interest" in excluding the play. *Id.* at 370.  Not only did the court reason that "pedagogical" refers broadly to anything "relating to teaching," but it also held that "makeup of the curriculum of [the school] is *by definition* a legitimate pedagogical concern." *Id*. (emphasis added) (citing *Searcey v. Harris*, 888 F.2d 1314, 1319 (11th Cir. 1989)). Ultimately,

the Fourth Circuit held that "[i]n the case of a public school, in our opinion, it is far better public policy, absent a valid statutory directive on the subject, that the makeup of the curriculum be entrusted to the local school authorities[.]" *Id*. at 371.

Plaintiffs will point out, one presumes, that *Boring* involved a *teacher's* claimed First Amendment right, not a *student's* claimed First Amendment right. And they'd be right that that's a factual distinction between Count One of this case and *Boring*. But it's a distinction that makes no difference. For one, *Hazelwood* already addressed that topic and held that education officials' expansive right to control curriculum (a) trumped students' interest in conveying or receiving information of interest to them, and (b) was robust and broad enough to include even control over the contents of curriculum-adjacent venues like student newspapers. In addition, the relevant parts of *Boring* cited above aren't limited by or dependent on the facts of that case or the fact that public employee's speech rights are more narrowly circumscribed that students' speech rights. Rather, the relevant holdings of *Boring* are from a section of the opinion that assumes for the sake of argument that the teacher had a free speech right but *still* concluded that the ostensible right must give way to the administration's extensive control over the school curriculum. The same is true here. Even assuming the Student Plaintiffs had a constitutional interest in learning in an AP format (which they don't), that interest must still yield to the established right of Defendant Weaver and education officials to select and manage curricula.

Accordingly, under both Supreme Court and Fourth Circuit precedent, Defendant Weaver cannot be in violation of the First Amendment by exercising her discretion over the selection of which courses will be offered in which ways because the selection and makeup of school curriculum is, by definition, a legitimate pedagogical concern. That's particularly true when, as here, the evidence cited and incorporated into the Amended Complaint indicates the opposite, namely that she and the South Carolina Department of Education had legitimate pedagogical

motivations and justifications for their acts.

**B.     Count Two fails because District Three's decision to remove *Stamped* from its school libraries does not violate Plaintiff Kendi's First Amendment rights.**

In Count Two of the Amended Complaint, Plaintiff Kendi claims that District Three's decision to remove his book, *Stamped*, from its school libraries constitutes viewpoint discrimination and violates the First Amendment. (Am. Compl. ¶¶ 246–51.) He is wrong for at least two reasons. Each is discussed below.

1.     *The selection, curation, and management of public school library materials is government speech that is not subject to the Free Speech Clause.*

Kendi's claim reaches the wrong conclusion because he starts from the wrong premise, namely his assertion that a public school library is a forum that he allegedly has a constitutional right to access. (Am. Compl. ¶ 248.) Not so. A public school's choice of some books for its libraries, and its rejection of others, is government speech; therefore, the selection, curation, and management of the library's contents is not subject to scrutiny under the Free Speech Clause, and the forum analysis framework proposed by Kendi doesn't apply. *See United States v. Am. Libr. Ass'n, Inc*., 539 U.S. 194, 205 (2003) (plurality) (hereinafter "*ALA*") ("[F]orum analysis and heightened judicial scrutiny are . . . incompatible with the discretion that public libraries must have to fulfill their traditional missions."); *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005) (affirming the dismissal of First Amendment suit brought by a textbook author and noting that two "key" points to the analysis were (1) that "in establishing and implementing certain governmental functions, the government, including its educational institutions, has the discretion to promote policies and values of its own choosing free from forum analysis or the viewpoint-neutrality requirement," and (2) "the government retains this discretion even where it chooses to employ private speakers to transmit its message"); *Page v. Lexington Cnty. Sch. Dist*., No. 3:06-249-CMC, 2007 WL 2123784, at *6 (D.S.C. July 20, 2007) (same); *see also* Mark G. Yudof, *Personal Speech and*

*Government Expression*, 38 CASE W. RES. L. REV. 671, 687 (1987) ("Even in the school library, the librarian must normally implement the board's decisions, and certainly the writers of the books do not have a constitutional right to determine what books will be acquired.").

