**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| SOUTH CAROLINA STATE CONFERENCE OF THE NAACP; IBRAM X. KENDI; and T.R., a minor by and through their father and next friend, TODD RUTHERFORD,<br><br>*Plaintiffs*,<br><br>v.<br><br>ELLEN WEAVER in her official capacity as South Carolina Superintendent of Education; and LEXINGTON COUNTY SCHOOL DISTRICT THREE,<br><br>*Defendants*. | Case No. 3:25-cv-487-SAL<br><br>**Second Amended Complaint for Declaratory and Injunctive Relief** |

**COMPLAINT**

Plaintiffs South Carolina State Conference of the NAACP; Ibram X. Kendi; and Todd Rutherford on behalf of his minor child T.R., (collectively, "Plaintiffs"), by their undersigned counsel, bring this action against South Carolina Superintendent of Education Ellen Weaver, and Lexington County School District Three (collectively, "Defendants"). For their complaint against Defendants, Plaintiffs allege as follows:

**PRELIMINARY STATEMENT**

1. Plaintiffs file this action to challenge the budget proviso labeled "SDE:

Partisanship Curriculum" in section 1.79 of the 2024-2025 South Carolina Appropriations Bill,[1] as well as identical versions of the proviso included in various past and future South Carolina budgets.[2] (collectively, "Budget Proviso").

2. Education is crucial to the well-being of our democracy. It provides an opportunity for individuals to develop the necessary skills and knowledge to be productive in the workforce, promotes social mobility by positioning citizens to contribute meaningfully to society, and provides the next generation with the critical thinking skills necessary to participate in a government of, by, and for the people.

3. A classroom open to a broad range of ideas, perspectives and students, in turn, is the backbone of a quality education. It is essential to public education that students be exposed to a variety of viewpoints and ideas that broaden their understanding of the world around them. The ability to explore and openly question one's assumptions challenges students to think critically about their beliefs. Any attempt to suppress certain ideas or information must be rejected as harming students' ability to think independently and engage meaningfully in constructive debate.

4. Students' right to receive information does not entitle any particular author to have their work included in a school library or curriculum. It does, however, prohibit government officials from removing or restricting access to books based on disagreement with the viewpoints they express. If a school district disagrees with an author's views about the role of race in American history, or the necessary measures to dismantle racism in our society, it

---

[1] H. 5100, 2023–2024 Gen. Assemb., 125th Sess., Part 1B § 1.79 (S.C. 2024).

[2] *See e.g.* H. 4100, 2021–2022 Gen. Assemb., 124th Sess., Part 1B § 1.105 (S.C. 2021); H. 5150, 2021–2022 Gen. Assemb., 124th Sess., Part 1B § 1.93 (S.C. 2022); H. 4300, 2023–2024 Gen. Assemb., 125th Sess., Part 1B § 1.82 (S.C. 2023); and H. 5126, 2025-2026 Gen. Assemb., 126th Sess., Part 1B § 1.75 (S.C. 2026).

may respond with alternative viewpoints and educational materials. It may not, however, suppress those ideas merely because they are disfavored by the district and without a legitimate pedagogical justification.

5. These basic principles have been reflected in South Carolina's laws for decades. The State Supreme Court has held that under the South Carolina Constitution, all students must have the opportunity to acquire "a fundamental knowledge of economic, social, and political systems, and of history and governmental processes" at public schools. *Abbeville Cnty. Sch. Dist. v. State*, 515 S.E.2d 535, 540 (S.C. 1999). Consistent with these principles, South Carolina's 2019 social studies standards encouraged critical thinking and analysis of multiple perspectives across a range of topics, including developments in modern world history, comparison of different government systems, and the evolution of individual rights "through social movements" and "how marginalized Americans have struggled and continue to push for equality and expanded rights."[3]

6. Students' exposure to these multiple perspectives is critical to developing students into well-rounded, well-educated, and responsible American citizens.[4]

7. The South Carolina legislature enacted the Budget Proviso in response to protests demanding racial equality following the murder of George Floyd in 2020. The Budget Proviso is a racially and politically motivated censorship law and an example of South Carolina's well-documented history of suppressing accurate teaching in public school classrooms about racism and discrimination against Black people in the United States.

---

[3] Molly M. Spearman, *South Carolina Social Studies College- and Career-Ready Standards* 54, 96, 126 (2019), https://ed.sc.gov/instruction/standards/social-studies/standards/2019-south-carolina-social-studies-college-and-career-ready-standards/.

[4] *See generally id.* at 121.

8. Through the enactment of the Budget Proviso, South Carolina legislators seek to limit the history of racial discrimination to a fixed set of historical events and prevent discussions of how to remedy present-day racial inequality. This is especially problematic in South Carolina, where the experiences of Black people illustrate that the struggle against racial discrimination is an ongoing process that is rooted in the destructive violence and dehumanization of slavery and the legacy of racial oppression that continues to this day. South Carolina has a long history of Black people resisting slavery, oppression, and racial violence.

9. South Carolina was the site of the Stono Rebellion, the largest slave rebellion in the British North American colonies, when, in 1739, nearly two dozen enslaved Africans gathered near the Stono River just outside Charleston, South Carolina, and were attacked by a group of slaveholders as they attempted to march toward freedom.[5] South Carolina is also home to Fort Sumter, where the Civil War began,[6] and the location of Robert Smalls's daring escape from slavery, when in 1862 he commandeered a Confederate ship, sailing himself and over a dozen enslaved Africans to freedom.[7] South Carolina's history also includes the experiences of Gullah Geechee people, descendants of enslaved West Africans who resisted slavery through preservation of African cultural traditions and language and who continue to resist the

---

[5] Birgit Rasmussen, *"Attended with Great Inconveniences": Slave Literacy and the 1740 South Carolina Negro Act*, 125 PMLA 201, 201–03 (2010), https://www.jstor.org/stable/25614450.

[6] *Timeline of the Civil War: 1861*, Libr. of Cong., https://www.loc.gov/collections/civil-war-glass-negatives/articles-and-essays/time-line-of-the-civil-war/1861/ (last visited Sept. 16, 2026).

[7] *Robert Smalls*, Nat'l Park Serv., https://www.nps.gov/people/robert-smalls.htm#:~:text=Around%203%20am%2C%20Smalls%20and,Fort%20Sumter%20and%20Fort%20Moultrie (last visited Sept. 16, 2026).

gentrification of their ancestral land in the South Carolina Lowcountry.[8]

10. In 2015, racially-motivated violence in Charleston, South Carolina, garnered national attention when a self-identified White supremacist killed nine Black people during Bible study at Mother Emanuel AME Church.[9] Following the shooting, South Carolina lawmakers voted to remove the Confederate flag from State House grounds when images of the shooter posing with the flag renewed conversations about its harmful impact, especially on Black people.[10] Prior to its removal, the Confederate flag had been prominently displayed on South Carolina's State House dome since 1961 until protests against the flag as a symbol of White supremacy resulted in a compromise with lawmakers[11] that led to it being placed on a

---

[8] *The Gullah Geechee People*, Gullah Geechee Cultural Heritage Corridor, https://gullahgeecheecorridor.org/the-gullah-geechee/ (last visited Sept. 16, 2026); *see also* Belén Wilson, *The Gullah/Geechee Struggle to Preserve Ancestral Lands: Why Heirs' Property Ownership is Displacing Local Communities Along the Southeastern Shores*, Wake Forest L. Rev. (Apr. 2021), https://www.wakeforestlawreview.com/2021/04/the-gullah-geechee-struggle-to-preserve-ancestral-lands-why-heirs-property-ownership-is-displacing-local-communities-along-the-southeastern-shores/.

[9] Bryce Jacquot, *9-Year Mark Since Mother Emanuel Shooting; Memorial Bible Study Held*, ABC News 4 (June 17, 2024), https://abcnews4.com/news/local/9-year-mark-since-mother-emanuel-shooting-bible-study-balloon-release-held-wciv-abc-news-4-mother-emanuel-ame-church-racist-mass-shooting-bible-study-reverend-clementa-c-pinckney-tywanza-sanders-reverend-sharonda-singleton-cynthia-graham-hurd.

[10] *Id.*; *see also* Sam Tyson, *A Look Back on the Removal of the Confederate Flag from SC's Statehouse*, ABC News 4 (July 8, 2016), https://abcnews4.com/news/emanuel-ame-shooting/a-look-back-on-the-removal-of-the-confederate-flag-from-scs-statehouse#.

[11] As part of the compromise that led to the removal of the Confederate flag, lawmakers passed the Heritage Act, which required a supermajority/two-thirds vote in the state legislature to remove or change certain statutes and monuments in public spaces. The two-thirds provision was later ruled unconstitutional and now requires a simple majority vote. John Monk & Emily Bohatch, *SC Supreme Court Upholds Heritage Act, but Rules Vote Measure an 'Overreach'*, The State (Sept. 23, 2021), https://www.thestate.com/news/politics-government/article252684518.html.

pole in front of the State House in 2000.[12]

11. During the summer of 2020, racial justice protests in response to police killings of Black Americans spread across the country, including multiple cities in South Carolina. Hundreds of teachers in South Carolina converged in Columbia to rally in support of equity for Black students.[13] These calls for racial justice prompted school districts in the state to address disparities impacting students of color. In the Charleston County School District, staff received cultural competency training to challenge biases that harmed students, including high suspension and arrest rates of Black students in the district.[14] Schools also began hiring more Black teachers, incorporating diverse perspectives and authors into the curriculum, and adopting culturally relevant teaching practices.[15]

12. Since 2021, the Budget Proviso has been used in school districts across South Carolina to restrict or eliminate instruction, training, and resources about racial and gender inequalities. For example, the Budget Proviso caused the removal of a book about racism by Black authors, and the censorship of a high school argumentative writing lesson on the topics of equity and systemic racism. The Budget Proviso also served as the basis for a lawsuit brought

---

[12] *After 54 Years, Confederate Flag Comes Down in S.C.*, CBS News, https://www.cbsnews.com/news/confederate-flag-south-carolina-statehouse-grounds-comes-down/ (last updated July 10, 2015).

[13] Andrew Caplan, *Hundreds of Teachers Protest for Equity in SC Schools*, The State (June 15, 2020), https://www.thestate.com/news/coronavirus/article243516952.html; *see also* Lucas Daprile, *More Black Perspectives Needed in SC Classrooms, Experts Say at Panel*, The State, https://www.thestate.com/news/local/education/article244135902.html (last updated July 13, 2020).

[14] Anne Emerson, *CCSD Staff Gets Trained in 'Cultural Competency' During Pandemic*, ABC News 4, https://abcnews4.com/news/local/ccsd-staff-gets-trained-in-cultural-competency-during-pandemic (last updated July 16, 2020).

[15] Michael Harriot, *South Carolina's Critical Race War on Education, Part 1: Origin Story*, TheGrio (May 16, 2023), https://thegrio.com/2023/05/16/south-carolinas-critical-race-war-on-education-part-1-origin-story/.

by certain South Carolina state lawmakers opposed to teachings about systemic inequalities, which resulted in the elimination of a diverse language arts curriculum from dozens of public schools across two South Carolina school districts.[16] Additionally, the Budget Proviso caused at least one librarian to preemptively remove the book *Flamer*, a novel about a gay boy tracing his struggles with self-acceptance and his identity. As these examples demonstrate, the Budget Proviso denies students opportunities to engage with classroom instruction and materials that center on diverse perspectives and the experiences of Black people, especially on the subject of racial inequalities in the United States.

13. In June 2024, the South Carolina Department of Education ("SCDE") cited the Budget Proviso when it removed the statewide course code for Advanced Placement African American Studies ("AP AAS"), a course that is taught across the country and was successfully piloted in the state for two years, and subsequently garnered interest from hundreds of students. In 2022, College Board completed SCDE's approval process for AP AAS's inclusion in the state's course directory, and SCDE approved and created the AP AAS pilot course code later that year in accordance with South Carolina's methodical course code assignment process. SCDE's deletion of the AP AAS course code stripped AP AAS of its full AP status and made students, including Student Plaintiffs, ineligible for multiple benefits to which students taking the course were previously entitled. SCDE's abrupt removal of AP AAS, after the end of the 2023– 2024 school year and after countless students had enrolled, created widespread confusion and frustration among teachers, parents, and students.

---

[16] Floriana Boardman, *Lawsuit Filed Against CCSD Claims Students Being Taught Critical Race Theory in Classrooms*, ABC News 4 (Feb. 22, 2023), https://abcnews4.com/news/local/lawsuit-filed-against-ccsd-claims-students-are-taught-critical-race-theory-in-classrooms-wciv-education-board-members-charleston-county-district-school.

14. The Budget Proviso violates the First and Fourteenth Amendments to the United States Constitution. The Budget Proviso violates the First Amendment right to receive information and the right to disseminate ideas. Its vague, ambiguous language violates the Due Process Clause of the Fourteenth Amendment. It also violates the Equal Protection Clause of the Fourteenth Amendment because it was enacted to stifle discussions and efforts to address racial discrimination against Black people. As such, Plaintiffs will continue to suffer serious injuries unless this Court intervenes, declares the Budget Proviso unconstitutional, and enjoins its enforcement.

## PARTIES

### I. PLAINTIFFS

15. Plaintiff South Carolina State Conference of the NAACP ("NAACP-South Carolina") was founded in 1939 and is the oldest civil rights organization in South Carolina. It has over 8,000 members, including Black parents of children attending South Carolina K-12 public schools, Black students in South Carolina K-12 public schools, educators at all levels of public education, and authors.

16. NAACP-South Carolina's mission is to ensure the political, social, educational, and economic equality of all persons and to eliminate race-based discrimination. To advance its mission, NAACP-South Carolina's key goals include educational advocacy to ensure that all students have access to a quality, integrated public education.

17. NAACP-South Carolina and its members are concerned about the censorship of teachings about the history of racial discrimination in South Carolina and in the United States, as well as present-day discrimination and systemic inequalities, from the Budget Proviso, which would detrimentally impact the quality of public education that its student members receive.

18. NAACP-South Carolina brings this action on behalf of its student members

enrolled in South Carolina public schools. These members include students who enrolled in the AP AAS course and students who had concrete plans to enroll in the AP AAS before SCDE removed the statewide AP AAS course code. NAACP-South Carolina also has members who attend schools where books and instructional materials about race and racism have been removed or restricted pursuant to the Budget Proviso, including students who would read or check out *Stamped: Racism, Antiracism, and You* if it were restored to school library circulation. All of these injuries to NAACP-South Carolina's student members are germane to the organization's mission to eliminate race-based discrimination and ensure equal access to quality public education.

19. For example, A.G. is a Black male student who is currently a junior at Blythewood High School. A.G. is a member and Vice President of his NAACP local youth chapter. Before Defendant Weaver caused the removal of the statewide AP AAS course code, A.G. had already enrolled in AP AAS for the upcoming academic year through his school's guidance counselor course-selection process and reasonably expected to participate in the course during the 2024-2025 school year. He intended to take the course during his freshman year and plans to re-enroll in the course if it is offered prior to his graduation. His school does not offer an honors-level African American studies course and as a result of the cancellation of the AP AAS course he lost access to the unique educational, academic, and financial benefits associated with an AP AAS. A.G. is the Vice President of his NAACP Youth Chapter. NAACP-South Carolina also has members who attend schools where books and instructional materials about race and racism have been removed or restricted pursuant to the Budget Proviso, including students who would read or check out *Stamped: Racism, Antiracism, and You* if it were restored to school library circulation.

20. J.C., a student member of NAACP-South Carolina and a junior at Ridge View High School, planned to take AP AAS during high school and would enroll in the course if it is reinstated before he graduates. J.C., A.G., and other student members of NAACP-South Carolina want to take AP AAS because it would provide rigorous, AP-level instruction in African American history and culture, AP weighting for their grade point averages, and the opportunity to earn college credit. Because SCDE removed the AP AAS course code, they cannot take the AP version of the course or receive the educational, academic, and financial benefits associated with AP coursework.

21. Plaintiff T.R. is a Black male student, under the age of 18, who is currently a senior at A.C. Flora High School, a school in Richland County School District One in Columbia, South Carolina. He intends to enroll in AP AAS if the statewide course is reinstated before he graduates and would be able to do so if Defendants cease enforcing the barriers challenged in this action

22. A.C. Flora High School had previously offered the AP AAS course to students, and the school planned to offer it for the 2024-2025 school year but for the removal of the statewide course code.

23. Plaintiff Ibram X. Kendi ("Author Plaintiff") resides in Massachusetts. His book *Stamped: Racism, Antiracism, and You* ("*Stamped*") is a #1 New York Times bestselling book that describes and deconstructs the history of racist thought in America and was written specifically for young adult readers. Kendi's works have been lauded by critics, librarians, and educators, and have been featured on several bestseller lists and best-of lists throughout his career.

24. School libraries are a critical means of reaching Kendi's intended audiences and

securing the broadest possible readership. His books, including *Stamped*, are vehicles for his personal messages and ideas about how to dismantle patterns of racism in the United States.

25. *Stamped* has been removed from school libraries in South Carolina under the Budget Proviso's prohibition against so-called "indoctrination" in at least one school district. The removal of his books from school libraries and school classrooms, including the associated stigma, causes him personal and professional harm.

26. "Student Plaintiffs" include Plaintiff NAACP-South Carolina and Plaintiff T.R. NAACP-South Carolina is an organization, whose membership includes students in South Carolina public schools governed by the Budget Proviso and parents of students enrolled in South Carolina public schools who are concerned about the ability of their children to be exposed to a variety of viewpoints and ideas in their classrooms.

27. Defendant Ellen Weaver is the South Carolina Superintendent of Education. Superintendent Weaver is responsible for the actions of the South Carolina Department of Education, which is responsible for enforcing the Budget Proviso.[17]

28. Defendant Lexington County School District Three ("School District Three Defendant") is a public school district that provides public education to students in the western portion of Lexington County, South Carolina, and a portion of Saluda County, South Carolina.

## JURISDICTION AND VENUE

29. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) because this action arises under the United States Constitution and 42 U.S.C. § 1983.

---

[17] H. 5126, 2025-2026 Gen. Assemb., 126th Sess., Part 1B § 1.75 (S.C. 2026) ("For the current fiscal year, of the funds allocated by the Department of Education to school districts, no monies shall be used by any school district or school to provide instruction in . . . any of the following concepts.").

30. Venue is proper in this District under 28 U.S.C. § 1391(b)(1)–(2) because one or more of the Plaintiffs reside within this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

31. The Court is authorized to award the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202 (Declaratory Judgment Act) and Fed. R. Civ. P. 57.

## FACTUAL ALLEGATIONS

### I. SOUTH CAROLINA'S PUBLIC-SCHOOL CURRICULA ABOUT RACISM AND RACIAL INEQUALITIES

32. For generations, dating back to the inception of public education in South Carolina, state officials suppressed the complete and accurate histories of slavery, racism, race and sex-based discrimination, and Black-led movements for racial justice. The resulting curriculum excluded key historical events, left students without the knowledge necessary to understand the history of racism in South Carolina and the broader United States, and restricted students from learning and identifying solutions to modern-day discrimination.