Courts have concluded that library curation is government speech in the context of public libraries, and their reasoning applies even more strongly in the context of public school libraries, which are not passive repositories of information but are part of a governmental program designed to accomplish a particular purpose and convey specific ideas and message selected by the government. *See People for the Ethical Treatment of Animals v. Gittens*, 414 F.3d 23, 28 (D.C. Cir. 2005) (hereinafter "*PETA*") ("With respect to the public library, the government speaks through its selection of which books to put on the shelves and which books to exclude."); *Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (Kavanaugh, J., concurring) ("As the case law makes clear, 'government speech' can include not only the words of government officials but also 'compilation of the speech of third parties' by government entities such as libraries[.]"); *see also ALA*, 539 U.S. at 205 (plurality) ("Public library staffs necessarily consider content in making collection decisions and enjoy broad discretion in making them.");[15] *Chiras*, 432 F.3d 606, 615 (affirming the district court's dismissal of a First Amendment lawsuit brought by an author whose textbook was excluded from public schools, holding that "[b]ecause the Board must necessarily exercise its editorial discretion in selecting which private entities will convey the message the state selects, forum analysis and the viewpoint neutrality requirement are inapposite in this case.").

---

[15] *See also ALA*, 539 U.S. at 204 (plurality) ("To fulfill their traditional missions, public libraries must have broad discretion to decide what material to provide to their patrons."); *id*. (a library's "goal has never been to provide 'universal coverage,'" but rather "to provide materials 'that would be of the greatest direct benefit or interest to the community'") (citation omitted); *id*. ("libraries collect only those materials deemed to have 'requisite and appropriate quality'"); *id*. at 208 ("A library's need to exercise judgment in making collection decisions depends on its traditional role in identifying suitable and worthwhile material[.]"); *id*. at 217 (Breyer, J., concurring in judgment) (referring to "the discretion necessary to create, maintain, or select a library's 'collection'").

Selecting materials based on their "requisite and appropriate quality" necessarily means choosing some content and viewpoints while rejecting others, and the First Amendment allows this. *See ALA*, 539 U.S. at 204–08. When, as here, government officials determine how public funds and spaces will be used to present ideas and messages, those decisions constitute government speech. *See Sutliffe v. Epping School District*, 584 F.3d 314 (1st Cir. 2009) (rejecting the plaintiffs' Free Speech challenge and holding that when the government "uses its discretion to select between the speech of third parties for presentation" through government channels, that decision and selection constitutes government speech and "an expressive act by the government"); *see also Illinois Dunesland Preservation Soc'y v. Illinois Dept. of Natural Resources*, 584 F.3d 719, 721 (7th Cir. 2009) (rejecting the plaintiffs' Free Speech challenge and holding that the government's selection of which private messages to display or present to the public constitutes government speech); *PETA*, 414 F.3d at 28 (rejecting plaintiff's Free Speech claim and, analogizing to the library context, noting that "the government speaks through its selection of which books to put on the shelves and which books to exclude").

2. *Kendi has not alleged (and cannot allege) facts capable of supporting a claim that District Three removed Stamped for viewpoint discriminatory reasons rather than because of the book's factual errors and omissions.*

Plaintiff Kendi alleges that District Three violated the First Amendment by removing *Stamped* from its libraries. His claim fails, however, because the allegations and the materials incorporated in the Amended Complaint indicate that the book was removed due to its lack of intellectual rigor and its numerous errors and omissions. *See* Factual Background, *supra*.

The Supreme Court has only once considered the issue of whether a school district may remove books from a public-school library. *See Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853 (1982). As explained below, *Pico's* fractured opinions provide no applicable, controlling precedent here, and Plaintiffs cannot show that District Three

violated the First Amendment even under the most favorable (to them) standard articulated by the Supreme Court. (*See* Am. Compl. ¶¶ 248, 260.)