33. The South Carolina General Assembly first made public education for South Carolina's youth compulsory in 1895, just as similar laws were passed in a number of states across the country.[18] However, South Carolina's compulsory education requirement coincided with the legislature's promulgation of laws now referred to as South Carolina's Black Codes of 1895.[19] The Constitution of 1895 provided for the establishment of a separate school system for Black South Carolinians, which denied Black South Carolinians the same access to quality

---

[18] Alan Wieder, Race and Education: Narrative Essays, Oral Histories, and Documentary Photography, 125–26 (Int'l Acad. Publishers 1997).

[19] *Id.*

education as White South Carolinians.[20]

34. William Gilmore Simms and his granddaughter Mary C. Simms Oliphant, who were prominent defenders of American chattel slavery, developed a popular series of history textbooks in South Carolina.[21] Simms and Oliphant's history textbooks served as the "dominant" history texts for middle school students across the State of South Carolina for nearly 150 years, having been used in some capacity in South Carolina schools from approximately 1840 to 1985.[22]

35. Simms and Oliphant's textbooks adopted a "pro-southern point of view of the Civil War" and drew on influences such as the Lost Cause Movement and White supremacist ideology to "implant[] in the seventh and eighth grade students' minds who typically read the textbooks' false ideas about the events and people involved in the war."[23] Scholars describe the slanted narrative provided in the textbooks as "twist[ing] the facts of the Civil War era" through revision, omission, implicit and explicit racism, and a form of "heroification"—or "the remaking of historical figures into heroes despite their flaws."[24]

---

[20] *Equalization of Schools in South Carolina*, Nat'l Parks Serv., https://www.nps.gov/articles/equalization-schools-of-south-carolina.htm (last visited Sept. 16, 2026); *see also* Larry McIntyre, The South Carolina Black Code and Its Legacy 38 (2016) (M.A. Thesis, University of North Carolina at Charlotte), https://ninercommons.charlotte.edu/islandora/object/etd%3A195 (noting that the Freedman's Bureau advocated for schools to be made available to South Carolinians after the Black Codes were passed in 1865).

[21] Jeffrey Allan Bird, Jr., The Lost Cause, Reconciliation, and White Supremacy in South Carolina's Education System, 1920–1940, at 2 (2021), (M.A. thesis, Indiana University), https://scholarworks.iupui.edu/bitstream/handle/1805/26468/J.Bird%20MA%20Thesis.pdf?sequence=4&isAllowed=y.

[22] *Id.* at vii.

[23] *Id.*

[24] *Id.*

36. Other textbooks used in South Carolina schools during the late nineteenth century and the twentieth century, as well as two textbooks used in South Carolina schools as recently as 1997,[25] "claim or imply that enslaved people were lucky to be captives in the United States" and were "on the one hand, adoring and loyal and, on the other hand, dangerous."[26] These texts also included claims that "abolitionists and any other 'outsiders' opposed to slavery were malevolent," "Radical Reconstruction was evil," and that the Ku Klux Klan and "the Constitution of 1895 and its Black Codes were important for the survival of white South Carolina."[27] In addition, texts from the late 1980s and 1990s "ignored twentieth century Black history in South Carolina," and none of the texts incorporated the history of South Carolina's African Americans into their accounts of South Carolina history.[28]

37. In 1984, South Carolina state lawmakers enacted the Education Improvement Act of 1984, S.C. Code Ann. § 59-29-55 ("Act"), recognizing the absence of the experiences, cultures, and contributions of Black people from South Carolina public education.

38. The Act stipulated that, by the 1989–1990 school year, each public school in South Carolina must instruct students in the history of Black people as a regular part of its

---

[25] The textbooks examined by oral historian Alan Wieder include the following: John J. Dargan's *School History of South Carolina* (1906), John Langdon Weber's *Fifty Lessons in the History of South Carolina* (1891), John Chapman's *School History of South Carolina* (1895), and Henry Alexander White's *The Making of South Carolina* (1906). In 1997, when Wieder examined the textbooks, there were two texts approved by the State Department of Education; Lewis P. Jones's *South Carolina: One of the Fifty States* (1985) and Archie Vernon Huff Jr.'s *The History of South Carolina in the Building of the Nation* (1991). Wieder also examined William Gilmore Simms' textbooks from 1917 and 1922, as well as updated and revised versions of Simms' texts from 1922, 1940, 1958, and 1970 by his granddaughter Mary C. Simms Oliphant. *See* Wieder, *supra* note 18, at 127.

[26] *Id*. at 153.

[27] *Id*. at 153–54.

[28] *Id*. at 154.

history and social studies courses. The Act also required that the State Board of Education ("SCBE" or "Board of Education") establish regulations for the adoption of history and social studies textbooks that incorporate Black history pursuant to the Act's mandate, as well as SCBE's assistance to school districts in identifying, locating, and developing suitable printed materials and other aids for instruction in Black history.[29]

39. Notwithstanding the Education Improvement Act's explicit mandate, South Carolina public schools failed to incorporate Black history sufficiently into public school history curricula.

40. For example, a 2000 study by the Avery Research Center for African American History and Culture ("Avery Study"), which investigated whether South Carolina's public schools were following the Education Improvement Act's mandate to incorporate Black history into public school curricula, identified "resistance to making the African-American experience an important as well as integral part of the curricula in the state's public schools."[30]

41. The researchers for the Avery Study conducted interviews with students, and concluded that their "knowledge about the African-American experience within the framework of South Carolina history was not congruent or consistent with what teachers and administrators in [their] survey and interviews claimed that they were doing to teach the African American experience."[31] The researchers further reported that "principals and teachers were concerned

---

[29] *History and Rationale,* S.C. Council for Afr. Am. Stud., https://www.sccaas.org/page-1581466#:~:text=They%20carried%20into%20law%2C%20under,history%20and%20social%20studies%20courses (last visited Sept. 16, 2026).

[30] Avery Rsch. Ctr., A Study of the Teaching of the African-American Experience in South Carolina Public Schools: A Report to the College of Charleston Education Oversight Committee 35 (2007), https://dc.statelibrary.sc.gov/bitstream/handle/10827/5130/EOC_A_Study_of_the_Teaching_African-American_2007.pdf?sequence=1.

[31] *Id.*

about making courses on the African-American experience required . . . because of the lack of training and teacher preparation to teach the courses" and found that "the general lack of training for teachers on the African-American experience . . . seems to be the norm throughout the state."[32]

42. In addition, the Avery Study researchers concluded that the fact that "[s]ome areas of South Carolina are not progressive in race relations" was "reflected in the implementation [of the Act's mandate], or lack thereof, in some sections of this state."[33]

43. A review of the 2011 South Carolina Social Studies Academic Standards similarly identified specific deficiencies in South Carolina's teaching of Black history. The researcher of that study noted that the standards, which were drafted by a panel that was unrepresentative of South Carolina students because "it was comprised of largely white members or teachers from largely white districts," were also deficient because they "exclude[d] salient aspects of African American history."[34] The researcher concluded that while the standards for eleventh grade United States History and the Constitution "include[d] African American history in accordance with the South Carolina Educational Improvement Act," the standards "d[id] not provide a balanced inclusion of African American history for the period prior to the Civil War."[35]

## II. EVENTS PROMPTING FOCUS ON RACIAL JUSTICE ISSUES

44. On April 4, 2015, Walter Scott, an unarmed Black man, was murdered by a police

[32] *Id*. at 27, 29.

[33] *Id*. at 35.

[34] J.C. Eargle, The Dominant Narrative of Slavery in South Carolina's History Standards, 40 J. Soc. Stud. Rsch. 295, 304 (2016).

[35] *Id*.

officer in North Charleston, South Carolina; the officer shot Mr. Scott in the back while Mr. Scott was fleeing from a police stop for a non-functioning tail light on his vehicle.[36]

45. Just six weeks after Walter Scott's murder, on June 17, 2015, a self-identified "White supremacist," targeted Mother Emanuel A.M.E. Church in Charleston, South Carolina—a 200-year-old church that is historically significant to Black South Carolinians—as the site to carry out a mass murder and "start a race war."[37] After the congregants welcomed him into the church, he murdered nine Black South Carolinians as they attended Bible Study.

46. On June 27, 2015, ten days after the mass murder at Mother Emanuel A.M.E. Church, a group of activists organized a public demonstration to remove the Confederate flag from the steps of the South Carolina State House and keep the flag in a box while the funerals for the victims of the mass murder were held.[38] Activist Bree Newsome was arrested after scaling the flagpole and removing the flag, and images of the flag removal and Newsome's arrest drew significant national attention to the continued display of the Confederate flag at the South Carolina State House. Following Ms. Newsome's demonstration and arrest, state officials

---

[36] The police officer eventually pleaded guilty to second-degree murder and obstruction of justice for killing Walter Scott. *See* Matthew Vann & Erik Ortiz, *Walter Scott Shooting: Michael Slager, Ex-Officer, Sentenced to 20 Years in Prison*, NBC News (Dec. 9, 2017), https://www.nbcnews.com/storyline/walter-scott-shooting/walter-scott-shooting-michael-slager-ex-officer-sentenced-20-years-n825006.

[37] Melissa Block, *Dylann Roof Said He Wanted to Start A Race War, Friends Say*, NPR (June 19, 2025), https://www.npr.org/2015/06/19/415809511/dylann-roof-said-he-wanted-to-start-a-race-war-friends-say.

[38] Melissa Locker, *Activist Bree Newsome Arrested After Daring South Carolina Confederate Flag Removal*, Vanity Fair (June 17, 2015), https://www.vanityfair.com/news/2015/06/activist-bree-newsome-arrested-after-daring-south-carolina-confederate-flag-removal.

voted to remove the Confederate flag from the South Carolina State House grounds.[39]

47. In the summer of 2020, following the police killings of George Floyd and Breonna Taylor, millions of people of all races across the country participated in racial justice demonstrations, often organized under the banner of Black Lives Matter. These racial justice demonstrations became the largest social justice demonstrations in American history and eventually spread across the globe. Protesters marched for racial justice in cities throughout South Carolina, including but not limited to Aiken, Charleston, Columbia, Florence, Greenville, Rock Hill, and Sumter.

48. Responding to the wave of racial justice protests, cities across the country removed Confederate monuments and other symbols of racism and White supremacy.[40] In June 2020, the City of Charleston removed its monument to John C. Calhoun, an early U.S. Vice President and ardent slavery advocate, from Marion Square, a sprawling greenspace in its downtown area.[41] Mayor John Tecklenburg claimed the city would move forward with an agenda focused on equity, inclusion, and racial conciliation.[42]

---

[39] Amanda Holpuch et al., *South Carolina Governor Signs Law Ordering Removal of Confederate Flag*, The Guardian (July 9, 2015), https://www.theguardian.com/us-news/2015/jul/09/south-carolina-confederate-flag-friday.

[40] Rachel Treisman, *Nearly 100 Confederate Monuments Removed in 2020, Report Says; More than 700 Remain*, NPR (Feb. 23, 2021), https://www.npr.org/2021/02/23/970610428/nearly-100-confederate-monuments-removed-in-2020-report-says-more-than-700-remai#:~:text=Pop%20Culture-,Nearly%20100%20Confederate%20Monuments%20Removed%20In%202020%2C%20Report%20Says%3B%20More,aftermath%20of%20George%20Floyd's%20killing.

[41] Meg Kinnard, *Slavery Advocate's Statute Removed in South Carolina*, Associated Press (June 24, 2020), https://apnews.com/article/us-news-ap-top-news-sc-state-wire-slavery-south-carolina-a88ad98372bbb810d1261d61acb5350f.

[42] Kaitlin Stansell, *Recommendations to Address Racial Injustice in Charleston Released*, Live 5 News WCSC (Aug. 4, 2021), https://www.live5news.com/2021/08/04/special-commission-releases-recommendations-address-racial-injustice-racial-inequity-charleston/.

49. School districts across the country were pushed to "rewrite curriculum to include more voices from people of color[] and diversify their teaching force."[43] In June 2021, the Kershaw County School District hired Dr. Gloria Swindler Boutte to educate teachers on how to teach African-American history and literature with "culturally relevant teaching," which emphasizes using students' culture as a bridge for teaching content.[44]

50. Berkeley County Schools hired Deon Jackson in 2021 as its first Black Superintendent and began hiring more Black teachers and expanding the culturally relevant teaching model.[45]

51. Colleges and universities responded to student demands for racial equality through attempts to change building names honoring enslavers and segregationists. Clemson University approved removing the name of slavery proponent John C. Calhoun from its honors college, a move applauded by Reclaim and Rename, a student-led group that pushed for the name change and, while recognizing it as a symbolic victory, advocated for more substantive changes for students of color.[46] Clemson also sought approval from the state legislature to remove former Governor and U.S. Senator Benjamin Tillman's name from Tillman Hall, the

---

[43] *How the Murder of George Floyd Changed K-12 Schooling: A Collection*, Educ. Week, https://www.edweek.org/leadership/how-the-murder-of-george-floyd-changed-k-12-schooling-a-collection#:~:text=School%20districts%20in%20some%20communities,and%20diversify%20their%20teaching%20force (last visited Sept. 16, 2026).

[44] Harriot, *supra* note 15.

[45] *Id.*

[46] Greta Anderson, *Clemson Removes Calhoun Name from Honors College*, Inside Higher Ed (June 14, 2020) https://www.insidehighered.com/quicktakes/2020/06/15/clemson-removes-calhoun-name-honors-college.

most prominent building on campus.[47] During his lifetime, Tillman led violent racist mobs and boasted about murdering Black people.[48]

52. In 2021, a special commission at the University of South Carolina recommended "renaming 10 buildings or monuments . . . that honor Confederates, slaveholders," or advocates of segregation.[49] However, nearly all efforts in the state to rename buildings have been unsuccessful because state law prevents renaming buildings in public spaces or removing certain public statutes without approval from the state legislature.[50]

53. South Carolina colleges and universities also reacted to student demands for racial progress by establishing task forces and committees to assess campus culture and racial equity. Furman University formed an Ad Hoc Committee on Black Life and a Black Alumni Council and "implemented a Strategic Diversity Plan."[51] Clemson University established a "social justice and equity taskforce" after groups on campus discussed "how to make the former-plantation campus more inclusive."[52] After Wofford College students formed the "Wofford Anti-Racism Coalition," the college agreed to "provide anti-racist and anti-bias training and

---

[47] Matt Moore, *No Movement on Renaming Tillman Hall at Clemson's Campus*, WYFF (May 7, 2021), https://www.wyff4.com/article/no-movement-on-renaming-tillman-hall-at-clemsons-campus/36354932.

[48] *Who Was Ben Tillman?*, Historic Columbia, https://www.historiccolumbia.org/Tillman (last visited Sept. 16, 2026).

[49] *USC Report Recommends Removing Names of Strom Thurmond, Longstreet, Thomas Cooper from Campus Buildings*, WLTX (July 16, 2021), https://www.wltx.com/article/news/local/university-south-carolina-final-report-renaming-buildings/101-a75bfe96-3180-4685-822f-a2cf6031b5ca.

[50] *Id.*; *see also* Monk & Bohatch, *supra* note 11.

[51] Zoe Nicholson & Ariel Gilreath, *College Students Urged Change After George Floyd's Murder. Here's What SC Universities Did*, Greenville News (May 26, 2021), https://www.greenvilleonline.com/story/news/2021/05/26/george-floyd-what-sc-colleges-did-racial-justice-furman-clemson-wofford-university-south-carolina/5128528001/.

[52] *Id.*

formed a committee on justice, equity, diversity and inclusion."[53] The University of South Carolina, the state's largest university, adopted an equity plan presented by students and "established a 14-person committee to address six key areas of change."[54]

## III. BACKLASH AGAINST WIDESPREAD RACIAL JUSTICE EFFORTS, CULMINATING IN BUDGET PROVISO

54. In response to the widespread protests for racial justice and the subsequent actions of South Carolina educators and school administrators to advance racial justice, some South Carolina public officials began publicly criticizing and denouncing concepts such as Critical Race Theory ("CRT") and so-called "wokeness."

55. "Critical Race Theory" is a recognized academic theory and body of advanced scholarship that originated in the 1970s to identify and remedy racial inequalities in social institutions and the law.[55]

56. "Woke" is defined as "alert to racial or social discrimination or injustice."[56]

57. Current and former South Carolina officials have criticized the terms "Critical Race Theory" and "wokeness" by misconstruing them to exclude the central premise of racial justice, while inaccurately claiming that those terms could be harmful in South Carolina public schools.

58. For example, in response to a question about Critical Race Theory, South Carolina Governor Henry McMaster said, "I don't think it has a place in South Carolina and I

---

[53] *Id.*

[54] *Id.*

[55] Janel George, *A Lesson on Critical Race Theory*, (Jan. 11, 2021) ABA, https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/civil-rights-reimagining-policing/a-lesson-on-critical-race-theory/.

[56] *Woke*, Oxford English Dictionary (3d ed. 2017).

don't think it's helpful and could be harmful."[57] Similarly, then-State Superintendent of Education Molly Spearman said in a statement on Facebook, "The Critical Race Theory (CRT) ideology has no place in South Carolina schools and classrooms."[58]

59. Former South Carolina Governor Nikki Haley asserted, "Critical race theory is going to hold back generations of young people."[59] During an interview, she stated that "every governor in the country needs to ban funding for critical race theory."[60] Gov. Haley also attacked "wokeness," calling it "a virus more dangerous than any pandemic, hands down."[61]

60. As a candidate for South Carolina Superintendent of Education, Defendant Weaver detailed her plan "to keep critical race theory out of the state's classrooms[,]"[62] and said she was "going to work to make sure that the 'woke Washington ideology' stops making its way

---

[57] Adam Mintzer, *Governor, State Superintendent, Lawmakers, Strongly Oppose Critical Race Theory in SC*, WIS News 10, https://www.wistv.com/2021/06/09/governor-state-superintendent-lawmakers-strongly-oppose-critical-race-theory-sc/ (last updated June 9, 2021).

[58] *Id.*

[59] Bradford Betz, *Nikki Haley Slams Critical Race Theory, Says America Should Not Be 'Divided by Different Shades of Color'*, Fox News (July 7, 2021), https://www.foxnews.com/us/nikki-haley-critical-race-theory.

[60] Joshua Q. Nelson, *Nikki Haley Calls for Every Governor in America to Ban Funding for Critical Race Theory in Schools,* Fox News (July 12, 2021), https://www.foxnews.com/politics/nikki-haley-calls-for-every-governor-in-america-to-ban-funding-for-critical-race-theory-in-schools?cmpid=fb_fnc.

[61] Eric Garcia, *Nikki Haley Declares 'Wokeness Is a Virus More Dangerous than Any Pandemic' as She Bashes Don Lemon*, Independent (Mar. 3, 2023), https://www.independent.co.uk/news/world/americas/us-politics/nikki-haley-wokeness-cpac-2023-b2293855.html.

[62] Matthew Christian, *Ellen Weaver Says Critical Race Theory in State's Classrooms, Outlines Plans to Remove It*, Aiken Standard (June 26, 2022), https://www.postandcourier.com/aikenstandard/education/ellen-weaver-says-critical-race-theory-is-in-states-classrooms-outlines-plans-to-remove-it/article_1df5d8ce-f59d-11ec-aa7c-a34176ffecfc.html.

into South Carolina's classrooms."[63]

61. Notably, the comments by South Carolina officials about "Critical Race Theory" and "wokeness" mirrored language from Executive Order 13950 signed by President Donald Trump in September 2020.