In *Pico*, a school board voted to remove nine books from the district's middle and high school libraries because they posed a "moral danger" to the students. *See* 457 U.S. at 857. Students at the school sued, claiming that the board violated their First Amendment rights by removing the books for "social, political, and moral" reasons. *Id.* at 865, 858–59. After the district court granted summary judgment for the school board, the Second Circuit reversed and remanded on the First Amendment claim. *Id.* at 859–60. The Supreme Court affirmed in a severely fractured decision.

The lead opinion by Justice Brennan was joined in full by only two justices (Justices Marshall and Stevens) and joined in part by Justice Blackmun. *Id.* at 855, 882. In total, seven Justices filed opinions in *Pico*, and the Court was divided four-to-four on the constitutional issue of whether and how, if at all, the First Amendment limits a school board's discretion to remove books from a school library. The result is that "*Pico* is of no precedential value as to the application of the First Amendment to these issues." *Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1045 n.30 (Former 5th Cir. 1982) (en banc) (plurality opinion of Hill, J.). With numerous opinions and "no part of any of them gathering five votes from among the nine justices . . . *Pico* is a non-decision so far as precedent is concerned. It establishes no standard." *ACLU of Fla., Inc.*, 557 F.3d at 1200.

*Pico* does not and cannot control. It does not establish a standard of review and has no precedential value for the First Amendment issue of whether school districts have the discretion to remove books from their libraries. Plaintiffs' claim depends on this Court adopting a legal theory not established by any controlling precedent. (*See* Am. Compl. ¶¶ 242, 260.) Plaintiffs have not sufficiently alleged that the District violated the First Amendment when it removed *Stamped*.

Even if this Court finds that Plaintiffs are entitled to the most favorable (to them) standard in *Pico*, Plaintiffs still cannot show that District Three violated the First Amendment. The best-case

scenario for Plaintiffs is for this Court to adopt a standard that failed to attract a majority in *Pico*: that school officials may not remove books from library shelves "simply because they dislike the ideas contained in those books and seek by their removal to prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Pico*, 457 U.S. at 872. But even if this standard applies, Plaintiff Kendi's claim *still* fails—he has not plausibly alleged that District Three removed *Stamped* for illicit reasons rather than for legitimate pedagogical reasons. The evidence Kendi incorporated in his complaint establishes that District Three removed *Stamped* due to the book's lack of candor and academic rigor and its inclusion of factual errors, among other pedagogical concerns. (Am. Compl. ¶ 164); **Exhibit B** (report of Committee's decision to remove *Stamped*).

As a threshold issue, Plaintiff Kendi has incorrectly and misleadingly asserted that the District "banned" *Stamped* from its libraries. (Am. Compl. ¶ 173.) Not so. Book banning "takes place where a government or its officials forbid or prohibit others from having a book." *ACLU of Fla., Inc.*, 557 F.3d at 1218; *see also Black's Law Dictionary* 154 (8th ed. 2004) (defining "ban" as "[t]o prohibit, esp[ecially] by legal means"). The term does not apply where a school district decides to remove a book from its own library shelves. *Id.* at 1219. The word "remove" means to "move from a place or position; take away or off." *Id.* (citing *Random House Unabridged Dictionary* 1630 (2d ed.1993)); *see also Black's Law Dictionary* 1322 (8th ed. 2004) (defining removal as "[t]he transfer or moving of a . . . thing from one location, position, or residence to another"). The District here did not "ban" *Stamped*. Students are still permitted to buy the book, own the book, check the book out from the public library, bring the book to school, or discuss the book with their friends. The District's selection of which books to include on its *own* library shelves is far from a "ban." *See C.K.-W. by and through T.K. v. Wentzville R-IV School District*, 619 F. Supp. 3d 906, 909 (E.D. Mo. 2022) (finding that it was "important at the outset for the Court to clarify something: this case does not involve banning books . . . [n]owhere do Plaintiffs

allege that the District has prohibited anyone from reading, owning, possessing, or discussing any book.  Rather, through a policy enacted by its elected school board, the District allows librarians to use their best judgment to remove books in select scenarios[.]"); *Presidents Council, District 25 v. Community School Board No. 25*, 457 F.2d 289 (2nd Cir.) ("The administration of any library, whether it be a university or particularly a public junior high school, involves a constant process of selection and winnowing based not only on educational needs but financial and architectural realities. To suggest that the shelving or unshelving of books presents a constitutional issue, particularly where there is no showing of a curtailment of freedom of speech or thought, is a proposition we cannot accept.").