62. In defiance against the historic, nationwide, racial justice protests that condemned the murders of George Floyd and Breonna Taylor by police and the underlying, institutional anti-Black racism that led to those police killings, a number of federal executive orders were signed that promoted an ahistorical interpretation of American history (Executive Order 13958),[64] protected monuments previously erected to honor Confederate soldiers who defended the institution of slavery (Executive Order 13933; Executive Order 13978),[65] and censored speech, including, without limitation, trainings and training materials, that sought to prevent race and sex-based discrimination in the federal government and in private organizations that were federal contractors or grant recipients (Executive Order 13950).[66]

63. Through Executive Order 13958 ("EO 13958"), President Trump established the "1776 Commission" to "promote patriotic education."[67] The Commission opposed what was

[63] *Id.*

[64] Executive Order on Establishing the President's Advisory 1776 Commission, Exec. Order No. 13958, 85 Fed. Reg. 70951 (Nov. 2, 2020).

[65] Executive Order on Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Violence, Exec. Order No. 13933, 85 Fed. Reg. 40081 (June 26, 2020); Executive Order on Building the National Garden of American Heroes, Exec. Order No. 13978, 86 Fed. Reg. 6809 (Jan. 18, 2021) (citing Building and Rebuilding Monuments to American Heroes, Exec. Order No. 13934, 85 Fed. Reg. 41165 (July 3, 2020)).

[66] Executive Order on Combatting Race and Sex Stereotyping, Exec. Order No. 13950, 85 Fed. Reg. 60683 (Sept. 22, 2020).

[67] Executive Order Establishing the President's Advisory 1776 Commission, Exec. Order No. 13958, 85 Fed. Reg. 70951 (November 2, 2020).

described as "toxic propaganda" of Critical Race Theory.[68] It also opposed *The New York Times*'s initiative, *The 1619 Project*,[69] which centered the experiences of Black Americans in its recounting of the founding of the United States.

64. President Trump's Executive Order 13950 ("EO 13950"), issued in September 2020, prohibited federal agencies and institutions, federal contractors, and federal grant recipients from engaging in certain speech pertaining to race and sex-based systemic discrimination.[70] Specifically, Executive Order 13950 outlawed nine topics deemed to be "divisive concepts" ("Divisive Concepts").[71]

65. EO 13950's preamble asserted that its prohibition of Divisive Concepts was intended to address a "destructive ideology . . . grounded in misrepresentations" of American

---

[68] Remarks by President Trump at the White House Conference on American History (Sept. 17, 2020), https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-white-house-conference-american-history/ (introducing EO 13958 and the 1776 Commission).

[69] *Id.*

[70] Exec. Order No. 13950, 85 Fed. Reg. 60683 (Sept. 22, 2020).

[71] The Order defines "Divisive concepts" as:

> the concepts that: (1) one race or sex is inherently superior to another race or sex; (2) the United States is fundamentally racist or sexist; (3) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (4) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (5) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (6) an individual's moral character is necessarily determined by his or her race or sex; (7) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (8) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (9) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race. The term 'divisive concepts' also includes any other form of race or sex stereotyping or any other form of race or sex scapegoating.

*Id.*

history that suggest the country was founded "by white men, for the benefit of white men."[72]

66. Civil rights organizations and healthcare providers challenged EO 13950 in two separate federal lawsuits, for its violation of the free speech rights of federal contractors and grant recipients and its frustration of their ability to carry out their missions, including their ability to conduct trainings for their workforce on topics such as "implicit bias."[73]

67. A federal judge agreed, and on December 29, 2020, issued a nationwide injunction, enjoining the enforcement of EO 13950's prohibition of the training and discussion of Divisive Concepts as to federal contractors and federal grantees, as violative of the First Amendment and void for vagueness under the Fifth Amendment Due Process Clause.[74] The following month, President Biden revoked the executive order, mooting much of the litigation that had been pending.[75]

68. Despite the repudiation of the Divisive Concepts prohibition by a federal court and the Biden Administration, supporters of the now-defunct executive order quickly moved to replicate its censorship at the state level throughout the country.

69. South Carolina state legislators introduced a budget provision and seven bills from 2021–2023 with language that echoed the Trump administration's repudiation of Critical Race Theory, *The 1619 Project*, and the so-called Divisive Concepts.

70. More specifically, South Carolina's House Bills 4343 and 4799 sought to outlaw

---

[72] *Id*.

[73] *See* Complaint, *Nat'l Urb. League v. Trump*, No. 1:20-cv-03121 (D.D.C. Oct. 29 2020), 2020 WL 6391278; *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521 (N.D. Cal. 2020).

[74] *See Santa Cruz Lesbian & Gay Cmty. Ctr.*, 508 F. Supp. 3d at 550.

[75] Executive Order on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, Exec. Order No. 13985, 86 Fed. Reg. 7009 (January 20, 2021).

the teaching of *The 1619 Project* in South Carolina public schools and provided, in part, that "a public school must not teach, use, or provide for use by any pupil *The 1619 Project* as part of any curriculum, course materials, or instruction in any course."[76]

71. Much like the preamble to EO 13950, House Bill 4392 presented an ahistorical view of American history, in which slavery and other forms of White supremacy that discriminated against Black people were an aberration, rather than foundational, to the United States' origins. More specifically, H. 4392 prohibited teaching "that the advent of slavery in the territory that is now the United States constituted the true founding of the United States;"[77] or "that, with respect to their relationship to American values, slavery and racism are anything other than deviations from, betrayals of, or failures to live up to, the authentic founding principles of the United States, which include liberty and equality."[78] Slavery and White supremacy, of course, were inscribed in the founding principles of the United States.[79]

72. House Bills 4325, 4343, 4392, 4605, 4799, 5183, and 3728 all sought to outlaw what legislators defined as "critical race theory" ("Anti-CRT Bills").[80] The Anti-CRT Bills prohibited, among other things, inculcation of certain "discriminatory concepts," inaccurately

---

[76] Academic Integrity Act, H. 4343, 2021-2022 Gen. Assemb., 124th Sess. (S.C. 2021); Critical Race Theory, H. 4799, 2021-2022 Gen. Assemb., 124th Sess. (S.C. 2022); *see* S.C. Code Ann. § 59-29-650.

[77] Keep Partisanship Out of Civics Act, H. 4392, 2021-2022 Gen. Assemb., 124th Sess. (S.C. 2021).

[78] *Id.*

[79] *See, e.g.*, U.S. Const. art. 1, § 2, cl. 3.

[80] *See* Critical Race Theory Instruction Prohibition, H. 4325, 2021-2022 Gen. Assemb., 124th Sess. (S.C. 2021); S.C. H. 4343; S.C. H. 4392; Freedom From Ideological Coercion and Indoctrination, H. 4605, 2021-2022 Gen. Assemb., 124th Sess. (S.C. 2021); S.C. H. 4799; Integrity in Education Act, H. 5183, 2021-2022 Gen. Assemb., 124th Sess. (S.C. 2022); Transparency and Integrity in Education Act, H. 3728, 2023-2024 Gen. Assemb., 125th Sess. (S.C. 2023).

deemed to be "tenets" of CRT ("Discriminatory Concepts").[81] These Discriminatory Concepts mirrored much of what President Trump had previously identified as Divisive Concepts in Executive Order 13950.[82]

73. On April 29, 2021, the South Carolina State Senate introduced an amendment to the budget that prohibited the Discriminatory Concepts. In May 2021, just days before the legislature's regular session adjourned, the first three of the Anti-CRT Bills[83] were introduced and referred to the Education and Public Works Committee. In June 2021, before those Anti-CRT Bills could be debated and considered for enactment, the South Carolina Legislature returned to finalize and ratify the budget, including the budget amendment that formally incorporated the prohibition of Discriminatory Concepts into the General Appropriations Bill for Fiscal Year 2021–2022, H. 4100, 2021–2022 Gen. Assemb., 124th Sess. (S.C. 2021), under provision 1.105 titled, "Partisanship Curriculum."

74. Specifically, Budget Proviso 1.105 provided:

---

[81] S.C. H. 4343; *see also* S.C. H. 4799; S.C. H. 4605; S.C. H. 4325 ("'critical race theory' means any of the following tenets: . . . individuals should be adversely treated on the basis of their sex, race, ethnicity, religion, color, or national origin.").

[82] The Discriminatory Concepts included:

> (1) one race or sex is inherently superior to another race or sex; (2) an individual, by virtue of his or her race or sex, is inherently racist, sexist or oppressive, whether consciously or unconsciously; (3) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (4) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (5) an individual's moral character is necessarily determined by his or her race or sex, (6) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (7) any individual should feel discomfort, guilt, anguish or any other form of psychological distress on account of his or her race or sex; or, (8) meritocracy or traits such as a hard work ethic are racist or sexist or were created by members of a particular race to oppress members of another race.

S.C. H. 4343.

[83] S.C. H. 4325; S.C. H. 4343; S.C. H. 4392.

> For the current fiscal year, of the funds allocated by the Department of Education to school districts, no monies shall be used by any school district or school to provide instruction in, to teach, instruct, or train any administrator, teacher, staff member, or employee to adopt or believe, or to approve for use, make use of, or carry out standards, curricula, lesson plans, textbooks, instructional materials, or instructional practices that serve to inculcate any of the following concepts: (1) one race or sex is inherently superior to another race or sex; (2) an individual, by virtue of his race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (3) an individual should be discriminated against or receive adverse treatment solely or partly because of his race or sex; (4) an individual's moral standing or worth is necessarily determined by his race or sex; (5) an individual, by virtue of his race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (6) an individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his race or sex; (7) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by members of a particular race to oppress members of another race; and (8) fault, blame, or bias should be assigned to a race or sex, or to members of a race or sex because of their race or sex. Nothing contained herein shall be construed as prohibiting any professional development training for teachers related to issues of addressing unconscious bias within the context of teaching certain literary or historical concepts or issues related to the impacts of historical or past discriminatory policies.

75. While the Legislature repeatedly failed to pass the Anti-CRT Bills into law, it went on to incorporate identical language prohibiting the Discriminatory Concepts in the next four state budgets through budget provisos. Through the budgetary process, the Legislature passed the censorship into law by default each fiscal year. The Budget Proviso was ratified as budget provision 1.93 in the General Appropriations Bill for Fiscal Year 2022–2023, H. 5150, 2021–2022 Gen. Assemb., 124th Sess. (S.C. 2022); budget provision 1.82 in the General Appropriations Bill for Fiscal Year 2023–2024, H. 4300, 2023–2024 Gen. Assemb., 125th Sess. (S.C. 2023); and the currently operative budget provision 1.75 of the General Appropriations Bill for Fiscal Year 2026–2027, H. 5126, 2025–2026 Gen. Assemb., 126th Sess. (S.C. 2026).

76. The Budget Proviso's censorship of Discriminatory Concepts[84] suppresses certain speech and information about current and historic systemic race- and gender-based

---

[84] S.C. H. 5100 § 1.79.

inequalities. For example, a federal district court held that laws including similar language to the Budget Proviso—namely, the prohibition of the concept that "an individual should be discriminated against or receive adverse treatment solely or partly because of his race or sex"[85] —may censor efforts to advance affirmative action or educational equity for certain students who have been historically disadvantaged.[86]

77. Additionally, citing the federal government's own guidance, another federal district court found that the same prohibited concepts in Executive Order 13950 would unconstitutionally prohibit "unconscious or implicit bias training . . . to the extent it teaches or implies that an individual, by virtue of his or her race, sex, and/or national origin, is racist, sexist, oppressive, or biased, whether consciously or not."[87] The court further stated that, under the government's own interpretation, the prohibited concepts could also suppress speech on topics of "systemic racism and sexism, implicit bias, white privilege, intersectionality, and similar concepts."[88] Such topics would be suppressed despite scientific research documenting how such biases perpetuate persistent harms, privileges, and disadvantages associated with systemic

[85] *Id*. § 1.79(3).

[86] *See Pernell v. Fla. Bd. of Governors of State Univ. Sys.* 641 F. Supp. 3d 1218, 1233 (N.D. Fla. 2022) (noting that concept banned by Florida statute that "[a] person, by virtue of his or her race, color, national origin, or sex should be discriminated against or receive adverse treatment to achieve diversity, equity, or inclusion" is merely "another way to describe affirmative action"), *aff'd sub nom. Pernell v. Fla. Bd. of Governors of State Univ.*, 181 F.4th 1135 (11th Cir. 2026); *see also Loc. 8027 v. Edelblut*, No. 21-CV-1077-PB, 2024 WL 2722254, at *9 (D.N.H. May 28, 2024) ("But rather than take on issues like structural racism, implicit bias, and affirmative action directly, the Amendments employ general terms such as teaching that one race is superior to another, that individuals are inherently racist, and that individuals should not be subject to adverse treatment because of their race.").

[87] *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d at 539 (internal quotations and citation omitted).

[88] *Id*.

discrimination.[89]

78. Multiple statements from White legislators who supported the Budget Proviso's censorship indicate that *White* people—not Black people—were the intended beneficiaries of the proviso's prohibitions against causing people to "feel discomfort, guilt, or anguish" or assigning "fault, blame, or bias." For example, State Representative Melissa Oremus, who is White, stated that censorship was necessary because critical race theory caused her "uncomfortable feelings."[90] According to Representative Oremus, it would be "just wrong" for students to "be burdened" by hearing in the classroom that historical events occurred "because of your terrible White grandfather . . . or great-grandfather."[91] Representative Robert J. May—the primary sponsor of H. 4799, one of the bills that the Legislature failed to pass before it turned to the Budget Proviso—admitted that the bill would limit discussions related to slavery and prohibit schools from using *The 1619 Project* in the classroom.[92]

## IV. ABSENCE OF ANY PEDAGOGICAL VALUE IN BUDGET PROVISO

79. The state legislators who enacted the Budget Proviso and its prohibited Discriminatory Concepts have not identified their pedagogical value for South Carolina public

---

[89] *See*, e.g., Jennifer Eberhardt, *Biased: Uncovering the Hidden Prejudice That Shapes What We See, Think, and Do* 31 (2019).

[90] *January 26, 2022 Hearing on H.4325, H.4343, H.4392. H.4605, H.4799 Before the H. Educ. & Pub. Works Comm.*, 2021–2022 Gen. Assemb., 124th Sess. 1:50:00–1:55:08 (S.C. 2022) [hereinafter *January 26 Hearing*], https://www.scstatehouse.gov/video/archives.php.

[91] *Id.*

[92] *February 16, 2022 Hearing on H.4325, H.4343, H.4392, H.4605, and H.4799 Before the H. Educ. & Pub. Works Comm.*, 2021–2022 Gen. Assemb., 124th Sess. (S.C. 2022) [hereinafter *February 16 Hearing*], https://www.scstatehouse.gov/video/archives.php. Rep. May stated that, "[T]he only thing that my bill addresses about slavery is that with respect to their relationship to American values, slavery and racism are anything other than deviations and betrayals and failures to live up to what is in the Constitution and our American values. . . . If a teacher said that slavery was not a betrayal, that would be banned. . . . You could not say that slavery was other than a betrayal to live up to the authentic founding principles of the United States." *Id.* at 3:19:22-3:20:50.

schools.

80. Rather, by enacting the Budget Proviso to censor certain course materials and curricula, these state politicians have undermined many of South Carolina's own academic standards.

81. At the time the Budget Proviso was enacted, the 2019 SCDE standard stated that the fourth-grade curriculum must include instruction about the "economic, political, and social divisions during the United States Civil War"[93] to "encourage inquiry into the relationship between the Civil War and the experiences of women, African Americans, and the planter class in South Carolina."[94] The then-standards required that fourth-grade students be able to "identify and evaluate the economic, political, and social changes experienced throughout the Civil War" and discuss the "continuities and changes experienced by Americans of various genders, positions, races, and social status during the Civil War."[95]

82. Similarly, fifth-grade students were required to explore the "causes and impacts of social movements" with the skills and content necessary to "[a]nalyze the continuities and changes of race relations in the United States and South Carolina following the Supreme Court decisions of *Briggs v. Elliott* and *Brown v. Board of Education*."[96] The standards also require students to interrogate the causes and effects of "state-sponsored persecution," such as the Holocaust, and actions to defeat "discrimination toward marginalized groups in America."[97]

83. Standard 3 for sixth-grade social studies required that students demonstrated an

---

[93] Spearman, *supra* note 3, at 35.

[94] *Id*. at 36.

[95] *Id*.

[96] *Id.* at 46.

[97] *Id.* at 45.

understanding of the development of the Atlantic World.[98] Indicators for this standard advised teachers to promote "inquiry into the beginning of the Transatlantic slave trade, the ideological, economic, and political policies that upheld slavery, and how the slave trade led to the systematic oppression of Africans in the Atlantic World."[99] The standard further required curricula to "[c]ontextualize the experience of indigenous peoples due to expansion and the conflict that arose from it."[100]

84. Standard 5 for eighth-grade history required students to "[d]emonstrate an understanding of the impact of world events on South Carolina and the United States from 1929 to [the] present."[101] Indicators for this standard included that instruction should "foster inquiry into the changes in South Carolina's political party platforms resulting from the Civil Rights Movement"[102] and Nixon's Southern Strategy, and "utilize a variety of primary and secondary sources to analyze multiple perspectives on the cultural changes."[103] The standard further required that students be able to analyze the correlation between the Modern Civil Rights Movement in South Carolina and across the country, specifying that the indicator for this standard was developed to "promote inquiry into the relationship between national leadership, protests, and events and South Carolina leadership, protests and events, such as the Friendship Nine and the Orangeburg Massacre."[104]

---

[98] *Id.* at 56.

[99] *Id.*

[100] *Id.*

[101] *Id.* at 82.

[102] *Id.*

[103] *Id.* at 83.

[104] *Id.*

85. Lastly, the South Carolina Social Studies College- and Career- Ready Standards for secondary education required: "encourag[ing] inquiry into how the legislative and judicial branches responded to . . . emancipation;" "[s]ummariz[ing] the impact of technological changes and social developments on the U.S., including the Civil War;" "facilitat[ing] inquiry into how the Abolitionist Movement and Women's Rights Movements encouraged reforms;" "encourag[ing] inquiry into how events such as the Indian Removal Act, the Civil War, and Reconstruction prompted examination of the federal government's role in protecting natural rights;" and "encourag[ing] inquiry into the shaping of American culture as a result of mass media [and] African American cultural and arts movements."[105]

86. As demonstrated by South Carolina's current social studies standards, which have been in operation for five years, students are expected to engage with the complex histories and information related to Black history and race relations, even prior to high school.

87. Because the Budget Proviso caused the removal of *Stamped: Racism, Antiracism, and You*, by Ibram X. Kendi and Jason Reynolds, and the decertification of the AP AAS course, South Carolina students are unable to fully learn the complex history and factual information about pervasive racial inequalities in the United States and South Carolina, and the ongoing impact and present-day relevance of those inequalities—the very type of information that South Carolina's current social studies standards require. This inconsistency with the state standards illustrates the Budget Proviso's lack of pedagogical value.

## V. VAGUENESS OF BUDGET PROVISO'S "DISCRIMINATORY CONCEPTS"

88. The Budget Proviso's vagueness prevents instructors from knowing what is prohibited and what is not under its terms.

---

[105] *Id*. at 113–16.