Furthermore, the assertion in the Amended Complaint alleging that District Three did not remove *Stamped* for legitimate pedagogical reasons (*see* Am. Compl. ¶ 173) is flatly contradicted by the review committee's report (*see* Am. Compl. ¶ 164); (*see also* **Exhibit B**), which expressly states that *Stamped* was removed due to its factual and historical inaccuracies. Again, this is similar to *ACLU of Fla., Inc.*, in which the 11th Circuit held that the school district did not violate the First Amendment when it removed a book, reasoning that the "school board could remove book based upon numerous factual inaccuracies and misleading omissions therein." *Id*. at 1177.  The court found that "[w]hatever else it prohibits, the First Amendment does not forbid a school board from removing a book because it contains factual inaccuracies, whether they be of commission or omission. There is no constitutional right to have books containing misstatements of objective facts shelved in a school library." *Id*. at 1202.

Here, Plaintiffs have not plausibly alleged non-conclusory facts that, if true, would show that District Three intended to deny students access to ideas with which it disagreed or that such intent was the decisive factor in its decision. The only reason given for removing *Stamped* was because of its factual errors and omissions and its lack of educational suitability. *See* **Exhibit B**.

36

Plaintiffs' allegations that *other* people's disagreement with the book (including a couple of legislators who spoke in support of the Budget Proviso) cannot support their burden to plead (and later to prove) that District Three acted with improper motives.

### C. Count Three fails because reframing a failed First Amendment claim as a Due Process claim cannot create a viable cause of action where none exists.

Plaintiffs' third cause of action is just a First Amendment claim dressed up in Due Process garb. But a plaintiff cannot simply reframe her free speech arguments as a Fourteenth Amendment Due Process claim in hopes of finding a viable claim where none exists under the First Amendment. *Corales v. Bennett*, 567 F.3d 554, 569 n.11 (9th Cir. 2009) (noting the denial of the plaintiffs' First Amendment claims foreclosed consideration of their substantive due-process claim); *Hufford v. McEnaney*, 249 F.3d 1142, 1151 (9th Cir. 2001) ("If, in a § 1983 suit, the plaintiff's claim can be analyzed under an explicit textual source of rights in the Constitution, a court should not resort to the more subjective standard of substantive due process. [] In this case, because the First Amendment explicitly covers [plaintiff's] claim, the First Amendment, not the Fourteenth Amendment's guarantee of substantive due process, should guide the analysis of the [plaintiff's] claim[s].").[16]

To the extent this claim arises from the teachers' dissatisfaction with the curricular choices

---

[16] *See also McCann v. Mangialardi,* 337 F.3d 782, 786 (7th Cir. 2003) ("The Supreme Court has made it clear that a substantive due process claim may not be maintained when a specific constitutional provision . . . protects the right allegedly violated."); *Ammari v. City of Los Angeles*, 988 F. Supp. 2d 1139 (C.D. Cal. 2013) ("The City argues that substantive due process does not apply in this case, because the specific First Amendment rubric supplants the broader, more nebulous due-process protection . . . The City is correct that the First Amendment analysis applies in this case in lieu of substantive due process."); *Galibois v. Fisher*, No. 04–cv–444–JD, 2007 WL 1246452, at *4 (D.N.H. Apr. 27, 2007) ("Despite recasting [its] claim within the context of a liberty interest protected by the due process clause of the Fourteenth Amendment, [plaintiff's] claim remains, in essence, a First Amendment claim. The due process clause is not an appropriate means to address a First Amendment issue."); *Logan v. Lockett*, No. 07–1759, 2009 WL 799749, at *7 (W.D. Pa. Mar. 25, 2009) ("Thus, plaintiff's claim arises, if at all, under the First Amendment, and he cannot recast his claim as one involving a deprivation of due process.").