89. For example, the Budget Proviso prohibits the use of SCDE funds to, among other things, "provide instruction in, to teach, instruct, or train" school employees with respect to "standards, curricula, lesson plans, textbooks, instructional materials, or instructional practices that serve to inculcate" the identified Discriminatory Concepts.[106] Yet the statute provides no definition of the term "inculcate."

90. Furthermore, the 2026-2027 Budget Proviso sanctions school employees who "adopt or believe . . . standards, curricula, lesson plans, textbooks, instructional materials, or instructional practices that serve to inculcate" the prohibited concepts. It is unclear to instructors what it means to "adopt or believe" in "inculcate[ing]" any of the so-called "discriminatory concepts," thus making these prohibitions limitless.

91. The Budget Proviso also denounces "Partisanship Curriculum," but that term is not defined within the body of the statute. The Budget Proviso does not provide any standards for identifying educational materials that are partisan. In other words, the Budget Proviso summarily references "partisanship curriculum" but provides no guidance or standards for identifying curriculum that is inappropriate as "partisan."

92. Moreover, the Discriminatory Concepts prohibited by the Budget Proviso include matters of race and gender in curricula or materials that may make an individual "feel discomfort, guilt, [or] anguish," or that "fault, blame, or bias should be assigned to a race or sex."[107] But the Budget Proviso does not provide any standards for identifying educational materials that make someone "feel discomfort, guilt, anguish," or that assign "fault, blame, or bias" to a race or sex.

---

[106] H. 5126, 2025-2026 Gen. Assemb., 126th Sess., Part 1B § 1.75 (S.C. 2026).

[107] *Id.*

93. The vague language of the Budget Proviso leaves teachers and school employees in an impossible position to either avoid any discussions about race or otherwise risk making students "uncomfortable." Former South Carolina Superintendent of Education Molly Spearman recognized the Budget Proviso's vagueness, noting that "our proviso this year ***really makes it kinda [sic] unclear when it says we should not teach things that [sic] make students feel uncomfortable*** . . . under some of the proposed legislation . . . the teaching of the holocaust and the discomfort we feel seeing the images . . . would not be allowed."[108]

94. If discussions about the Holocaust and Critical Race Theory are likely prohibited by the Budget Proviso, it is unclear what other concepts that might cause "discomfort" may also be prohibited.

95. Confusingly, though Defendants instructed schools that the AP AAS course violates the Budget Proviso, schools are free to offer a locally approved honors course on African American Studies. It is unclear how the AP AAS course would violate the Budget Proviso, if a locally approved Honors course would not.

96. Additionally, it is unclear whether a teacher may discuss or answer questions about the benefits and value of affirmative action, which arguably "treats members of identified groups different on account of their race" in violation of the Budget Proviso. Similarly, teachers may or may not be prohibited from speaking favorably about programs like the Small Business Administration affirmative action programs for socially disadvantaged business owners that include business owners disadvantaged because of their race.

97. Similarly, teachers may not know if they can laud the values of the Equal Rights Amendment and express disappointment with its failed ratification. And a teacher may not be

---

[108] *February 16 Hearing*, *supra* note 92, at 21:23-21:55.

able to suggest to students that women today are paid less than their male counterparts on account of their sex, and also may not be able to criticize pay disparity as a form of sex discrimination stemming from earlier times.

98. School librarians experience similar confusion. Librarians lack guidance on which books or library initiatives may or may not violate the Budget Proviso. For example, some schools have removed *Stamped: Racism, Antiracism, and You*, by Plaintiff Ibram X. Kendi and Jason Reynolds, pursuant to the Budget Proviso, but it is unclear whether that book has been removed in all other South Carolina public schools as well. In fact, there is no guidance as to why the book *Stamped* is prohibited and whether other books discussing racism or antiracism might also be prohibited.

99. Instructors are placed in an impossible situation of trying to understand what information is allowed and what information is prohibited by the Budget Proviso. Instructors have also faced consequences for failing to correctly interpret the proviso's vague language.

100. For example, Ayanna Mayes has been a public-school librarian in South Carolina for 13 years. Prior to the Budget Proviso's implementation, Mayes was able to perform her job without incident, as she developed informational library initiatives and made books accessible that would expose students to cultures, communities, and lived experiences different from their own. However, since the Budget Proviso's passage, Mayes has experienced increased surveillance and scrutiny of her work.

101. Mayes first learned about the Budget Proviso in 2021 and did not receive any guidance, training, or instruction on how the Budget Proviso impacts her job as a librarian.

102. Mayes still does not understand what it means to"inculcate" as used in the Budget Proviso, much less understand the Budget Proviso generally. She also cannot ascertain

which topics are deemed "sensitive" or prohibited by the Budget Proviso.

103. Mayes's school district removed *All Boys Aren't Blue* by George Johnson, a memoir that recounts the author's acceptance of his Black and queer identity. The book had been on the shelves at Irmo High School and was available in Mayes's library through inter-library loan. The school board characterized the book as "pornography," and district librarians were subjected to online harassment for allowing the book to be in circulation.

104. In 2022, Mayes's principal called her into two separate meetings during which she was informed that her school district was requiring her to alter and ultimately cancel a library initiative to support authors during national Banned Books Week. Unbeknownst to Mayes, someone came into her library, took a picture of her Banned Books Week flyer which read, "Show Your Love for a Banned Author," and a school board candidate ultimately posted the picture on their Facebook campaign page, stating "They are promoting banned books in Chapin High School." Mayes's principal instructed her to edit the flyer so that it did not appear that she was supporting banned books. Mayes changed the flyer, but a few days later, her principal told her that she needed to take down the flyer altogether because it was "biased" and did not show "both sides." The principal conveyed to her that he was being directed to say this, but he did not tell her by whom.

105. Mayes continues to worry that the library materials she creates for educational initiatives could continue to be photographed and used to file complaints against her. School board members use their Facebook pages to platform parents making complaints about educators, and Mayes fears being targeted online.

106. Mayes's school district also required her to restrict access to the nonfiction book *Yolk* by Mary H.K. Choi, after pictures of her School Library Month "Book Pals" initiative,

which anonymously paired teachers, students, and staff with access to new book titles, received online scrutiny and complaints. Because of this experience, Mayes now shares reviews for every book she plans to use for Book Pals with her supervisors and other librarians to get feedback. She does this to protect herself and her job, even though it is extra work.

107. Mayes also puts up book displays on tables and shelves in her library, which also invite scrutiny of her under the Budget Proviso. Upon information and belief, she has heard students complain about the displays violating the Budget Proviso and say that certain books should not be in the library. Upon information and belief, students and parents have complained to school board members that the displays violate the Budget Proviso.

108. As a result of the increased surveillance of her work by students, parents, and the school board due to the Budget Proviso, Mayes preemptively cancelled several additional library initiatives, including her book of the month program, library-sponsored trivia, and even a free book table, out of an abundance of caution for fear of violating the Budget Proviso. Mayes preemptively removed the book *Flamer*, a coming-of-age story about a young gay boy, for fear that the novel would violate the Budget Proviso.

109. Other titles that were previously available to high school students within District Three but were not required reading as part of classroom curriculum, including the entire *A Court of Thorns and Roses* series, have also been removed from general circulation in libraries or media centers following complaints and a directive from the school district. These books now either require written parental permission to be checked out, or have been removed from all school libraries throughout the entire school district.

110. Mayes understands that the restricted circulation or removal of these books under the Budget Proviso occurred outside the proscribed library material challenge process.

111. South Carolina restricts state funding through the vague and undefined scope of the Budget Proviso.

112. The budgetary restrictions that school districts face under the Budget Proviso translate to harsh penalties for school employees if they are considered to have violated the law, potentially jeopardizing state funding for the school. For example, during the 2022–2023 school year, when Mary Wood, a high school educator, assigned a memoir by Ta-Nehisi Coates, *Between the World and Me*, as part of her argumentative writing lesson in her AP English Language and Composition class, she was reported by some of her students.[109] The District Director of Secondary Education for Wood's school district and her school's Assistant Principal told her that her lesson plan violated the Budget Proviso. Indeed, school district administrators met with Wood on multiple occasions and claimed that her lesson plan and chosen educational videos about redlining and unequal opportunity violated the Budget Proviso. During one meeting, they provided Wood with a copy of the Budget Proviso, though at no point did the administrators explain what exactly the Budget Proviso meant or how her chosen instructional materials ran afoul of the Budget Proviso. On March 6, 2023, Wood received a letter of reprimand from her principal. The Budget Proviso also made her a target for attacks, and she experienced reputational damage when parents at school board meetings openly called for the district to impose adverse employment actions in response to her lesson plan because of its purported violation of the Budget Proviso.

113. Upon information and belief, Wood ended up cancelling multiple periods of her lesson plan about *Between the World and Me*, which would have included instruction on

---

[109] Hannah Natanson, *Students Reported Her for a Lesson on Race. Then She Taught It Again*, Wash. Post (Feb. 1, 2024), https://www.washingtonpost.com/education/2024/02/01/south-carolina-teacher-racism-lesson-revised/.

argumentative essay writing and constructive debate, because it was unclear what she could and could not say under the Budget Proviso.

114. Moreover, upon information and belief, despite her students' requests to resume having open classroom discussions and debates, Wood has had to drastically limit debates and constructive arguments in her class for fear of violating the Budget Proviso.

115. School officials initially instructed Wood to remove copies of *Between the World and Me* from her classroom altogether, and she complied.

116. Upon information and belief, months later, after receiving notification that her school district had ultimately approved *Between the World and Me* for instruction, Wood told her principal that she planned to reinclude the book in her curriculum and identified several alternative texts that met College Board standards for students who wished to opt out.

117. Despite the principal's awareness of this lesson plan, school officials told Wood, after a parent complained, that her opt-out alternatives were insufficient. Further, the Chief Instructional Officer for Wood's school district, as well as the District Content Specialist and the District Director, instructed Wood to include additional materials that disagreed with various aspects of the book, and to devote equal class time to *Between the World and Me* and these new materials, without regard to the truth or accuracy of the new materials. Wood did not receive guidance on how to avoid further conflict with the Budget Proviso.

118. In October 2023, school board member Catherine Huddle emailed the Superintendent of her school district requesting copies of all books purchased by or for Chapin High School English teachers since the 2021–2022 school year. While Ms. Huddle ultimately stated that she did not find any books that concerned her, Wood worries that the increased scrutiny of her job would expose her to professional consequences.

119. This school year (2024–2025), Wood again taught *Between the World and Me*. Her principal required her to provide an opt-out option to students who did not want to read the book and to spend an equal amount of time teaching texts that disagreed with the book. Her principal also required her to send a letter to the parents of the students in her AP English class, explaining her rationale for teaching the book and providing the relevant College Board standards. Wood has not been asked to send a similar letter about any other books taught in her class.

120. Like Wood, educators who teach lessons related to "race" or "critical race theory"—in subjects as wide-ranging as sociology, history, and civics—risk being subject to adverse employment actions, including increased surveillance of their work, professional reprimand, suspension, or termination. Adding to this risk, SCDE recently set up an anonymous hotline for members of the public to report teachers whose lessons allegedly violate the Budget Proviso. Walker Decl., ECF No. 30-4 ¶ 26. Educators like Wood also face public, personal attacks for purportedly "inculcating" students with a concept that is prohibited by state legislators.

121. Upon information and belief, during an October 2024 school board campaign, the "Defeating Communism" Political Action Committee distributed flyers to homes in Wood's community, featuring her name, face, and the statement "Controversy is rearing around our schools . . . it's time to put parents back in the driver's seat!" She did not go to work for two days, and kept her children home, for her safety and the safety of her school.

122. These significant consequences to job security and personal safety because of the Budget Proviso encourage educators, like Wood, to avoid difficult topics altogether if they want to avoid controversy.

123. Importantly, the Budget Proviso has no standards to evaluate compliance with its provisions. Because it does not indicate who can determine whether a curriculum "serves to inculcate" the prohibited concepts, the Budget Proviso relies on subjective judgments of unidentified decisionmakers without statutory definitions or guidance. This lack of standards causes teachers to self-censor, thereby depriving students of their First Amendment right to receive information and ideas.

124. This unfettered discretion in determining violations of the Budget Proviso leaves open the possibility that the prohibited concepts will be interpreted to ban discussions about race and racism to the disadvantage of Black people.

## VI. DISCRIMINATION AGAINST BLACK SOUTH CAROLINIANS

125. When passing and enacting the Budget Proviso, South Carolina legislators were motivated, at least in part, by the race of the people who would be disadvantaged by the Budget Proviso—and, vice versa, they were motivated by the race of the people who would benefit from the Budget Proviso.

126. In addition, Defendants are not enforcing the Budget Proviso evenhandedly. Defendants selectively enforce the proviso to prohibit and discourage educational engagement related to the historical oppression of, or animus against, particular groups of people based on race, color, and ethnicity, including discussion of slavery, White supremacy, unconscious bias, and systemic racism. This enforcement disproportionately harms Black people.

### *A. Departure from Ordinary Legislative Procedures*

127. The Budget Proviso's censorship of Discriminatory Concepts became South Carolina law through a rushed budgetary process that circumvented longstanding, standard procedures for regulating classroom instruction, after legislators failed to pass multiple Anti-CRT Bills through the legislative process.

128. The standard process through which the Department of Education promulgates regulations on classroom instruction has several steps. This process includes: (1) review and approval of the regulation by the Department of Education; (2) review and approval by the Board of Education; and (3) review and approval by the South Carolina General Assembly.

129. For example, Article 19 of the SCDE Regulations, "Instructional Program," provides the required content of public-school programs for grades K-12, and was reviewed and approved by the Department of Education, the Board of Education, and the General Assembly.[110]

130. The Legislature may also regulate classroom instruction through the passage of a law, as was done with the Educational Improvement Act in 1984, which required South Carolina schools to include Black history in their "regular" history and social studies courses by the 1989–1990 school year.[111]

131. However, with the Budget Proviso, the Legislature pursued neither standard course of action to regulate K-12 education. Instead, after repeatedly failing to secure a legislative win with multiple Anti-CRT Bills, legislators used the budgetary process to circumvent public scrutiny and swiftly ratify classroom censorship into law.

132. In May 2021, just days before the end of the regular legislative session, the first three of the Anti-CRT Bills were introduced by legislators and referred to the House Education and Public Works Committee. These bills included the Critical Race Theory Instruction Prohibition, H. 4325, 2021–2022 Gen. Assemb., 124th Sess. (S.C. 2021); the Academic Integrity Act, H. 4343, 2021–2022 Gen. Assemb., 124th Sess. (S.C. 2021); and the Keep

[110] Instructional Program, S.C. Code Regs. §§ 43-231 to 43-234 (2024).

[111] S.C. Code Ann. § 59-29-55.

Partisanship Out of Civics Act, H. 4392, 2021–2022 Gen. Assemb., 124th Sess. (S.C. 2021).

133. Before these Anti-CRT bills could be debated and properly considered, legislators circumvented the legislative process and included the same language censoring the Discriminatory Concepts through a budget provision numbered 1.105 ("Budget Proviso 1.105") as part of the General Appropriations Bill for Fiscal Year 2021–2022, H. 4100, 2021–2022 Gen. Assemb., 124th Sess. (S.C. 2021).

134. With the ratification of Budget Proviso 1.105, the language outlawing the Discriminatory Concepts in South Carolina's public schools became effective before the Anti-CRT Bills even had a chance to make it out of Committee.

135. On November 17, 2021, once the Legislature returned to session, legislators introduced a fourth Anti-CRT Bill prohibiting the Discriminatory Concepts: Freedom From Ideological Coercion and Indoctrination, H. 4605, 2021–2022 Gen. Assemb., 124th Sess. (S.C. 2021).

136. Later, in the new year, on January 13, 2022, the legislature introduced another Anti-CRT Bill, Critical Race Theory, H. 4799, 2021–2022 Gen. Assemb., 124th Sess. (S.C. 2022), which sought to ban the Discriminatory Concepts and *The 1619 Project* from South Carolina's public schools.

137. All five Anti-CRT Bills soon advanced to robust public comment and testimony before the Committee for Education and Public Works. The Committee held three public meetings, which collectively lasted over 15 hours and 44 minutes and featured testimony from 83 people, including—without limitation—concerned community members, educators, parents, and students, the vast majority of whom testified against the Anti-CRT Bills and their censorship of so-called Discriminatory Concepts.

138. The Committee also discussed the proposed legislation in two more meetings that were closed to the public, during which the Committee Chair and Research Director spoke for 43 minutes. Afterwards, Committee members questioned both the Chair and Research Director for approximately three hours about the Anti-CRT Bills in the closed-door session.

139. After this robust legislative debate and public process, the Committee decided, without explanation, not to advance any of the five Anti-CRT Bills. Instead, on March 30, 2022, the Committee consolidated the bills into one omnibus bill, the South Carolina Transparency and Integrity in Education Act, H. 5183, 2021–2022 Gen. Assemb., 124th Sess. (S.C. 2022), which again prohibited the Discriminatory Concepts.

140. Public educators and civic groups lobbied against the omnibus bill, which ultimately failed to pass by *sine die*, or the end of the formal legislative session, on May 12, 2022.[112]

141. However, shortly after the South Carolina Legislature failed to pass the omnibus bill, it unexpectedly called a special unlimited session to begin on May 17, 2022, to finalize the state budget. During that special session, the Legislature ratified the Budget Proviso to swiftly extend the budgetary censorship of the Discriminatory Concepts—censorship that it failed to successfully pass through the public legislative process.

142. With the budgetary process, the Legislature did not hold any hearings at which the public could comment.

143. The Legislature has repeated this tactic annually since 2021, circumventing a failed legislative process, and the accompanying public scrutiny, to ratify discriminatory

---

[112] *See* Sine Die Adjournment, S. 1325, 2021–2022 Gen. Assemb., 124th Sess. (S.C. 2022).

censorship and regulate classroom content through the state budget.

144. In 2023 and 2024, the Legislature failed to pass yet another Anti-CRT Bill, the Transparency and Integrity in Education Act, H. 3728, 2023–2024 Gen. Assemb., 125th Sess. (S.C. 2023), which again sought to prohibit schools from teaching the Discriminatory Concepts. Instead, the Legislature ratified the Budget Proviso for two more fiscal cycles, including section 1.82 of the General Appropriations Bill for Fiscal Year 2023–2024, H. 4300, 2023–2024 Gen. Assemb., 125th Sess. (S.C. 2023) and the now operative section 1.79 of the General Appropriations Bill for Fiscal Year 2024–2025, H. 5100, 2023–2024 Gen. Assemb., 125th Sess. (S.C. 2024).

145. South Carolina House Representative Bill Taylor had called H. 3728 an "Anti-CRT Bill" that would "require[] 'fact-based' discussions on history while creating a multi-step uniform process for parents to raise objections if they believe already banned concepts are being taught."[113] Representative Taylor explained that "anti-CRT bill" H. 3728's "*[b]anned concepts, initially inserted in the state budget two years ago*, include any race being superior to another, anyone being responsible for past atrocities because of their race, and traits such as hard work being considered oppressive and racist."[114] He also stated that H. 3728 would "require[] 'fact-based' discussions on history while creating a multi-step uniform process for parents to raise objections if they believe already banned concepts are being taught."[115]

### ***B. Legislative Notice of Harm to Black South Carolinians***

146. The South Carolina Legislature enacted the Budget Proviso despite testimony

---

[113] Bill Taylor, *Cancel Culture Push Back*, Taylor S.C. House (Apr. 22, 2023), https://taylorschouse.com/newsletter/cancel-culture-push-back/.