made by their superiors, they fail to state a claim. Teachers don't have a constitutional right in the makeup of the school curriculum under the First *or* Fourteenth Amendments. *See Boring v. Buncombe County Bd. of Educ.*, 136 F.3d 364, 370–71 (4th Cir.1998) (en banc) (teacher's choice of play not constitutionally-protected speech); *Webster v. New Lenox Sch. Dist. No. 122*, 917 F.2d 1004 (7th Cir. 1990) (affirming dismissal under Rule 12(b)(6) and holding the plaintiff teacher had neither a First Amendment right nor a Fourteenth Amendment right to choose and teach material the school district and administration had told him not to teach).[17]

To the extent this claim arises from the students' dissatisfaction about the class choice, students have no constitutional right to choose their curriculum. *Brinsdon v. McAllen Indep. Sch. Dist.*, 863 F.3d 338, 350 (5th Cir. 2017) ("Students, moreover, generally do not have a right to reject curricular choices as these decisions are left to the sound discretion of instructors."); *Seamons v. Snow*, 84 F.3d 1226, 1234–1235 (10th Cir. 1996) (holding a student didn't have "a constitutional right to particular incidents of education" such as "to take advanced placement classes").[18]

### D.    Counts Four and Five fail because reframing a failed First Amendment claim as an Equal Protection claim can't create a viable cause of action where none exists.

At the outset, restating a failed First Amendment claim as an Equal Protection claim does not suddenly transform it into a viable claim.  A plaintiff cannot manufacture a viable claim by

---

[17] *See also Lee v. York Cnty. Sch. Div.*, 418 F. Supp. 2d 816, 825 (E.D. Va. 2006) (holding that "curricular speech" encompasses nearly every aspect of a school employee's expression related to the school and is not protected by the Constitution); *see also Edwards*, 156 F.3d at 491–92 (holding that professor has no First Amendment right to compel university to allow him to teach class from a religious perspective); *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1176 (3d Cir. 1990) (holding that teacher has no First Amendment right to employ classroom teaching methodology of choice); *Kirkland v. Northside Indep. Sch. Dist.*, 890 F.2d 794, 795 (5th Cir. 1989) (teacher's choice of supplemental reading list not constitutionally-protected speech).

[18] *See also C.H. v. Rankin Cnty. Sch. Dist.*, 415 Fed. App'x 541 (5th Cir. 2011) (noting that a student "has no constitutional right to choose his own curriculum"); *Mazevski v. Horseheads Central School District*, 950 F. Supp. 69, 72 (W.D.N.Y. 1997) ("[P]laintiffs have cited no case which stands for the proposition that a student has a protected property interest in participating in a particular class . . . . Many courts have rejected arguments similar to those advanced by plaintiffs here. . . . there is no constitutional right to any one specific curricular or extracurricular activity.").

reframing her failed First Amendment claim as an Equal Protection claim. *See Orin v. Barclay*, 272 F.3d 1207, 1213 n. 3 (9th Cir. 2001) (finding that equal protection claim was "no more than a First Amendment claim dressed in equal protection clothing" and was "subsumed by, and co-extensive with" plaintiff's First Amendment claim); *Lee v. York Cnty. Sch. Div.*, 418 F.Supp.2d 816, 834 (E.D. Va. 2006) (finding it inappropriate to address equal protection argument that was "'a mere rewording of a First Amendment claim'" because plaintiff "asks this court to do under the Fourteenth Amendment what he asks it to do under the First Amendment: to evaluate the constitutionality of [the challenged statute]") (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 250 (4th Cir.1999)) (brackets omitted); Ronald D. Rotunda & John E. Nowak, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE § 18.39 (5th ed. 2013) ("[L]aws that classify persons in terms of their abilities to exercise rights that have specific recognition in the first eight Amendments do not generally arise as equal protection issues. In these instances the denial of the right to one class of persons is likely to be held a violation of the specific guarantee without any need to resort to equal protection analysis."); *see also Morrison v. Bd. of Ed. of Boyd Cnty.*, 521 F.3d 602, 614 n.6 (Moore, J., dissenting) (explaining that the court was not even ruling on the student plaintiff's Equal Protection claim "[b]ecause the . . . equal-protection arguments are essentially First Amendment arguments masquerading as Fourteenth Amendment arguments").