[114] *Id*. (emphasis added).

[115] *Id*.

from several community members and comments from some of its own legislators regarding the proviso's significant risk of causing discrimination.

147. The testimony from concerned community members spanned five separate meetings of the House Education and Public Works Committee during the 2021–2022 legislative session. At the first and fifth meetings, the Committee members discussed the legislation with each other. At the second, third, and fourth meetings, the Committee heard public testimony from over 80 speakers.

148. During a meeting held on January 26, 2022, the Committee discussed the Anti-CRT Bills publicly,[116] at which time several Black committee members raised concerns. Representative Terry Alexander shared: "That's my concern. . . . When we create bills or laws, I don't care how right it is, it *is* going to offend somebody. . . . [I]t should be upon us . . . [to] be mindful of the offense that [the legislation] *might have on other folks as well*."[117] Representative Michael Rivers added: "I see this as a marketing reaction . . . to the shifting demographics that's making a lot of people uncomfortable, because . . . in some ways, the privilege that they've been used to is being challenged and there's some consternation about that. That's how I see it. I also find it somewhat amusing that people that [have] always been free, who have always known freedom, [are] somewhat nervous about the aspects of other people enjoying the same freedom that they have been used to enjoying all of their lives."[118]

149. At a public meeting held on February 16, 2022, former Fairfield County School District Superintendent Dr. J.R. Green provided public comment and emphasized that the Anti-

[116] *See January 26 Hearing*, *supra* note 90.

[117] *Id.* at 0:42:20 (emphasis added).

[118] *Id.* at 1:17:38.

CRT Bills would be a "disservice to people of color."[119] Marcus McDonald, a substitute teacher and community organizer echoed the same, telling the Committee: "I want to make this clear that *this will have a negative effect on Black and brown children across the state*."[120] Mr. McDonald warned of the potential harm to students "being Black in the school system in South Carolina; and not seeing representation in the curriculum."[121] Another community member and teacher, Dr. Susi Long, voiced the same concern: "Whose discomfort are we worried about? Is it the White student who may learn the history of enslavement or current events? Or is it the Black student who *lives through 12 years of schooling without learning the history's resistance and resilience of their people* beyond one designated month of the year?"[122]

150. On March 1, 2022, Courtney McClain, then President of the NAACP Youth & College Division of South Carolina, testified.[123] She warned the Committee that many of her peers would be forced to transfer if majors such as African American History were no longer offered at the University of South Carolina.[124] And she encouraged the Committee to "uphold the freedom brought by Harriet Tubman, the fight of Malcolm X, [and] the intellect of W. E. B. Du Bois in our history books, and not remove content because it makes some people uncomfortable. What is uncomfortable is to see my ancestors erased, Black leaders who are still alive today and lived through [racist events] have their experiences invalidated as 'divisive.'

---

[119] *February 16 Hearing*, *supra* note 92, at 2:02:40.

[120] *Id.* at 3:38:36.

[121] *Id.* at 3:39:09.

[122] *Id.* at 4:16:27.

[123] *March 1, 2022 Hearing on H.4325, H.4343, H.4392, H.4605 and H.4799 Before the H. Educ. & Pub. Works Comm.*, 2021–2022 Gen. Assemb., 124th Sess. 2:58:48 (S.C. 2022) [hereinafter *March 1 Hearing*], https://www.scstatehouse.gov/video/archives.php.

[124] *See id.* at 3:00:09.

This legislation is not against critical race theory, but for the *suppression of basic history and the promotion of America's history from a non-POC perspective*."[125] Audrey K. Starks-Lane, a Charleston parent, similarly warned that the legislation would "continue to perpetrate the White supremacist system and way of thinking."[126] Ms. Starks-Lane also brought the Committee's attention to signatures from 140 community members who could not attend the hearing—whom Cleo Scott Brown, owner of the History Matters Institute, later clarified were *all* against the proposed legislation.[127] Speaking to a world where the legislation was adopted, criminal defense attorney Katherine Myers remarked: "If you say 'forget the past and let's start a blank slate,' it's not *really* equal."[128]

151. At its final public meeting, on March 8, 2022, the Committee was again put on notice of the disparate harm that the Budget Proviso would have on people of color—this time by school leaders in particular. Dr. Barron R. Davis, then superintendent of Richland School District 2, warned that "[i]f these bills are passed and take root in our state, we will create more separation and division."[129] And Leticia Voll, a former school principal, shed light on how the legislation's potential impact on teacher training would perpetuate the "achievement gaps between Black, White, and Hispanic students."[130] She cautioned that "to prohibit professional development related to race or gender [would] impair the abilities of school leaders in schools

[125] *Id.* at 3:00:30.

[126] *Id.* at 3:16:00.

[127] *Id.* at 4:16:10.

[128] *Id.* at 4:35:10.

[129] *March 8, 2022 Hearing on H.4325, H.4343, H.4392, H.4605 and H.4799 Before the H. Educ. & Pub. Works Comm.*, 2021–2022 Gen. Assemb., 124th Sess. 1:04:22 (S.C. 2022) [hereinafter *March 8 Hearing*], https://www.scstatehouse.gov/video/archives.php.

[130] *Id.* at 2:38:48.

of education to properly train and prepare teaching staff. *Schools look at data disaggregated by race and gender and adopt key strategies to support the needs of their learners based on the data*."[131]

152. The Committee also met on March 29, 2022, this time without public comment.[132] Observing how the unpopular omnibus Anti-CRT Bill moved forward despite such prolific public warning of its likely harm on Black South Carolinians, Representative Annie E. McDaniel stated: "[T]he bill is being advanced with the total racial split on this committee. All five African American Democrats voted no. All twelve Caucasian Republicans voted yes. That sounds like we have taken ourselves so far back in history."[133]

153. The Committee was also aware that its proposed legislation mirrored similar laws across the country, which are causing harm to people of color. On March 8, 2022, Riley Sutherland, a history student at the University of South Carolina, urged the Committee to draw lessons from the consequences of Florida's Stop W.O.K.E. Act: "We have to ask ourselves: If these bills were to pass, then how would people interpret them? And we don't have to speculate, because identical texts have already become law in several states. And look at what's happening there. . . . In Florida, under a resolution with identical text, the education commissioner has already reported instances of *teachers being censored or terminated for discussing African American history with their students*."[134]

154. That same day, the public testimony also warned the Committee of the potential

---

[131] *Id.* at 2:40:11 (emphasis added).

[132] *See March 29, 2022 Hearing on H.4325, H.4343, H.4392, H.4605 and H.4799 Before the H. Educ. & Pub. Works Comm.*, 2021–2022 Gen. Assemb., 124th Sess. 1:04:22 (S.C. 2022), https://www.scstatehouse.gov/video/archives.php.

[133] *Id.* at 1:49:10.

[134] *March 8 Hearing*, *supra* note 129, at 5:36:05.

illegality of the proposed legislation. Etienne C. Toussaint, a Law Professor at the University of South Carolina, cautioned that "these bills stand on shaky legal grounds."[135] Another expert, Joe Cohn, Legislative Director of the free speech group FIRE, noted his agreement with Professor Toussaint and concluded that two of the bills were unconstitutional.[136] Yet, the Legislature moved forward with ratifying its controversial censorship through the Budget Proviso, despite ample warning of its potential illegality and harm to Black people in South Carolina.

### *C. Disproportionate Harms to Black South Carolinians*

155. Since its inception, the Budget Proviso has been utilized to chill important speech in classroom discussions and curriculum that advances equality for people of color who continue to face racial barriers, especially Black people, in deference to state legislators' own discriminatory viewpoints and in furtherance of their discriminatory purpose.

156. As a consequence, the removal of curriculum and educational materials that discuss race and anti-racism disproportionately harms Black people in South Carolina.

157. Research shows that students who see positive representations of themselves in their curriculum have improved educational outcomes.[137] For Black students, culturally relevant education decreases dropout rates and suspensions while increasing student participation, confidence, academic achievement, and graduation rates.[138] Thus, evidence-based and pedagogical best practices call for more culturally relevant and racially inclusive curriculum,

---

[135] *Id.* at 0:09:39.

[136] *Id.* at 3:57:12.

[137] *See* Thomas S. Dee & Emily K. Penner, *The Causal Effects of Cultural Relevance: Evidence from an Ethnic Studies Curriculum*, 54 Am. Educ. Rsch. J. 127 (2017), https://www.jstor.org/stable/44245373.

[138] *Id.* at 129–30, 150.

including curriculum about Black people, so that students of color, especially Black students, who experience educational disadvantages may have more opportunities to thrive in school.

158. Racially inclusive pedagogy has been proven to be an effective educational approach and empowers students of color to be "more intellectually engaged and empowered, experience enhanced self-efficacy, develop a positive sense of racial identity, have higher individual and group self-esteem, experience a sense of social belonging, and become more securely attached to themselves and the social community."[139]

159. The Budget Proviso's prohibitions risk precluding discussions or acknowledgement of White supremacy's role in slavery, lynchings, Jim Crow laws, and segregation, as well as references to pervasive advantages and disadvantages associated with race and gender in our society. Significantly, these concepts are critically important to the Black experience, as well as the understanding of Black history, in South Carolina and the United States as a whole.

160. The unique focus on censoring concepts pertaining to the Black American experience demonstrates the discriminatory purpose of the Budget Proviso. These restrictions were implemented without the involvement of any students, educators, experts, or social science research studies supporting this unilateral action by political state actors.

161. Based on the most recent data, Black students comprise 30.42% (237,028 students) of South Carolina's public school student population.[140] Yet Black students and other

[139] Nat'l Educ. Ass'n & L. Firm Antiracism All., *The Very Foundation of Good Citizenship: The Legal and Pedagogical Case for Culturally Responsive and Racially Inclusive Public Education for All Students* 7 (2022), https://www.nea.org/sites/default/files/2022-09/lfaa-nea-white-paper.pdf.

[140] *Active Student Headcounts, District Headcount by Gender, Ethnicity and Pupils in Poverty 2025-26*, S.C. Dep't of Educ., https://ed.sc.gov/data/other/student-counts/active-student-headcounts/ (last visited Sept. 16, 2026).

students of color who continue to face unfair disadvantages in the public school system do not see their own cultures and experiences reflected in the curriculum. Worse, they are confronted with public statements and actions, like those related to the Budget Proviso, that denounce the very existence or value of important elements of their cultures and experiences.

162. Thus, Black people, including Black students in South Carolina public schools, are disproportionately harmed by the Budget Proviso's prohibitions.

**a. <u>Book Removals</u>**

163. Without clear explanation, the Budget Proviso has been used to remove books by Black authors that tackle topics of systemic racism and highlight personal experiences with racism, including *Between the World and Me* by Ta-Nehisi Coates and *Stamped: Racism, Antiracism, and You* by Plaintiff Ibram X. Kendi and Jason Reynolds.[141]

164. *Stamped* is an adaptation of Plaintiff Kendi's seminal work, *Stamped from the Beginning*, and was written specifically for young adults. *Stamped* describes and deconstructs the history of racist thought in the United States and encourages young readers to have developmentally appropriate conversations about race and inequality. The National Education Association categorizes *Stamped* as a "young adult level" book and provides access to an educator guide and other classroom resources related to the book.[142]

---

[141] Hannah Natanson, *Her Students Reported Her for a Lesson on Race. Can She Trust Them Again?*, Wash. Post (Sept. 18, 2023), https://www.washingtonpost.com/education/2023/09/18/south-carolina-teacher-ta-nehisi-coates-racism-lesson/; Kailee Kokes, *Batesburg-Leesville Schools Remove Book on Racism, National Censorship Watchdog Pushes Back*, Lexington Cnty. Chron. (Oct. 27, 2022), https://www.lexingtonchronicle.com/stories/batesburg-leesville-schools-remove-book-on-racism-national-censorship-watchdog-pushes-back,30882?.

[142] *Stamped: Racism, Antiracism, and You*, Nat'l Educ. Ass'n, https://www.nea.org/professional-excellence/student-engagement/read-across-america/find-your-book/stamped-racism-antiracism-and-you (last visited Sept. 16, 2026).

165. *Stamped* has received myriad awards and recognition. It is a #1 *New York Times* bestseller, a *Wall Street Journal* bestseller, the *Washington Post*'s Best Children's Book of the Year, a *Parents Magazine* and *Publishers Weekly* Best Book of the Year, *TIME Magazine's* Ten Best Children's and Young Adult Books of the Year, a Barnes & Noble Book of the Year finalist, a Jane Addams Children's Book Award finalist, a *Kirkus* prize finalist, the 2021 Children's Choices – Best of the Year, a Georgia Children's Book Awards 2021-2022 Top 20 Finalist, and the 2021 Kids' Book Choice Awards Best Book of the Year.

166. Nevertheless, *Stamped* has been removed from many libraries across the state.[143]

167. In October 2022, School District Three Defendant removed *Stamped* by Plaintiff Kendi and Jason Reynolds from all of its schools and libraries, due to concerns that it violated the Budget Proviso.[144] On November 30, 2022, after review of the text, School District Three Defendant's review committee[145] recommended the formal removal of *Stamped* from circulation in the district. School District Three Defendant removed *Stamped* because of the Budget Proviso and without anyone lodging a formal complaint against the contents of *Stamped*.

168. The internal committee appointed by the District to review *Stamped*, however, claimed that *Stamped* is "adverse to the state requirement that books under the theme [SDCE]: Partisanship Curriculum item number 2 – an individual, by virtue of his race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously[,] would be banned." *Id*. at 3. In further support of its removal, the District's review committee rejected several of

---

[143] *See Index Data, Spineless Shelves: Two Years of Book Banning*, PEN Am. (Dec. 14, 2023), https://pen.org/spineless-shelves/ [hereinafter *Index Data*] (indicating removal of Stamped from schools in Lexington County, Beaufort County, and Pickens County).

[144] *See* Kokes, *supra* note 141.

[145] The review committee was comprised of one media specialist, one English/language arts teacher, one principal, one community member, and one other district staff. ECF No. 30-3, at 2.

*Stamped*'s arguments, including that racial inequality explains why "40% of [the] incarcerated population is [B]lack," instead concluding the disparity is simply "cause and effect." *Id*.

169. Between August of 2022 and November of 2023, *Stamped* was the only book reviewed and removed by School District Three Defendant.[146]

170. Under School District Three Defendant's policy that was in effect at the time of the removal, the decision to remove *Stamped* could not be appealed through internal processes until 2027.

171. As demonstrated by its content, *Stamped* is intended to address the ongoing discrimination that Black people continue to experience in the United States. Thus, by enacting the Budget Proviso that caused the removal of *Stamped*, the state legislature and School District Three Defendant removed a resource for students and educators to discuss the problems of racism and how to address various manifestations of racism. That removal is particularly harmful to Black people, including Black students, who are more likely to experience the racism addressed in the book.

172. School District Three Defendant did not suggest that *Stamped* contained inappropriate language, vulgarity, or adult sexual content.

173. Instead, School District Three Defendant's disagreement with the opinions contained in the book, not the book's educational suitability, drove the decision to remove *Stamped* from the school district's library shelves.

174. Additionally, there contention that reading *Stamped* amounts to "inculcating" students into a theory or perspective lacks support. A core tenet of the book is devoted to

[146] Kailee Kokes, *A Survey of Book Complaints and Removals at Lexington County School Districts*, Lexington Cnty. Chron. (Nov. 2, 2023), https://www.lexingtonchronicle.com/stories/a-survey-of-book-complaintsand-removals-at-lexington-county-school-districts,75769.

critiquing some of the same concepts that the Budget Proviso prohibits. For example, Plaintiff Kendi writes in the book's introduction that "a racist idea is any idea that suggests something is wrong or right, superior or inferior, better or worse about a racial group. An antiracist idea is any idea that suggests that racial groups are equal."[147]

175. Another core theme that Plaintiff Kendi espouses in *Stamped* is that people are not inherently racist or oppressive by virtue of their race. This position is aligned with—not in contravention of—the Budget Proviso.

176. School District Three Defendant's decision to remove *Stamped* from its school libraries across the district was not based on any objectively neutral pedagogical concern but rather personal disagreement with the book's contents.

177. The Budget Proviso was an operative and substantial cause of *Stamped's* removal from District Three libraries. If the Budget Proviso is declared unconstitutional and Defendants are enjoined from relying upon it, a significant barrier preventing Stamped from returning to circulation will be removed. Such relief would materially increase the likelihood that students may again access Stamped in District Three schools and would redress Dr. Kendi's ongoing injuries resulting from its removal.

178. District Three's statements about *Stamped* harmed Dr. Kendi's reputation as an author, academic scholar, and historian.

179. Upon information and belief, other books have been removed from school libraries across the state because they discuss concepts related to race and sex with which the legislature disagrees.[148]

---

[147] Jason Reynolds & Ibram X. Kendi, *Stamped: Racism, Antiracism, and You* (2020).

[148] *See Index Data*, *supra* note 143.

**b. Course Cancellations**

180. Defendant Weaver's enforcement of the Budget Proviso resulted in the cancellation of AP AAS, a nationally standardized course providing instruction on the history, culture, and impact of Black people in America and beyond.

181. In 2022, the College Board implemented a pilot program for AP AAS, a course that offers students a rich, evidence-based education about the history and experiences of Black people throughout American and South Carolinian history to the present day. The framework for AP AAS was developed in consultation with more than 300 African American studies professors, to examine the "diversity of African American experiences through direct encounters with varied sources" and explore key issues ranging from early African kingdoms to both historical and ongoing challenges and achievements.[149] The course includes the study of the intersections of race, gender, and class for African Americans; the past, present, and future implications of social movements and strategies to combat systemic inequality in American society; and the literary and artistic traditions of the African diaspora, among other topics.

182. High school students who participate in AP courses are more likely than similarly situated students who do not take AP courses to enroll in a four-year college, succeed in introductory college courses, and take subsequent AP courses.[150] Yet, according to a report from The Education Trust, a nonprofit that advocates for equity in education, Black students

---

[149] *AP African American Studies: Course and Exam Description* 6, Coll. Bd. (2024), https://apcentral.collegeboard.org/media/pdf/ap-african-american-studies-course-and-exam-description.pdf; *Advanced Placement Program Releases Official AP African American Studies Framework*, Coll. Bd. (Feb. 1, 2023), https://newsroom.collegeboard.org/advanced-placement-program-releases-official-ap-african-american-studies-framework.