The merits of the Equal Protection claims fare no better. Plaintiffs allegation that removal of *Stamped* was a targeted effort to "censor books written by black authors" is nothing more than an unsupported assertion. (Am. Compl. ¶ 278.) But Plaintiffs plead no factual allegations that could support that claim and, as noted in the section on Standing, *supra*, it's not even true as to Kendi himself, whose books are still present in District Three's libraries. And none of the Equal Protection Plaintiffs have a right to demand that a public school obtain or retain any particular book or class. *See supra*.

Likewise, Plaintiffs due process selective enforcement claim also fails. Plaintiffs attempt to bolster their argument that the Budget Proviso is selectively enforced by incorporating and referencing the comments of three legislators expressing their own views and opinions about critical race theory. But that proves nothing about *these Defendants'* actions. And Plaintiffs' bald assertions that the Budget Proviso's application is interpreted to the detriment of Black people is not only unsupported, but is factually *contradicted*, by Plaintiffs' own assertion. (*See* Am. Compl. ¶¶ 105–06). For example, of the five instances Plaintiffs cite to where either of the Defendants removed a book purportedly in response to the Budget Proviso, two were by Black authors, two were by Asian-American authors, and one was by a White author. *See id.*

Plaintiffs have not pled facts or Equal Protection causes of action on which the Court can grant relief. Their Amended Complaint should be dismissed with prejudice.

### III. Plaintiffs' claims are effectively preempted by recent federal mandates that duplicate the Proviso's requirements, and Plaintiffs' alleged injuries cannot, therefore, be redressed by the relief they seek in this suit.

Even if the Court were to find that Plaintiffs had standing and had asserted viable claims, another problem awaits: lack of redressability. If the Court were to grant Plaintiffs' request to enjoin the proviso, Plaintiffs' circumstances would remain unchanged. That's because on January 29, 2025, the President of the United States issued an Executive Order entitled "Ending Radical Indoctrination in K-12 Schooling."[19] Set to take effect 90 days after it was issued,[20] the Executive Order is substantially similar to the proviso in that it prohibits the expenditure of federal funds for instruction on ideologically divisive concepts, which it defines in an enumerated list that is almost completely parallel (though in a slightly different order and with slight variations in wording) to

---

[19] https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-indoctrination-in-k-12-schooling/ (last visited April 18, 2025)

[20] The EO is set to go into effect on April 29, 2025, exactly one week after this Motion is filed.

the requirements of the Budge Proviso. *Compare* Exec. Order, § 2(b) *with* Budget Proviso (n.1 supra and accompanying text).

The overlap between them is such that even if the Court were to grant the relief sought by Petitioners, it wouldn't make any practical difference. The schools will still be subject to the same requirements, and the Plaintiffs' situation will be unchanged. Plaintiffs' alleged injuries are, therefore, not redressable in this suit.

CONCLUSION

For the reasons stated above, this action should be dismissed because the Plaintiffs lack standing under Fed. R. Civ. P. 12(b)(1) and the Plaintiffs have failed to state a claim under Fed. R. Civ. P. 12(b)(6). The District respectfully requests this Court enter an Order dismissing this action with prejudice and awarding such other relief as this Court deems just and appropriate.

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: /s Miles E. Coleman
    Miles E. Coleman (Fed. Bar No. 11594)
    E-Mail: miles.coleman@nelsonmullins.com
    William A. Neinast (Fed. Bar No. 13172)
    E-Mail: will.neinast@nelsonmullins,com
    2 W. Washington Street / Suite 400
    Greenville, SC 29601
    (864) 373-2300

    *Attorneys for Ellen Weaver, in her official capacity as South Carolina Superintendent of Education, and Lexington County School District Three*

Greenville, South Carolina
April 22, 2025