[150] *New Analyses of AP Scores of 1 and 2*, Coll. Bd. (June 2021), https://reports.collegeboard.org/media/pdf/new-analyses-ap-scores-1-and-2_1.pdf.

remain underrepresented in AP classes.[151] Other reports indicate that, nationally, White students were 1.8 times more likely than Black students to be in an AP course.[152]

183. In South Carolina, White students were 3.2 times more likely than Black students to be in AP courses, the highest racial disparity in the country.[153] AP AAS provided an opportunity to fill this racial gap because the course was designed to better engage with "those from traditionally underrepresented groups and those who have not taken an AP course before," according to College Board.[154]

184. Consistent with College Board's intention for creating the course, one student shared that high interest in AP AAS encouraged Black students to engage in advanced level learning. This course was the first AP course for some Black students, and they were excited to see their race and culture represented in an advanced class. Other students also expressed high interest in the course. Adelaide Lanz, a White high school student in Charleston County, stated that AP AAS "was a lot of [students'] first AP class. It was their first time taking an AP exam or writing free response questions and learning at a higher level."[155]

185. Nacala McDaniels, a Black student at Clemson, who took AP AAS as a high school senior in the 2022–2023 academic year, stated that the elimination of the course is "insulting to

---

[151] *See Black and Latino Students Shut Out of Advanced Coursework Opportunities*, Ed Trust (Jan. 9, 2020), https://edtrust.org/press-release/black-and-latino-students-shut-out-of-advanced-coursework-opportunities/.

[152] Lena V. Groeger et al., *Miseducation: Is There Racial Inequality at Your School?,* ProPublica (Oct. 16, 2018), https://projects.propublica.org/miseducation/.

[153] *Id.*

[154] Valerie Nava, *AP African American Studies Class Cut by SC Education Department was an 'Eye Opener', Students Said*, Post & Courier (July 15, 2024), https://www.postandcourier.com/education-lab/ap-african-american-studies-students-speak-sc/article_8fe2d8fa-3d54-11ef-a1b3-2fd46b2a8e4d.html.

[155] *Id.*

the Black community but also to the students who have a passion for learning."[156] Similarly, Clementine Jordan, a former student who took AP AAS at Ridge View High School, stated that "[d]eciding not to add the class 'implies that the study of African Americans is politically biased and inherently a form of indoctrination.'"[157] Anaya Hardy, a Black student who took AP AAS during the first year it was offered in South Carolina, stated that the elimination of AP AAS from the state's public schools was "very upsetting . . . because now students are not going to get the same chance [she] got to learn more about themselves, their culture and the things that people who look like them, sound like them and oftentimes, think like them, did and how they contributed to society as a whole."[158] To Hardy and many other Black students who, for the first time, saw themselves reflected in their AP curriculum, "it didn't seem fair."[159]

186. Defendant Weaver's suggestion to replace AP AAS with a locally approved Honors course disregards the undue financial burden that would shift to local school districts. When AP AAS had a state-approved course code, SCDE covered or supported costs necessary to make the course available to students across South Carolina, including educator certification and training, curriculum resources and materials, textbooks, and AP exam fees. Those financial and administrative supports are not available in the same way for locally approved Honors courses. Districts that attempt to recreate AP AAS locally must therefore absorb those expenses themselves, including the costs of developing curriculum, purchasing instructional materials, training teachers,

---

[156] Skylar Laird, *Students, Teachers Call on SC Education Agency to Add AP African American Studies to State List*, S.C. Daily Gazette (June 11, 2024), https://scdailygazette.com/2024/06/11/students-teachers-call-for-sc-education-agency-to-add-african-american-studies-to-ap-roster/.

[157] *Id.*

[158] *See* Nava, *supra* note 154.

[159] *Id.*

and administering any comparable assessments. Upon information and belief, many districts lack the financial resources and capacity to develop, staff, and fund a course equivalent to AP AAS. As a result, the purported Honors-course alternative is not meaningfully available to many students and does not cure the injury caused by Defendant Weaver's cancellation of AP AAS.

187. Moreover, locally approved Honors courses are not adequate substitutes for AP AAS. Honors African American Studies courses are substantively different from AP AAS because they are not nationally standardized and not as comprehensive, interdisciplinary, or academically rigorous as the AP course. As compared to an Honors version, AP AAS allowed students to explore concepts and ideas on a more comprehensive and theoretical level, including filling historical gaps in Honors coursework and developing an understanding of social and cultural trends. AP AAS provides an interdisciplinary approach, allowing students to use original texts, literature, art, economics, the sciences, and other sources to explore different aspects of African American history that an Honors course may not provide.

188. In addition to traditionally lasting a full course year (as opposed to semester), AP classes are also weighted more heavily than Honors classes in grade point average calculations, which can make a critical difference when students apply for scholarships, colleges, and universities. In addition, many colleges and universities offer credit for AP courses based on AP examination performance, which can translate into direct financial benefits for students who can take a reduced course load or graduate more quickly. Students relegated to a locally approved Honors course are therefore denied both the substantive educational benefits of AP AAS and the concrete academic and financial benefits associated with AP coursework.

189. Upon information and belief, AP AAS is not the only course that Defendant Weaver has targeted pursuant to the Budget Proviso. In SCDE's course code database, the following

courses were noted to be deactivated for the 2025–2026 school year: Dual Enrollment Black Atlantic and African Diaspora (HIST 363); Dual Enrollment Studies in Black Feminism (AAST 333); and Dual Enrollment Black Women Writers (ENGL 315).[160]

190. This pattern of targeting courses related to Black identity, arts, and culture for cancellation has been alarming, particularly when coupled with the lack of timely notice regarding the deactivation of AP AAS. Cancellation of these courses would also disproportionately harm Black students preparing for post-secondary education because of their disproportionate interest in these subject areas and their disproportionate benefit from courses that reflect their families, experiences, and perspectives.

191. Data released by the SCDE reveals that similar AP courses focused on other races, ethnicities, or cultures that are not associated with Black people have not been targeted for cancellation. According to state data that tracks AP exam results from 2018–2024, courses in Chinese Language and Culture; Spanish Language; Spanish Literature and Culture; French Language and Culture; German Language and Culture; and European History have been consistently offered by the South Carolina public schools during that six-year time frame.[161] Upon information and belief, SCDE did not cancel any of these courses for the 2024-2025 academic years.

**c. <u>Collaboration with Prager University Foundation</u>**

192. Defendant Weaver further seeks to limit critical discussions about systemic race and gender inequalities by instructing South Carolina schools to supplement curriculum with

[160] *SCDE Course Code Database*, S.C. Standards, https://sc-satchel.commongoodlt.com/6020cfb4-33a0-49dd-b464-1973c96831cb/296baa93-32f6-4b6f-957b-df1636681f62/839 (last visited Sept. 16, 2026).

[161] *AP*, S.C. Dep't of Educ., https://ed.sc.gov/data/test-scores/national-assessments/ap/ (last visited Sept. 16, 2026).

materials from a controversial and partisan advocacy group, Prager University Foundation ("PragerU").[162] PragerU launched PragerU Kids, which creates lesson plans and other materials specifically designed to combat the "[w]oke agendas [that] are infiltrating classrooms, culture, and social media."[163]

193. In September of 2024, Defendant Weaver announced a "partnership" between the South Carolina Department of Education and the media organization, based on PragerU's representation that its content aligns with South Carolina's educational standards.[164] On December 12, 2024, after concluding its assessment of which PragerU resources align with its standards, the SCDE added the "PragerU Standards Aligned Resources" document to its official website,

---

[162] PragerU is an advocacy group and media organization known for producing short, and often controversial, videos promoting partisan viewpoints on a range of political, social, and civic topics. The group was co-founded by conservative talk show host Dennis Prager in 2009 to offer free and accessible alternatives to "dominant left-wing ideology," and Prager himself has candidly admitted that one of his organization's goals is to indoctrinate children with its content. *See* Kerry Sheridan, *Videos by PragerU, a conservative media company, can be played in Florida classrooms*, NPR (Aug. 11, 2023), https://www.npr.org/2023/08/11/1193534564/videos-by-prageru-a-conservative-media-company-can-be-played-in-florida-classroo; Caleb Ecarma, *PragerU: Coming to a Public School Near You?*, Vanity Fair (Aug. 17, 2023).

[163] Several organizations, such as the Southern Poverty Law Center and the Freedom From Religion Foundation, have publicly challenged PragerU's content, raising concerns about the accuracy and bias present in their educational materials. In 2018, the SPLC identified a handful of videos—including "Playing the Black Card" and "Blacks in Power Don't Empower Blacks"—as functional "dog whistles to the extreme right." *See* Brendan Kelley, *PragerU's Influence*, S. Poverty L. Ctr. (June 7, 2018), https://www.splcenter.org/hatewatch/2018/06/07/prageru%E2%80%99s-influence. The Freedom From Religion Foundation has also issued a statement to the Oklahoma State Board of Education, urging them to terminate their partnership with PragerU to "ensure that Oklahoma students are indeed educated, not indoctrinated." *FFRF Warns PragerU Misinforms Students in Florida and Oklahoma*, Freedom from Religion Found. (Sept. 11, 2023), https://ffrf.org/news/news-releases/item/42678-ffrf-warns-that-propaganda-factory-will-misinform-students-in-florida-and-oklahoma.

[164] *See SC Standards with PragerU Content*, PragerU, https://assets.ctfassets.net/qnesrjodfi80/6yjhu05PKeEPFNQwVE9cXa/0479162a5dac3c1935c0fbcd5900a466/SC_Standards_with_PragerU_Content.pdf (last visited Sept. 16, 2026).

overviewing each South Carolina school standard by grade level with its corresponding PragerU materials.[165] Some of the PragerU materials included on the SCDE's approved list include a five-minute video entitled *Why You Should Be a Nationalist.* Importantly, this assessment and inclusion of PragerU materials into the SCDE curriculum was made without consultation of the SCBOE or any period of public notice and comment.[166]

194. Yet, the materials offered by PragerU provide an inaccurate recounting of Black history in America. For example, in one video, PragerU argues that the Three-Fifths Compromise, rather than an example of codified racial subjugation, actually had "nothing to do with the individual worth of a human slave," and "was an example of difficult, but necessary, political bargaining[.]"[167] Another video titled, "The Myth of Voter Suppression," opens with the question "do Republicans win elections by preventing minorities, Blacks, Latinos, and others from voting?"[168] The video goes on to assert that voter suppression is a myth that continues to be perpetuated by the "Left" and "Progressives," because "one party simply can't accept that they

---

165 *PragerU Standard Aligned Resources*, S.C. Dep't of Educ., https://ed.sc.gov/newsroom/strategic-engagement/prageru-standards-aligned-resources/ (last visited Sept. 16, 2026).

166 *Rightwing 'PragerU' Content is Now Available Through SC Education Department Portal,* Post & Courtier (Dec. 15, 2024), https://www.postandcourier.com/education-lab/sc-education-portal-prageru-conservative-content-resource/article_8a52542e-b676-11ef-b21c-af58fd76aa44.html#newsletter-popup.

167 Carol Swain, *Why the 3/5ths Compromise Was Anti-Slavery*, PragerU (July 22, 2018), https://www.prageru.com/video/why-the-threefifths-compromise-was-anti-slavery.

168 Jason Riley, *Myth of Voter Suppression,* PragerU (Dec. 2, 2019), https://www.prageru.com/video/the-myth-of-voter-suppression.

will lose a close election."[169] According to Superintendent Weaver, materials like these can be used by South Carolina schools to supplement both primary and secondary curriculum.[170]

195. Through this partnership with PragerU, Defendant Weaver has advanced unaccredited, partisan educational materials that perpetuate falsehoods related to the historical oppression of, or animus against, particular groups of people based on race, color, and ethnicity—and Black people, in particular. Such materials have an express purpose to "indoctrinate" students with radical and unsupported ideas and opinions, but are nevertheless permitted under the Budget Proviso.[171]

**d. <u>Freedom Caucus Lawsuits</u>**

196. The Budget Proviso has been utilized by the Freedom Caucus, a group of South Carolina state legislators, to affirmatively and aggressively eliminate or restrict curricular content about Black people or for the benefit of people of color in South Carolina public schools. In November 2022, the Freedom Caucus filed lawsuits challenging the use of EL Education, or inclusive curriculum, by Lexington County and Charleston County School Districts as alleged violations of the Budget Proviso.[172]

---

[169] *Id.*

[170] *See* PragerU in Schs., *PragerU Kids Is Now in South Carolina Schools*, PragerU (Sept. 16, 2024), https://www.prageru.com/video/prageru-kids-is-now-in-south-carolina-schools.

[171] While PragerU's co-founder states that the purpose of the group is to indoctrinate students, the Budget Proviso expressly prohibits curriculum and instructional materials, or instructional practices that serve to inculcate students on certain prohibited concepts. *See* Kerry Sheridan, *Videos by PragerU, A Conservative Media Company, Can Be Played in Florida Classrooms*, NPR (Aug. 11, 2023), https://www.npr.org/2023/08/11/1193534564/videos-by-prageru-a-conservative-media-company-can-be-played-in-florida-classroo.

[172] Complaint ¶¶ 37–40, *S.C. Freedom Caucus v. Charleston Cnty. Sch. Dist.*, No. 2022-CP-10-05451 (S.C. Ct. Common Pleas Nov. 28, 2022); *see also S.C. Freedom Caucus v. Lexington Cnty. Sch. Dist. One*, Civ. Act. No. 2022-CP-32-03931 (S.C. Ct. Common Pleas Nov. 16, 2022).

197. EL Education, formerly known as Expeditionary Learning, is a school reform model that emphasizes high achievement through active learning, character growth, and teamwork. The instruction aims to "[e]mpower [] students to achieve more than they thought possible by adopting [a] unique approach to curriculum, instruction, culture and character, assessment, and leadership."[173]

198. In its complaints, the Freedom Caucus claims that EL Education violated the Budget Proviso's provision "prohibit[ing] Defendants from using state monies to indoctrinate students or teachers in Critical Race Theory-Derived Ideas,"[174] and the use of "state money to indoctrinate teachers and students in the theories of racial primacy, which 'reject the philosophy of colorblindness' as inherently racist."[175]

199. As examples of the "Critical Race Theory-Derived Ideas" alleged to violate the Budget Proviso, the Freedom Caucus cited various statements and materials from EL Education's website, including a slide deck previously used for training teachers that allegedly called for "educators to be anti-racist" and to "acknowledge that 'whites benefit unfairly from structural racism.'"[176]

200. The Freedom Caucus also claimed that violations of the Budget Proviso were demonstrated by the fact that a significant portion of EL Education's curricular texts are authored

---

[173] *Core Practices*, EL Educ., https://eleducation.org/core-practices (last visited Sept. 16, 2026).

[174] Complaint, *supra* note 172, ¶ 38.

[175] *Id.* ¶ 3 (citation omitted).

[176] *Id.* ¶ 25.

by people of color, and the Freedom Caucus's assessment that *To Kill a Mockingbird* was included "primarily to criticize the book for 'center[ing] on the white experience of anti-black racism.'"[177]

201. As a result of these lawsuits, on June 20, 2023, Lexington One entered into a settlement agreement, obligating it to: (1) "end all contracts with EL Education, Inc., including for curricula and other school services, after the end of the 2022–2023 school year and not renew any agreements with EL Education, Inc. for 2023–2024[;]" and (2) "fully comply with all South Carolina laws regarding instruction and training for students, teachers, and other staff."[178]

202. On June 11, 2024, Charleston County also entered into a settlement agreement obligating it to "end all agreements with EL Education, Inc., including for curricula and other school services, after the end of the 2023–2024 school year and not renew any agreements with EL Education, Inc. for 2024–2025."[179]

203. Upon information and belief,, educators across South Carolina are confused about what conversations may be appropriate to have in the classroom, including what discussions, assignments, and materials they can and cannot include in their courses, due to ongoing limitations to curricula and censorship lawsuits as a result of the Budget Proviso.

204. This confusion, as well as the lawsuit settlements, deprive South Carolina students, including student members of NAACP-South Carolina, from accessing accurate information about race, racism, and the experiences of Black people that they would otherwise receive from educators.

---

[177] *Id.* ¶¶ 19, 22.

[178] *Lexington One Settles with SC Freedom Caucus*, WLTX (June 20, 2023), https://www.wltx.com/article/news/local/lexington-one-settlement-sc-freedom-caucus/101-72442042-c08e-4cd8-9a19-4fcb5716f088.

[179] Rule 408 Negotiation*, S.C. Freedom Caucus v. Charleston Cnty. Sch. Dist.*, No. 2022-CP-10-05451, (S.C. Cir. Ct. 2024).

### *D. Enforcement of the Budget Proviso*

205. The enforcement of the Budget Proviso targets Black people so they are treated differently than other similarly situated people.

206. This differential treatment of Black people in the enforcement of the Budget Proviso is consistent with the underlying reasons why the Budget Proviso was enacted, as expressed by the legislation's authors and supporters. *See supra* ¶ 78.

207. For example, the Budget Proviso prohibits instruction that may make an individual "feel discomfort, guilt, anguish, or any other form of psychological distress on account of his race or sex," or that may inculcate that "fault, blame, or bias should be assigned to a race or sex, or to members of a race or sex because of their race or sex."[180]

208. Although the statute's text does not identify any specific race or ethnicity, the provision's enforcement inherently focuses on the feelings of White people for the clear benefit of White people. In other words, as enforced, the Budget Proviso prohibits making a *White* person "feel discomfort, guilt, anguish . . . on account of his race" and prohibits inculcating that "fault, blame, or bias should be assigned to a race or sex, or to [*White people*] because of their race or sex."

209. This targeted enforcement of the Budget Proviso is consistent with statements made by the legislation's authors and supporters. Examples include comments from State Representative Melissa Oremus, a White legislator, that critical race theory made her feel "uncomfortable" and that it would be "just wrong" for students to "be burdened" by hearing in the

[180] H. 5126, 2025-2026 Gen. Assemb., 126th Sess., Part 1B § 1.75 (S.C. 2026).

classroom that historical events occurred "because of your terrible White grandfather . . . or great-grandfather."[181]

210. In addition, the Budget Proviso prohibits instruction or materials that suggest "an individual, by virtue of his race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; [] an individual should be discriminated against or receive adverse treatment solely or partly because of his race or sex; [] an individual's moral standing or worth is necessarily determined by his race or sex; [] an individual, by virtue of his race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; . . . [and] meritocracy or traits such as a hard work ethic are racist or sexist, or were created by members of a particular race to oppress members of another race."[182]

211. These statutory provisions do not refer to any particular race,but *are* enforced with a specific race or ethnicity in mind.

212. For example, as currently enforced, the Budget Proviso prohibits the concept that "an individual, by virtue of his [White] race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously."[183] There is no evidence that the Budget Proviso is enforced to prohibit the suggestion that a person, "by virtue of his [Black] race," is "inherently racist . . . or oppressive."

213. Another example is the enforcement of the Budget Proviso's prohibition against concepts that "one race or sex is inherently superior to another race or sex."[184] There is no evidence that the Budget Proviso is enforced to prohibit the concept that "the Black race is inherently

[181] *January 26 Hearing*, *supra* note 90, at 1:50:25–1:52:06.

[182] H. 5126, 2025-2026 Gen. Assemb., 126th Sess., Part 1B § 1.75 (S.C. 2026).

[183] *Id.*

[184] *Id.*

superior to the white race." *Id*. However, there is evidence—such as the censorship of the books *Stamped* and *Between the World and Me*—that the Budget Proviso prohibits discussions of widely denounced ideologies, like White supremacy, that are premised on the concept that "the white race is inherently superior to the Black race." *Id*.

214. This interpretation of the Budget Proviso, as it has been enforced, is consistent with the acknowledgment by Representative Robert J. May—the primary sponsor of H 4799, one of the bills that the Legislature failed to pass before it turned to the Budget Proviso—that the bill would limit discussions related to slavery and prohibit schools from using *The 1619 Project* because scholarship on slavery and *The 1619 Project* often include discussions about White supremacy.[185]

215. The uneven enforcement based on race is also evidenced by the courses and materials targeted by the Budget Proviso. AP AAS is the only course cancelled due to the Budget Proviso. Upon information and belief, no other course has been cancelled so abruptly or in the manner in which the AP AAS course was removed from South Carolina public schools. In addition, upon information and belief, no AP course discussing the history or culture of other non-Black races or ethnicities has been—or will be—cancelled or targeted for cancellation.

216. Moreover, the Budget Proviso has cancelled books, curriculum, and materials pertaining to race or racism, like *Stamped*, that center on Black people in the United States, including America's history of racism and White supremacy. Upon information and belief, books, curriculum, and materials pertaining to race or racism that center on other races or ethnicities have not been cancelled as a result of the Budget Proviso.

---

[185] *See supra* ¶ 78.

## VII. STUDENTS' INABILITY TO RECEIVE CERTAIN INFORMATION ABOUT RACE AND RACISM: CANCELLATION OF AP AFRICAN AMERICAN STUDIES

217. The AP AAS course was first piloted nationwide in 60 schools for the school year 2022–2023, including Ridge View High School in South Carolina. In its second year, during the 2023–2024 academic year, the AP AAS pilot program in South Carolina expanded to students in at least 12 schools across the state. Towards the close of the 2023–2024 school year, there was no indication that state approval for AP AAS for the 2024–2025 school year would be any different than the prior years. Teachers, students, and parents at the piloted schools had no reason to believe that AP AAS would not continue and many more schools planned to offer the course in the 2024–2025 school year Schools and districts across the state included AP AAS in their course catalog for the 2024–2025 school year. Similarly, Academic Magnet High School offered AP AAS in its 2024–2025 Program of Studies and the course appeared on the 2024–2025 course registration form for West Ashley High School.

218. AP AAS was highly sought after by students. In Charleston County alone, over 100 high school students expressed interest in the course.[186] In Ridge View High School, more students signed up to take the course than the assigned classroom allowed. ECF No. 30-4 ¶ 11. AP AAS is also popular nationally. College Board stated that AP AAS is one of the most popular courses

---

[186] Valerie Nava, *State Nixed AP African American Studies Course. Charleston County May Offer Honors Version*, Post & Courier (Aug. 15, 2024), https://www.postandcourier.com/education-lab/charleston-schools-african-american-studies-ap-honors/article_97f72c66-5a42-11ef-9082-db96cd28371d.html.

it offers, even in states with restrictions on teaching about race.[187] Nationwide, over 700 schools offered the course in the 2023–2024 school year.[188]

219. Students who have taken the course described it as "eye-open[ing]."[189] Anaya Hardy, a Black student who took AP AAS during the first year it was offered in South Carolina public schools, described how the course enabled her "to learn about other personalities from different time periods and the global impact African Americans have had beyond the U.S."[190] She said that she began to "actually look forward to going to class" because she knew she would learn something different every day.[191] Another Black student described how the class "sparked her interest due to her desire to learn more about history."[192]

220. Nacala McDaniels, who took the course as a high school senior in the 2022–2023 academic year, said she had taken plenty of AP classes, but she was particularly interested to take an AP course focused on African American history at a higher level.[193]

221. Students also highlighted how AP AAS aligned with their personal and professional interests.

222. Upon information and belief, the majority of students who enrolled in AP AAS in South Carolina were African American.

---

[187] Ileana Najarro, *Can South Carolina Schools Teach AP African American Studies? It's Complicated*, Educ. Week, https://www.edweek.org/teaching-learning/can-south-carolina-schools-teach-ap-african-american-studies-its-complicated/2024/06 (June 6, 2024).

[188] *Id.*

[189] *See* Nava, *supra* note 154.

[190] *Id.*

[191] *Id.* (internal quotations omitted).

[192] *Id.*

[193] *Id.*

223. Educators that received training to teach AP AAS described it as “rigorous” and “comprehensive.” One educator distinguished the substance of AP AAS, compared to general African American history courses, highlighting how the AP course offers important interdisciplinary education for students. “Literature, art, you get to look at different aspects of the history as opposed to just learning the dates and who did what.”[194] Another educator, in discussing the differences between their school’s AP AAS and honors African American Studies syllabus, similarly detailed that the AP AAS course was both more comprehensive and interdisciplinary in structure, as compared to the honors version.

224. In addition to providing both historically accurate and culturally relevant instruction, AP AAS also provides students with rigorous academic standards in preparation for post-secondary study. AP classes are nationally standardized and are designed to mirror college-level coursework; thus, unlike their honors counterparts, they allow for students to receive a higher grade point average and college credit.[195] Indeed, local school officials have stated that the course offered a “pathway for more students to realize themselves in an honors-level curriculum to open the doors for so many opportunities even beyond this course,” including improving their academic achievement markers of college readiness.[196]

225. Students are able to boost their grade point average from AP AAS because the course followed the national standards established for AP courses. According to the South

---

[194] Kei’Yona Jordon, *AP African American Studies Course Halted in SC High Schools* (June 13, 2024), https://abcnews4.com/news/local/ap-african-american-studies-course-brought-to-an-end-in-sc-high-schools-ellen-weaver-state-department-of-education-clementine-jordan-teachers-students-black-history-pilot-program (internal quotations omitted).

[195] AP courses are graded on a 6.0 scale, rather than the lower 5.0 scale for honors courses, and 4.0 for regular courses.

[196] Nava, *supra* note 186.

Carolina Uniform Grading Policy, AP courses are "State Board Approved Advanced Learning Opportunities" that are weighted a full quality point (i.e., two credits) above the standard 4.0 scale. Honors courses, by contrast, are weighted only half a quality point above the standard 4.0 scale for regular courses.[197]

226. South Carolina has paid for the exam fees for all students enrolled in AP courses, including AP AAS, as well as AP professional development training for teachers.[198] The state also offers all but two of the other 39 existing AP courses—the exceptions being AP Japanese and AP Italian.[199]

227. On June 4, 2024, during the summer and after countless students planned to enroll in the course, the South Carolina Department of Education issued a memorandum notifying District Superintendents and District Instructional Leaders that "the course code previously assigned to the African American Studies AP Pilot would not be valid for the 2024–2025 school year."[200] The SCDE stated that its decision to remove the course code was made because "in the years since this pilot began, there has been significant controversy surrounding the course

---

[197] *South Carolina Uniform Grading Policy*, S.C. State Bd. of Educ. 4-5 (May 2019), https://ed.sc.gov/districts-schools/state-accountability/uniform-grading-policy/ugp-may-2019-final-pdf/?fbclid=IwZXh0bgNhZW0CMTAAAR3KJ9NkqP2q1MLGWxUjtONtZAGarfqPG4lnAX4c43rlPl96ydeBvnZEmWM_aem_Adzvdkp9UWlsQj5Dv54yqXUdA7Ox2AS1MrpyMwAmWQsl-7jRV1WfmtSx-coep2zGpQ8ZnMSiyv67anKxwEHddqgn.

[198] Najarro, *supra* note 187.

[199] *Id.*

[200] Mem. from C. Matthew Ferguson, Deputy Superintendent and Chief Acad. Officer, S.C. Dep't of Educ., to Dist. Superintendents and Instructional Leaders (June 4, 2024), https://www.ed.sc.gov/newsroom/school-district-memoranda-archive/clarification-on-ap-course-offerings/clarification-on-ap-course-offerings-memo/.

concerning issues directly addressed by South Carolina's [Legislature] in a budget proviso as well as in pending permanent legislation."[201]

228. Though the Department characterized the course as too controversial to approve its AP designation, its memorandum notes "[t]here is nothing preventing districts from continuing to offer AP African American Studies as a locally-approved honors course should they choose to do so."[202]

229. The SCDE provided another purported basis for its decision to abruptly cancel the AP AAS course code: the then-upcoming review of "the state's social studies standards."[203] Upon information and belief, however, the review committee was not scheduled to begin meeting until Fall 2025, and any revised standards would not be implemented until the 2026–2027 school year at the earliest..[204]

230. The timing of SCDE's decision further supports an inference that its reliance on the social studies standards review was pretextual. SCDE cancelled AP AAS in June 2024, approximately one year before the review committee was scheduled to begin meeting in Fall 2025, and before any revised standards could be developed, approved, or implemented. Upon information and belief, any revised social studies standards would not take effect until the 2026–2027 school year at the earliest.

---

[201] *Id.*

[202] *Id.*

[203] *Id.*

[204] Ex. A, Mem. from Dana Yow, Exec. Dir. of S.C. Educ. Oversight Comm., to Sen. Greg Hembree *et al*. (Mar. 4, 2025).

231. Indeed, the SCDE Cyclical Review of the 2019 SC College- and Career-Ready Standards for Social Studies was not performed until after SCDE had already cancelled AP AAS for the 2024–2025 school year and did not contain any recommendations specific to AP AAS.[205]

232. The SCDE Cyclical Review noted "[t]he 9th–12th grade standards should include discussions of global civilizations and a variety of groups to ensure that multiple viewpoints are examined. The 9th–12th grade standards should also continue to integrate multiple viewpoints in the study of history, including viewpoints and experiences at the same time on the same issues."[206]

233. In making the determination to remove AP AAS, the Department did not evaluate the general interest in the course, nor did it consider how the course fit within Education Improvement Act obligations or state social studies standards. Upon information and belief, it is not normal practice to remove a course code in anticipation of an upcoming review of that subject's state standards. Indeed, SCDE announced at the same time that it would not renew the course code for both AP-AAS and Pre-Calculus.[207] But SCDE's decision not to renew the course code for AP Pre-Calculus was made *after* the relevant statewide standards were approved. The South Carolina standards for Mathematics were approved by the State Board of Education on December 12, 2023 to be implemented in the 2025-26 school year.[208]

234. The Education Improvement Act recognized South Carolina's dire need to provide students with comprehensive and rigorous instruction related to Black History and culture. The

---

[205] Ellen E. Weaver, *SCDE Cyclical Review of the 2019 SC College- and Career-Ready Standards for Social Studies*, South Carolina Dep't of Ed. (Mar. 4, 2026), https://ed.sc.gov/state-board/state-board-of-education/standards-learning-and-accountability-sla/items/march-2026/sla02-attach-scde-cyclical-review-2019-social-studies-standards/.

[206] *Id*. at 11.

[207] Mem. From C. Matthew Ferguson, *supra* note 200.

[208] *Standards*, S.C. Dep't of Educ., https://ed.sc.gov/instruction/standards/mathematics/standards/.

social studies standards for high school students are fully consistent with—and, in fact, generally parallel—the AP AAS curriculum, while also deepening students' critical thinking and writing skills and providing the opportunity to potentially obtain college credit.[209] The social studies standards published by the SCDE in 2019 included discussions of race that align with the goals of AP AAS. The South Carolina Social Studies College- and Career-Ready Standards require the SCDE to "instruct students in the history of [] black people as a regular part of its history and social studies courses" and "develop[] and locat[e] suitable printed materials and other aids for instruction in black history."[210]

235. One board member of a South Carolina School district characterized the decision to remove AP AAS as "a political one" that "has no place in denying students the academic knowledge and freedom to study this course content."[211]

236. Defendants Weaver's decision to eliminate the code for AP AAS was unexpected and abrupt. It came after the end of the 2023–2024 school year, after students—upwards of 60 students in Charleston County alone—had already mapped out their courses for the upcoming school year and planned to enroll in AP AAS for the following academic year. A.G., then a freshman at Blythewood High School, had enrolled, in AP AAS for the following academic year. Defendant Weaver's decision to eliminate the course code for AP AAS also confused both students and educators and "appeared to be deliberately misleading."[212] AP educators noted in an open

---

[209] *See* Letter from LDF et al. to Superintendent Ellen Weaver (June 11, 2024), https://www.naacpldf.org/wp-content/uploads/2024-06-10-SCDOE-Letter-re-AP-African-American-Studies-FINAL62.pdf.

[210] Spearman, *supra* note 3, at 5.

[211] Nava, *supra* note 186.

[212] Steven Nuzum & Nicole Walker, *Open Letter on AP African American Studies* (June 13, 2024), https://otherduties.substack.com/p/open-letter-on-ap-african-american (last visited Sept. 17, 2026).

letter that the SCDE did not provide a substantive explanation for the cancellation of AP AAS and much of the rationale provided, other than the Budget Proviso, fell flat. For example, AP educators noted that SCDE was merely presuming AP AAS would not pass the cyclical review of the state social studies standards, as the new standards had not yet been created.[213]

237. Since the cancellation of AP AAS, high-achieving high school students might opt to take another AP class instead of a lower-level African American history course to maintain their grade point average lead.[214] As one South Carolina history teacher stated, "There's nothing to be gained by denying history being taught on the advanced placement level."[215]

238. Removal of the course also thwarted student attempts to take advantage of Advanced Learning Opportunities. "By deciding not to offer an [Advanced Learning Opportunities] designation to the AP African American Studies course, the Department is knowingly and intentionally reducing the amount of grade points students can receive for taking the course."[216]

239. Educators have highlighted the financial burden this decision will now create for South Carolina schools. School districts that choose to adopt the course as an Honors class would need to use their own funds.[217] "[D]istricts without a course code will presumably be responsible for all of the expenses related to offering the course. This includes large expenses like buying

---

[213] *Id*.

[214] Skylar Laird, *Students, Teachers Call on SC Education Agency to Add AP African American Studies to State List* (June 11, 2024), https://scdailygazette.com/2024/06/11/students-teachers-call-for-sc-education-agency-to-add-african-american-studies-to-ap-roster/.

[215] Alexa Jurado, *SC Ends AP African American Studies in Public Schools. Some Say It's 'Whitewashing History'* (June 12, 2024), https://ca.news.yahoo.com/sc-ends-ap-african-american-131041564.html.

[216] Nuzum & Walker, *supra* note 213.

[217] *See* Nava, *supra* note 154.

textbooks and sending teachers to required College Board trainings, which for many districts means the course is out of reach for students who want to take it."[218] This new financial obligation may not be a possibility for many districts. "In practice, many districts cannot afford this additional expense, so by refusing to provide a course code the Department is effectively killing the course in under-resourced districts, and interfering with the ability of all districts to make their own decisions about which courses to offer."[219]

240. Not all public-school students throughout South Carolina have access to locally approved honors courses because many schools do not have the financial resources or capacity to develop a new course as comprehensive as the AP AAS course developed by College Board.

241. Defendant Weaver's cancellation of AP AAS has denied South Carolina public school students the opportunity to engage in the rigorous study of African American history and culture, including without limitation their struggles, accomplishments, and contributions to the United States, for which they can obtain college credit.

242. Plaintiff T.R. and member of Plaintiff NAACP-South Carolina A.G., who attend schools that planned to offer the AP AAS course for the 2024–2025 school year prior to its cancellation, will no longer be able to take the course and engage in its advanced study of the history of their ancestors while receiving college credit. All would take AP AAS if it is reinstated before they graduate.

243. College Board contemplates that AP AAS can be taught in a single semester.[220]

---

[218] Nuzum & Walker, *supra* note 213.

[219] *Id.*

[220] *AP African American Studies: Course and Exam Description*, *supra* note 149 at 12.

244. Upon information and belief, if the SCDE reinstates the course code for AP AAS, schools and school districts in South Carolina can launch the course within a few weeks if they want to offer it, and can launch it with very little administrative burden.

245. These same harms apply to Black children of the members of Plaintiff NAACP-South Carolina, who attend schools that had previously offered the AP AAS course and/or had planned to offer AP AAS but are now unable to receive the information in AP AAS because of the Budget Proviso.

## CLAIMS FOR RELIEF

## COUNT ONE

### FIRST AMENDMENT RIGHT TO RECEIVE INFORMATION

(Student Plaintiffs Against Defendant Weaver)

246. Plaintiffs incorporate and re-allege each and every allegation contained above as if fully set forth herein.

247. The First Amendment binds the State of South Carolina pursuant to the incorporation doctrine of the Fourteenth Amendment. All references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

248. The First Amendment protects the right to receive information and ideas as well as the right to disseminate ideas. A state's restriction on students' access to information and ideas must be "reasonably related to [a] legitimate pedagogical concerns." *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 273 (1988). But even if restrictions are reasonably related to legitimate pedagogical interests, they are unconstitutional if driven by illegitimate motives, including "narrowly partisan or political" interests, "racial animus," or a desire to "deny [students] access to ideas with which [the government actor disagree[s]." *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 870–72 (1982). *See also S.C. State Conference of the NAACP v. Weaver*, 181 F.4th 353, 374 (4th Cir. 2026) (affirming standing for Student Plaintiffs' claim in this case "that the First Amendment affords them the right to receive information and that Weaver's enforcement of the Proviso—i.e., removing the AP AAS course code—infringes that right by eliminating their ability to take AP AAS.").

249. The Budget Proviso's prohibitions are not based on any legitimate pedagogical interest. The state lawmakers who enacted the Budget Proviso did not identify how its prohibitions

have educational value for South Carolina public schools. Additionally, actions taken in compliance with the Budget Proviso have undermined South Carolina's academic standards. *See supra* § IV. Rather, the Budget Proviso was motivated by a desire to suppress expression and dissemination of ideas and opinions pertaining to race and racism related to Black people in conflict with the narrow political interests of the law's supporters. The Budget Proviso was motivated by a desire to eliminate from public education the ideas and opinions about which the legislative supporters disagree, and/or a racially discriminatory motive.

250. The Budget Proviso violates the First Amendment on its face because it prohibits educators from teaching specific concepts about race and racism in public schools throughout the state of South Carolina thereby depriving all students, including Student Plaintiffs, of their First Amendment right to receive information and ideas that otherwise would be taught to them.

251. In the alternative, the Budget Proviso violates the First Amendment as applied to A.G. and NAACP-South Carolina. When Defendant Weaver cancelled the AP AAS course code, she denied Student Plaintiffs access to the information they would have received from the course, including a more in-depth perspective on African American history and culture.

## <u>COUNT TWO</u>

**FIRST AMENDMENT**
**VIEWPOINT DISCRIMINATION**
(Author Plaintiff Against School District Three Defendant)

252. Plaintiffs incorporate and re-allege each and every allegation contained above as if fully set forth herein.

253. The First Amendment binds the State of South Carolina pursuant to the incorporation doctrine of the Fourteenth Amendment. All references to the First Amendment include the First Amendment as applied to the states through the Fourteenth Amendment.

254. Because libraries within the Lexington County School District Three are, at a minimum, nonpublic forums, school districts and school boards cannot remove an author's book from school libraries because they disagree with the author's views. *See Pico*, 457 U.S. at 870–71. *See Weaver*, 181 F.4th at 375 (affirming standing for Author Plaintiff's claim of viewpoint discrimination in this case based on the allegations that "the Proviso discriminates against certain viewpoints as demonstrated by District Three's removal of *Stamped* from circulation in its schools and libraries after concluding that it was 'adverse' to the Proviso.").

255. However, as described above, School District Three Defendant systematically excluded certain viewpoints and perspectives from school libraries when it removed *Stamped* based on ideological objections to the book's messages and subject matter, rather than for pedagogical reasons.

256. The removal of *Stamped* from school libraries constitutes viewpoint discrimination in violation of the First Amendment because it interferes with Plaintiff Kendi's ability to make his books available to readers and to distribute constitutionally protected books.

257. School District Three Defendant's removal of *Stamped* was also not related to a legitimate government interest, nor was it tailored to achieve that interest, and fails any level of scrutiny.

## COUNT THREE

### FOURTEENTH AMENDMENT – DUE PROCESS
### VOID FOR VAGUENESS

(Student Plaintiffs Against Defendant Weaver and Author Plaintiff Against District Three Defendant)

258. Plaintiffs incorporate and re-allege each and every allegation contained above as if fully set forth herein.

259. The Due Process Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that "[no] state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. "As a matter of due process . . . [a]ll are entitled to be informed as to what the State commands or forbids." *Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 620 (1976) (internal quotations omitted). "The general test of vagueness applies with particular force in review of laws dealing with speech." *Id.* (internal quotations omitted). The test is stricter in the First Amendment context "to ensure that ambiguity does not chill protected speech." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012). Although plaintiffs are generally limited to enforcing their own rights, "standing requirements to challenge [a law] under the Fourteenth Amendment Due Process Clause are broader than they otherwise might be" when "the effect of a vague statute would infringe upon a party's First Amendment rights." *Arce v. Douglas*, 793 F.3d 968, 987 (9th Cir. 2015). *See also Maldonado v. Morales*, 556 F.3d 1037, 1044 (9th Cir. 2009); *Hynes*, 425 U.S. at 620.

260. The Budget Proviso is unconstitutionally vague because it fails to provide persons of ordinary intelligence fair notice of what is prohibited, and because it is so standardless that it authorizes or encourages discriminatory enforcement. *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

261. The Budget Proviso is "void for vagueness [because] its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

262. The Budget Proviso is void for vagueness in violation of the Fourteenth Amendment on its face and as applied to specific forms of expression in which the Author Plaintiff and Student Plaintiffs wish to engage.

263. The Budget Proviso prohibits certain categories of speech in South Carolina public schools, and it adversely impacts school employees' employment, including the threat of

employment suspension, increased surveillance of work, or other forms of professional discipline. School employees face adverse employment actions for not complying with the Budget Proviso's vague provisions. Indeed, one school employee received a letter of reprimand from administrators at her school. *See supra* ¶ 112. And another school employee has experienced increased surveillance of her work by school administrators, and by students and parents, who often complain about educators directly to school board members, resulting in the requested cancellation of several library initiatives. *See supra* ¶ 108.

264. The vagueness of the Budget Proviso's speech prohibitions has led to potential over-enforcement of its provisions and/or uneven enforcement across the state, resulting in the removal of a book about racism by Black authors, censorship of a high school argumentative writing lesson concerning equity and systemic racism, the removal of the AP AAS course code, and the elimination of a diverse language arts curriculum from dozens of schools across two school districts. Thus, Student Plaintiffs are unable to access certain information due to the vagueness of the Budget Proviso's provisions.

265. The Budget Proviso utilizes vague operative terms within its text and fails to define several operative terms, resulting in inadequate notice of what conduct or materials are prohibited by law. For example, the Budget Proviso does not define the terms "inculcate" or "Partisanship Curriculum," nor does it provide standards for identifying educational materials that are prohibited because they make someone "feel discomfort, guilt, anguish" or "fault, blame, or bias." *See supra* ¶¶ 92–98. This lack of clarity forces school employees to self-censor or risk adverse consequences. *See supra* ¶¶ 104–140. For example, Mayes preemptively removed the book *Flamer*, outside of the proscribed library material challenge process, out of an abundance of caution for fear of violating the vague Budget Proviso. *See supra* ¶ 108.

266. The vague Budget Proviso has a direct impact on the Student Plaintiffs' right to receive information. As a direct result of the removal of the previously offered AP AAS course, due to the Budget Proviso's lack of clarity, the Student Plaintiffs have been and will continue to be deprived of their First Amendment right to receive information and ideas that otherwise would be taught to them in South Carolina public schools. *See Arce*, 793 F.3d at 987 (holding that students had standing to raise a vagueness claim to a statute that did not apply to them but inhibited their right to receive information); *see also Pico*, 457 U.S. at 853, 866 ("[T]he State may not, consistently with the spirit of the First Amendment, contract the spectrum of available knowledge.").

267. The failure to properly define the contours of speech prohibited by the Budget Proviso equates to a failure to provide adequate notice of what speech is prohibited.

268. With such vague and undefined standards, school employees cannot know which of their activities, speech, or expression are prohibited by the Budget Proviso and are fearful of engaging in any speech or conduct that school districts could penalize. School employees are "forced to speculate as to what conduct is permissible and what conduct is proscribed" and forced to self-censor as a result. *Moore v. Gaston Cnty. Bd. of Educ.*, 357 F. Supp. 1037, 1040–41 (W.D.N.C. 1973). This self-censorship deprives Student Plaintiffs of their right to receive information free of impermissible reasons to censorship.

269. The lack of standards in the Budget Proviso also authorizes and encourages its enforcement in a discriminatory manner.

270. School District Defendant Three has also selectively enforced the Budget Proviso to prohibit the dissemination of *Stamped* in all classrooms, libraries, and media centers within the school district. For example, School District Three Defendant removed *Stamped* even though its

central message aligns with the purported goal of the Budget Proviso—*see supra* ¶¶ 174–175—demonstrating that School District Three Defendant targeted *Stamped* for ideological reasons. The Budget Proviso enables School District Three Defendant to do so because its vague language permits arbitrary and selective enforcement.

271. Indeed, Defendants have already selectively enforced the Budget Proviso to prohibit and discourage educational engagement related to the historical oppression of, or animus against, Black people because of their race, including discussions of slavery, lynchings, Jim Crow laws, segregation, White supremacy, unconscious bias, and systemic racism. For example, Defendant Weaver cancelled AP AAS across the state, while permitting AP courses focused on other ethnicities and cultures—such as Chinese Language and Culture; Spanish Literature; Japanese Language and Culture; and European History—to be taught. Further illustrating Defendant Weaver's arbitrary and discriminatory enforcement of the Budget Proviso is her endorsement of PragerU's unaccredited, partisan material, which is now available on SCDE's website. In addition, Wood's school district cancelled her lesson on systemic racism, and School District Three Defendant removed every copy of *Stamped* from circulation in the district. This kind of selective enforcement harms Black students, including Student Plaintiffs, in an attempt to protect the feelings or points of view of White students. *See supra* ¶¶ 161–168, 169–191.

## COUNT FOUR

### THE FOURTEENTH AMENDMENT—EQUAL PROTECTION DISCRIMINATORY INTENT AND EFFECT

(Student Plaintiffs Against Defendant Weaver and Author Plaintiff Against School District Three Defendant)

272. Plaintiffs incorporate and re-allege each and every allegation contained above as if fully set forth herein.

273. The Equal Protection Clause of the Fourteenth Amendment prohibits States from denying "any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This direction requires "all persons similarly situated [to] be treated alike." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 606 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

274. "The Supreme Court has explained that the 'central purpose' of the Equal Protection Clause is to 'prevent the States from purposefully discriminating between individuals on the basis of race.'" *Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 878 (4th Cir. 2023) (quoting *Shaw v. Reno*, 509 U.S. 630, 642 (1993)), *cert. denied*, 146 S. Ct. 541 (2024).

275. Defendants do not need to harbor racial animus, hatred, or animosity toward a protected class to act with discriminatory intent. *See N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 233 (4th Cir. 2016). Moreover, "an Equal Protection plaintiff need not establish that the challenged policy 'rested solely on discriminatory purposes,' or even that 'a particular purpose was the "dominant" or "primary" one.'" *Coal. for TJ*, 68 F.4th at 883 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). However, if a discriminatory purpose has been a motivating factor in the decision, judicial deference is no longer justified. *Id*. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266.

276. The Budget Proviso violates Equal Protection Plaintiffs' constitutional rights because (1) the Budget Proviso exacts a disproportionate impact on Black people, including Equal Protection Plaintiffs, and (2) that impact is traceable to Defendants' "invidious" discriminatory intent. *See Arlington Heights*, 429 U.S. at 264–65; *see also N.C. State Conf. of the NAACP v.*

*Raymond*, 981 F.3d 295, 302 (4th Cir. 2020); *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 543–44 (3d Cir. 2011).

277. Because legislation that "appears neutral on its face" may nonetheless be motivated by discrimination, the United States Supreme Court articulated several non-exhaustive factors to inform an analysis of discriminatory intent, including: (1) the historical background of the proviso; (2) the specific sequence of events leading up to the proviso's enactment; (3) any departures from the normal legislative process; and (4) legislative history, including "contemporary statements by members of the decision making body, minutes of its meetings, or reports." *See Arlington Heights*, 429 U.S. at 266–68.

278. Application of the *Arlington Heights* factors reveals that the Budget Proviso was enacted, in part, with the purpose to discriminate against students of color by chilling and suppressing speech aimed at enhancing the educational, social, and civic experiences of Black students and their families.

279. The historical background and specific sequence of events surrounding the enactment of the Budget Proviso are evidence of discriminatory intent. As described in detail above, public education in South Carolina has suppressed the complete and accurate histories of slavery, racism, race and sex-based discrimination, and Black-led movements for racial justice. *See supra* ¶¶ 36–43. Even despite an explicit state mandate to incorporate the experiences, cultures, and contributions of Black people in public education, *see supra* ¶¶ 37–40, South Carolina public schools failed to incorporate Black history sufficiently into public school history curricula. *See supra* ¶¶ 41–43. In fact, public officials denounced several concepts critical to understanding Black history and racial inequities in the state and beyond. *See supra* ¶¶ 54–63.

280. Leading up to the proviso's enactment, the South Carolina legislature introduced several Anti-CRT Bills which sought to censor racially inclusive history and classroom discussions about systemic racism, White privilege, and other race and gender bias issues in South Carolina schools. *See supra* ¶¶ 73–82. Several of these bills prohibited the same Discriminatory Concepts outlined in the Budget Proviso at issue. *See supra* ¶¶ 72–75. Legislators drafted and enacted this budgetary measure alongside repeated failures to advance the aforementioned bills through the normal legislative process. *See supra* ¶ 75.

281. The legislature's departure from the normal legislative process is evidence of discriminatory intent. In passing this budgetary measure, legislators ignored and circumvented public comment and public scrutiny by inserting the censorship of "Discriminatory Concepts" into the state budget. *See supra* ¶¶ 133–160. Students, educators, district leaders, and community members from across South Carolina vigorously opposed codifying censorship of the prohibited concepts because it would impose severe restrictions on educators' ability to teach—and students' ability to receive—historically accurate and racially inclusive curriculum about Black people's experiences in the United States and South Carolina. *See supra* ¶¶ 137–143, 146–152, 155–156. The South Carolina Legislature enacted the Budget Proviso despite repeated testimony from community members and statements from its own legislators regarding the proviso's likelihood of causing discrimination. *See supra* ¶¶ 146–152, 155–156.

282. The legislative history of the proviso, including multiple statements from legislators who supported the Budget Proviso, also demonstrates that the provision was advanced with an impermissible motive. *See supra* ¶¶ 78, 249. State legislators acknowledged that the Budget Proviso's prohibition of certain concepts from the classroom was identical to prohibitions in the Anti-CRT Bills that ultimately failed to become law. *See supra* ¶¶ 72–78. Moreover,

legislators' comments about the Anti-CRT Bills revealed the motivation behind the prohibition of Discriminatory Concepts in those bills, which was ultimately codified in the Budget Proviso. *Id.* Legislators admitted that they sought to ban critical race theory and other instruction on race and inequities from the classroom—not for pedagogical reasons, but to assuage their own discomfort and guilt. *See supra* ¶¶ 78–79, 207–216.

283. The Budget Proviso also purposefully discriminates against the Equal Protection Plaintiffs because, even if it is considered "impartial in appearance," it is applied unevenly based on race. *Coal. for TJ*, 68 F.4th at 879; *see Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886) (acknowledging that since "no reason for [the unequal treatment] is shown . . . the conclusion cannot be resisted that no reason for it exists except hostility to the race and nationality to which the petitioners belong, and which, in the eye of the law, is not justified"); *see also Shaw*, 509 U.S. at 649 ("[A] plaintiff challenging a reapportionment statute under the Equal Protection Clause may state a claim by alleging that the legislation, though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification.").

284. As set forth above, School District Three Defendant removed *Stamped* as part of a targeted effort to exclude speech by authors based on their race and to censor books written by Black authors and books that explore concepts about race. In addition to the removal of books from schools, the Budget Proviso also censors or limits the discussion and teaching of curriculum that includes the experiences and perspectives of Black people, including through Defendant Weaver's cancellation of the AP AAS course.

285. The book removals, curriculum restrictions, course cancellation, and any other related acts of censorship at issue are principally rooted in the fact that they discuss topics

pertaining to systemic inequalities and the need to dismantle those inequalities for the benefit of Black people and other people of color. School District Three Defendant's removal of *Stamped* even without a formal complaint being leveled against the book, and Defendant Weaver's removal of the AP AAS course without formal complaint or evaluation, are evidence of Defendants' targeting of books, authors, and curriculum related to addressing the ongoing discrimination experienced by Black people. Such removals stigmatize Black history and Black identity as "divisive."

286. Defendant Weaver's partnership with PragerU and endorsement of its materials further illustrate her discriminatory motivation in enforcing the Budget Proviso. PragerU has an express purpose to "indoctrinate" students with unaccredited, partisan educational materials that perpetuate falsehoods related to the historical oppression of, or animus against, particular groups of people based on race, color, and ethnicity.

## <u>COUNT FIVE</u>

### FOURTEENTH AMENDMENT—EQUAL PROTECTION SELECTIVE ENFORCEMENT

(Student Plaintiffs Against Defendant Weaver and Author Plaintiff Against School District Three Defendant)

287. Plaintiffs incorporate and re-allege each and every allegation contained above as if fully set forth herein.

288. Under the Equal Protection Clause of the Fourteenth Amendment, U.S. Const. amend. XIV, § 1, "all similarly situated persons" must be "treated alike" in the enforcement of the Budget Proviso. *Grimm*, 972 F.3d at 606 (quoting *City of Cleburne*, 473 U.S. at 439). Nevertheless, although the Budget Proviso does not expressly identify any specific race in the

prohibited Discriminatory Concepts, it is enforced with an interpretation that concerns one specific race, as opposed to all races equally.

289. Although the Budget Proviso is facially neutral, the language regarding emotional and psychological distress is "in fact applied unevenly based on race" in violation of the Equal Protection Clause of the Fourteenth Amendment. *See Coalition for TJ*, 68 F.4th at 879. As noted above, White legislators who support the Budget Proviso and Anti-CRT Bills expressed their own discomfort with critical race theory and classroom instruction that would expose White students to tragic historical events involving their ancestors or the ancestors of other White people in the United States. *See supra* ¶¶ 78, 207. These legislators recognized that such censorship would limit discussions related to slavery and restrict access to books and other resources about Black history.

290. The Budget Proviso is enforced with this interpretation, which is almost exclusively to the detriment of Black people.

291. The Budget Proviso, therefore, purposefully discriminates against the Equal Protection Plaintiffs because, even if it is considered "impartial in appearance," it is applied unevenly based on race. *Coal. for TJ*, 68 F.4th at 879; *see Yick Wo*, 118 U.S. at 356, 373–74 (acknowledging that since "no reason for [the unequal treatment] is shown . . . the conclusion cannot be resisted that no reason for it exists except hostility to the race and nationality to which the petitioners belong, and which, in the eye of the law, is not justified"); *see also Shaw*, 509 U.S. at 649 ("[A] plaintiff challenging a reapportionment statute under the Equal Protection Clause may state a claim by alleging that the legislation, though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification.").

## REQUEST FOR RELIEF

**WHEREFORE**, in light of the foregoing facts and arguments, Plaintiffs respectfully request that this Court:

A. Declare the Budget Proviso and any regulations promulgated thereunder unconstitutional for being void for vagueness in violation of the Fourteenth Amendment to the United States Constitution;

B. Declare the Budget Proviso and any regulations promulgated thereunder unconstitutional for being intentionally discriminatory in violation of the Fourteenth Amendment to the United States Constitution;

C. Declare that the Budget Proviso and any regulations promulgated thereunder has been enforced in a manner that constitutes intentional discrimination in violation of the Fourteenth Amendment to the United States Constitution;

D. Declare the Budget Proviso and any regulations promulgated thereunder unconstitutional for impeding public school students' right to receive information in violation of the First Amendment to the United States Constitution;

E. Declare the Budget Proviso and any regulations promulgated thereunder unconstitutional for censoring Plaintiff Ibram Kendi's viewpoint in violation of the First Amendment to the United States Constitution;

F. Issue preliminary and permanent injunctive relief restraining Defendants from enforcing the Budget Proviso and any regulations promulgated thereunder;

G. Issue preliminary and permanent injunctive relief restraining Defendants from engaging in activities that would constitute enforcement of the Budget Proviso and any regulation promulgated thereunder;

H. In the alternative, issue preliminary and permanent relief restraining Defendants from interpreting the Budget Proviso and regulations promulgated thereunder in a manner that prohibits or deters educating South Carolina public school students about the nature, substance, history, relevant theories and/or ideas, subject matter, events, and concerns relating or pertaining to sex, gender identity, sexual orientation, race, creed, color, or ethnicity, past or present;

I. Require Defendant Weaver to immediately reinstate the AP African American Studies course code to allow high school students to enroll in the course for the 2026–2027 school year;

J. Require School District Three Defendant to lift the ban on *Stamped: Racism, Antiracism, and You*, by Plaintiff Kendi and Jason Reynolds, and make the book immediately available in all facilities and locations where it was previously available, including classrooms, libraries, and media centers;

K. Award Plaintiffs' costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1988; and

L. Grant such additional relief as the interests of justice may require.

Dated: September 18, 2026

Respectfully submitted,

*/s/ Santino Coleman*
Santino Coleman, Fed. ID 11914
Charles McLaurin*
Kacey Mordecai
Jason Bailey
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street N.W., Ste. 600
Washington, D.C. 20005
Tel: (202) 682-1300
Fax: (202) 682-1312
scoleman@naacpldf.org
cmclaurin@naacpldf.org
kmordecai@naacpldf.org
jbailey@naacpldf.org

Tyler D. Bailey, Fed. ID 12294
BAILEY LAW FIRM, LLC
1430 Richland St.
Columbia, SC 29201
Tel: (803) 667-9706
tyler@baileylawfirmsc.com

Debo P. Adegbile**
Thais Ridgeway**
250 Greenwich Street
New York, NY 10007
Tel: (212) 295-6615
Fax: (212) 230-8888
debo.adegbile@wilmerhale.com
thais.ridgeway@wilmerhale.com

Lauren Moore**
2100 Pennsylvania Avenue NW
Washington, DC 20037 USA
Tel: 202-663-6160
Fax: 202-663-6363
Lauren.Moore@wilmerhale.com

Lydia Bailey**
50 California Street
San Francisco, CA 94111 USA
Tel: 628-235-1104
Fax: 415-278-8367

Lydia.Bailey@wilmerhale.com

*Admitted *pro hac vice*
****Pro Hac Vice** application forthcoming
**COUNSEL FOR PLAINTIFFS**